RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| TODD FENER, | ) | No. |
|  | ) |  |
| Plaintiff, | ) | CLASS ACTION COMPLAINT FOR |
|  | ) | VIOLATIONS OF FEDERAL SECURITIES |
| vs. | ) | LAWS |
|  | ) |  |
| ASPEN TECHNOLOGY, INC., LAWRENCE | ) | JURY TRIAL DEMANDED |
| B. EVANS, LISA W. ZAPPALA, DAVID L. | ) |  |
| MCQUILLIN AND CHARLES F. KANE, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

MAGISTRATE JUDGE _____

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Aspen Technology, Inc. ("AspenTech" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of purchasers of the common stock of AspenTech between August 8, 2000 and October 29, 2004, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

5.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Todd Fener, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of AspenTech at artificially inflated prices during the Class Period and has been damaged thereby.

7.      (a)      Defendant AspenTech is a Delaware corporation with its principal place of business located at Ten Canal Park Cambridge, Massachusetts 02141.  The Company supplies software products and services for the analysis, design and automation of process manufacturing

- 2 -

facilities. The Company's software and services are used by companies in the chemical, petroleum, pharmaceuticals, pulp and paper, and metal industries.

(b)    Defendant Lawrence B. Evans ("Evans") is, and was at all relevant times, AspenTech's Chairman and was its Chief Executive Officer ("CEO") from the beginning of the Class Period to October 1, 2002.

(c)    Defendant Lisa W. Zappala ("Zappala") was AspenTech's Chief Financial Officer ("CFO") from the beginning of the Class Period to July 1, 2003.

(d)    Defendant David L. McQuillin ("McQuillin") has been AspenTech's President and CEO since October 1, 2002.

(e)    Defendant Charles F. Kane ("Kane") has been AspenTech's CFO since July 1, 2003.

(f)    Defendants Evans, Zappala, McQuillin and Kane are collectively referred to herein as the "Individual Defendants."

8.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

9.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the

- 3 -

narrowly defined group of defendants identified above. Each of the above officers of AspenTech, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

10.    As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

11.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of

- 4 -

their Board membership and/or executive and managerial positions with AspenTech, each of the Individual Defendants had access to the adverse undisclosed information about AspenTech's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about AspenTech and its business issued or adopted by the Company materially false and misleading.

12.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

13.    Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AspenTech common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding AspenTech's business, operations, management and the intrinsic value of AspenTech common stock; (ii) enabled the Company to acquire ICARUS Corp. using its artificially inflated shares as partial consideration; (iii) enabled the Company to complete a private placement of its common stock for gross proceeds of approximately $30 million; (iv) enabled the Company to complete a private placement of its common stock for gross proceeds of approximately $50 million and use those proceeds to acquire Hyprotech Ltd.; (v)

enabled the Company to sign a definitive agreement for $100 million in private equity financing on favorable terms; and (vi) caused plaintiff and other members of the Class to purchase AspenTech's common stock at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of AspenTech between August 8, 2000 and October 29, 2004, inclusive ("the Class") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AspenTech common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AspenTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

- 6 -

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AspenTech; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

20.    Defendant AspenTech describes itself as the "leading supplier of integrated software and services to the process industries, which consist of oil and gas, petroleum, chemicals, pharmaceuticals and other industries that manufacture and produce products from a chemical process." The Company develops and markets software and services to companies in the process industries.

21.    Throughout the Class Period, defendants issued numerous positive statements and filed quarterly reports with the SEC which described the Company's increasing financial performance. These statements were materially false and misleading because they failed to disclose

- 7 -

and misrepresented the following adverse facts, among others: (i) that the Company had improperly and prematurely recognized revenue for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000-2002 and possibly other periods; (ii) that the Company lacked adequate internal controls and was therefore unable to ascertain its true financial condition; and (iii) that as a result of the foregoing, the values of the Company's revenues, earnings, assets and/or liabilities for fiscal years 2000-2002 and possibly other periods were materially overstated and may have to be restated.

22.     On October 27, 2004, the Company shocked the market when it issued a press release announcing that its Audit Committee had undertaken a detailed review of the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000-2002. The Committee is reassessing the time periods in which revenue was recognized for these transactions and whether any of these transactions have prior or current material financial statement impact. The review could lead to a restatement. The press release continued, in pertinent part, as follows:

> Based on its preliminary review to date, the Audit Committee believes that one software license transaction in fiscal third quarter 2000 and two transactions in fiscal second quarter 2001 were included in AspenTech's results for such periods without reflecting the impacts of associated arrangements between AspenTech and those customers, which may require revised accounting treatment.

> The Committee has also identified a potential contingency associated with a fourth transaction recorded in the fourth fiscal quarter of 2001 which was not reflected in prior accounting, which may require revised accounting treatment.

23.     Upon this shocking news, on October 28, 2004, shares of the Company's stock fell to an intraday low of \$5.50 per share, or approximately 20%, before closing at \$6.68 per share, on unusually heavy trading volume.

24.     Then, on October 29, 2004, the Company announced that federal prosecutors launched a probe into the Company's accounting practices from 2000 through 2002. The Company

said it received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents relating to transactions that it entered into during those years, and other documents dating from January 1, 1999.

25.    Upon this shocking news, shares of the Company's stock fell an additional $0.67, or approximately 10%, to close at $6.01, on unusually heavy trading volume.

26.    Prior to disclosing these adverse facts to the investing public, AspenTech: (i) acquired ICARUS Corp. using its overvalued shares as partial consideration; (ii) completed a private placement of its common stock for gross proceeds of approximately $30 million; (iii) completed a private placement of its common stock for gross proceeds of approximately $50 million and used those proceeds to acquire Hyprotech Ltd.; and (iv) enabled the Company to sign a definitive agreement for $100 million in private equity financing on favorable terms.

## Materially False and Misleading
## Statements Issued During The Class Period

27.    The Class Period begins on August 8, 2000. On that day, AspenTech issued a press release announcing its financial results for the fourth quarter and year end of fiscal 2000, the period ending June 30, 2000. For the fiscal year, excluding one-time charges, AspenTech reported total revenues of $268.1 million and net income of $6.5 million or $0.21 per diluted share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> We are pleased to have exceeded our goals for both growth and profitability in the fourth quarter and fiscal year. The rapid growth in our license revenues continued to be driven by strong demand for our integrated Enterprise Optimization(TM) and supply chain solutions, as process manufacturers increasingly invest in technology to improve their manufacturing productivity and optimize their supply chains. We are unique in the industry as the only company with a proven integrated solution, and our domain expertise and process knowledge enable us to deploy mission-critical solutions that other vendors cannot provide.
>
> In the fourth quarter, we saw good strength across multiple process industry sectors, geographies, and product offerings. In addition to a number of significant fourth quarter Enterprise Optimization transactions, we won a highly competitive,

enterprise-wide supply chain deal with BP Chemicals, as well as several other large supply chain deals, extending our position as the market leader for process industry supply chain implementations. We are pleased with the performance of our supply chain solutions this past year, where license revenue more than doubled, and we are excited about our prospects for the year ahead.

As we move into fiscal 2001, we believe we are strategically positioned to provide critical technologies that will allow process manufacturers to seamlessly link to digital e-marketplaces and participate in direct materials procurement over the Internet. In this way, we are confident we can offer a customer annual savings that will often exceed tens of millions of dollars by streamlining their business processes and optimizing their operations.

28.     AspenTech's financial results for the fourth quarter and year end of 2000, the period

ending June 30, 2000, were repeated in the Company's Report on Form 10-K405 filed with the SEC

on or about September 28, 2000, which was signed by defendants Evans and Zappala, among others.

Concerning the Company's revenue recognition policies, the 10-K405 stated, in pertinent part, as

follows:

License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and

training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

29.     On September 5, 2000, the Company announced that it closed a transaction to acquire

ICARUS Corporation, the market leader in providing software that is used by the process

manufacturing industries to estimate plant capital costs and evaluate project economics for $24.5

million in a combination of cash and stock.

30.     On October 24, 2000, AspenTech issued a press release announcing its financial

results for the first quarter of fiscal 2001, the period ending September 30, 2000.  For the quarter, the

Company reported total revenues of $69.5 million and, excluding the one-time in-process research

and development charge, the Company reported a net loss of $0.2 million or $0.01 per share.

Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> Our supply chain solutions were a primary driver of our growth in the first quarter, as we won a number of important deals in our target markets. In addition, we saw a strong contribution from our Aspen Engineering Suite.  We are also continuing to gain momentum in the process industries as the only e-business software vendor with an end-to-end solution that integrates all facets of a corporation and its extended enterprise, from the digital marketplace to the plant floor.
>
> In the first quarter, we announced several important initiatives to help our customers address the critical areas of their e-business strategies: improve their internal processes with our infrastructure solutions such as Plantelligence and eSupply Chain suite, connect seamlessly to e-marketplaces using our netmarket solution and tie in external business partners through our B2B Foundation solution.

31.     AspenTech's financial results for the first quarter of fiscal 2001, the period ending

September 30, 2000, were repeated in the Company's Report on Form 10-Q filed with the SEC on

or about November 14, 2000, which was signed by defendant Zappala. Concerning the Company's

recognition policies, the 10-Q stated, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally

- 11 -

recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

32.    On January 24, 2001, AspenTech issued a press release announcing its financial results for the second quarter of fiscal 2001, the period ending December 31, 2000. For the quarter, the Company reported total revenues of $81.7 million and, excluding amortization of goodwill, in-process research and development and write-off of investments, net income of $3.1 million, or $0.10 per diluted share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

We were pleased to see continued strong license revenue growth this quarter across a broad base of business. Our supply chain and engineering applications were the largest contributors in the quarter, with the petroleum sector again being the strongest segment of our end-user customer markets. Services revenue and profitability showed dramatic year-over-year improvement as a result of investments we have made to expand our supply chain implementation capacity and productivity.

We are steadily gaining market share among process manufacturers worldwide as customers continue to standardize on our best-in-class technologies and recognize our differentiated position in the industry. As we move into the second half of the fiscal year, we are excited about our growth prospects and the opportunity to enhance our position as the leading e- business solutions provider for the process industries.

33.     AspenTech's financial results for the second quarter of fiscal 2001, the period ending

December 31, 2000, were repeated in the Company's Report on Form 10-Q filed with the SEC on or

about February 14, 2001, which was signed by defendant Zappala. Concerning the Company's

revenue recognition policies, the 10-Q stated, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.
>
> Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

34.     On April 24, 2001, AspenTech issued a press release announcing its financial results

for the third quarter of fiscal 2001, the period ending March 31, 2001. For the quarter, the Company

reported total revenues of $76.4 million and, excluding expenses relating to PetroVantage and amortization of goodwill, an AspenTech subsidiary providing software to optimize the trading and logistics of crude oil and refined products, a pro forma net loss of $3.2 million or $0.11 per basic share. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

> We saw a number of customers make significant investments in our technology during the quarter because of the tremendous value our solutions provide, closing ten deals that were greater than $1 million with customers such as Air Liquide, ConAgra Beef, Dupont, Mitsui Chemicals and PetroCanada. However, due to the uncertainty surrounding the economy, we saw a number of customers delay making software purchasing decisions at the end of March, which caused a shortfall in license revenues.

> In response to the current economic environment, we are taking steps to reduce our expenses, which we believe will help us to return to profitability in the near-term. We will continue to focus on initiatives that will drive our future growth, further our technology leadership position and advance our excellence in customer support. We expect to resume higher levels of investment when growth rates return to more attractive levels. Over the long term, AspenTech remains strategically positioned to deliver solutions that drive extraordinary value for our customers in the process industries because of the breadth of our solutions, our unparalleled domain expertise and the dramatic and the proven returns-on-investment our technology provides.

35.    AspenTech's financial results for the third quarter of fiscal 2001, the period ending March 31, 2001, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2001, which was signed by defendant Zappala. Concerning the Company's revenue recognition policies, the 10-Q stated, in pertinent part, as follows:

> License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor specific objective evidence (VSOE) exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established

- 14 -

by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

36.     On August 7, 2001, AspenTech issued a press release announcing its financial results

for the fourth quarter and year end of 2001, the period ending June 30, 2001. For the quarter, the

Company reported total revenues of $83.0 million and, excluding charges and expenses relating to

PetroVantage, the company's wholly owned subsidiary providing software to optimize the trading

and logistics of crude oil and refined products, pro forma net income of $0.4 million or $0.01 per

diluted share. Defendant Evans commented on the Company's performance, stating, in pertinent

part, as follows:

- 15 -

We are pleased to have exceeded expectations for both revenues and profitability this quarter in what remains a very difficult environment. During the quarter, we solidified our leadership position in the process industries with the launch of Aspen ProfitAdvantage(TM), which focuses on profit improvement strategies for our customers, and the creation a new alliance with Accenture. In addition, Rohm & Haas standardized on our manufacturing and supply chain planning technologies and we closed significant multimillion dollar transactions with Jacobs Engineering, Pemex, SASOL in South Africa, Valero Refining and Yukos, a large Russian oil company. However, we continued to see customers delay software purchases at the end of the quarter, which limits our near-term visibility.

In light of economic uncertainties, we anticipate making additional expense reductions to improve our efficiency and return to profitability as soon as possible. These actions include reducing our worldwide workforce, which numbered 1,900 at the end of June, by approximately 5 percent. Our management team has valuable experience executing in difficult environments, which we believe will help us to maintain our leadership in providing enterprise-wide software solutions to process manufacturers.

37.    AspenTech's financial results for the fourth quarter and year end of fiscal 2001, the

period ending June 30, 2001, were repeated in the Company's Report on Form 10-K filed with the

SEC on or about September 28, 2001, which was signed by defendants Evans and Zappala, among

others. Concerning the Company's revenue recognition policies, the 10-Q stated, in pertinent part,

as follows:

Revenue Recognition

The Company recognizes revenue in accordance with Statement of Position (SOP) No. 97-2, "Software Revenue Recognition," as amended and interpreted. License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual

method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

38.    On October 25, 2001, AspenTech issued a press release announcing its financial results for the first quarter of fiscal 2002, the period ending September 30, 2001. For the quarter, the Company reported total revenues of $61.2 million, with services revenues of $42.0 million and license revenues of $19.2 million, and a pro forma loss of $12.5 million or $0.39 per share, which excludes a one-time restructuring charge. Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

An uncertain economic environment, combined with the impact of the September 11th attacks, negatively affected our close rate for a number of software license deals at the end of September. Due to slower activity during the summer months, a larger portion of our first quarter revenues close in September, which made last month's terrorist attacks particularly disruptive to several end-of-quarter transactions in an

already challenging business climate. Fortunately, these license delays were largely offset by stronger-than-expected services revenues, where we continued to maintain gross margins in excess of forty percent, and by carefully controlled spending.

Some of our largest customers have expressed intentions to close significant license transactions in the second quarter. These indications make us cautiously optimistic, as customers focus on spending year-end budget surpluses in an environment where some of our end-user markets are showing early signs of stabilizing. We believe that stronger license revenues and continued operating efficiencies from our previously announced cost-cutting efforts will enable us to approach breakeven operations in the second quarter.

Defendant Zappala added, in pertinent part, as follows:

Our strong services revenue and expanding services backlog, which increased to $125 million this quarter, are indicative of continued investment by our customers in our solutions. This investment gives us confidence that demand for our software solutions will improve in the coming months, as these major transactions are evidence of the compelling return on investment that AspenTech's solutions provide.

39.     AspenTech's financial results for the first quarter of fiscal 2002, the period ending

September 30, 2001, were repeated in the Company's Report on Form 10-Q filed with the SEC on or

about November 14, 2001, which was signed by defendant Zappala. Concerning the Company's

revenue recognition policies, the 10-Q stated, in pertinent part, as follows:

The Company recognizes revenue in accordance with Statement of Position (SOP) No. 97-2, "Software Revenue Recognition," as amended and interpreted. License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has

- 18 -

established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

40.    On January 23, 2002, AspenTech issued a press release announcing its financial results for the second quarter of fiscal 2002, the period ending December 31, 2001. For the quarter, the Company reported total revenues of $81.9 million and earnings per share, excluding expenses of the PetroVantage investment, of $0.06 in the quarter.  Defendant Evans commented on the Company's performance, stating, in pertinent part, as follows:

In spite of an economy that continues to be challenging, I am very pleased with our performance this quarter as revenue growth significantly exceeded our expectations. A key factor in this performance was a significant rebound in our business from the chemicals industry, as customers made major investments in our solutions to improve their productivity and profitability. In addition to the chemicals industry, continued strength in the petroleum and pharmaceutical sectors enabled us to achieve a greater revenue contribution from larger license transactions, which had not occurred in the past few quarters.

- 19 -

We were also pleased with our transaction with Dow Chemical, which represents a milestone agreement for AspenTech, as Dow looks to leverage its ERP investment and improve its manufacturing efficiency. We believe that this agreement validates the strength of our solution for enabling process manufacturers to integrate their manufacturing processes with their enterprise-wide supply chains. As we look ahead, we remain confident about our prospects in the coming quarters and we believe we are well-positioned for growth and profitability.

41.    AspenTech's financial results for the second quarter of fiscal 2002, the period ending

December 31, 2001, were repeated in the Company's Report on Form 10-Q filed with the SEC on or

about February 14, 2002, which was signed by defendant Zappala. Concerning the Company's

revenue recognition policies, the 10-Q stated, in pertinent part, as follows:

> License revenue, including license renewals, consists primarily of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customer when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probably that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license agreements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair market value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.
>
> Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The

Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

42.    On February 7, 2002, the Company issued a press release announcing that it had

completed a private placement of redeemable convertible preferred stock from which the Company

received gross proceeds of $30.0 million.

43.    On April 25, 2002, AspenTech issued a press release announcing its financial results

for the third quarter of fiscal 2002, the period ending March 31, 2002. For the quarter, the Company

reported total revenues of $83.5 million and an operating loss of $6.9 million, resulting in a pro

forma loss of $0.15 per diluted share. Defendant Evans commented on the Company's performance,

stating, in pertinent part, as follows:

We are one hundred percent committed to doing whatever it takes to restore AspenTech to sustained profitability. Due to the current economic environment, we have taken difficult, but necessary, short-term actions that should enable us to make money in the current quarter. Our fourth quarter is seasonally our strongest and we possess a robust pipeline of sales opportunities that we believe will close by the end of June.

In addition, we have implemented a number of strategic and tactical programs that we believe will enhance our profitability longer-term. In recent months, we have significantly strengthened our balance sheet and expanded our partner relationship with Accenture to deliver enterprise-wide software solutions. Our product offering, competitive position and the value we deliver to our customers have never been stronger. Given these factors, we feel confident that in a moderate economic expansion our revenue and earnings growth will provide investors attractive returns.