UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re ASPEN TECHNOLOGY, INC.<br>SECURITIES LITIGATION | ) ) ) | Master File No. 04-cv-12375-JLT |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) | |
| ALL ACTIONS. | ) ) | |
| | ) | |

CONSOLIDATED AMENDED COMPLAINT

Lead Plaintiffs City of Roseville Employees' Retirement System and Operating Engineers Construction Industry and Miscellaneous Pension Fund (Local 66) (the "Lead Plaintiffs" or "Plaintiffs") have alleged the following based upon the investigation of their counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Aspen Technology, Inc. ("Aspen" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, interviews with former employees of Aspen and media reports about the Company, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of purchasers of the common stock of Aspen between December 7, 1999 and March 15, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Defendant Aspen supplies software products and services for the analysis, design and automation of process manufacturing facilities. The Company's software and services are used by companies in the chemical, petroleum, pharmaceuticals, pulp and paper, and metal industries.

3.    As detailed herein, Aspen has admitted that its financial statements for fiscal years 2000-2004 were materially false and misleading when issued and has restated those financial statements.  The Company has further admitted that it engaged in the following improper accounting practices which served to artificially inflate and/or distort its reported financial results:

> **Side Agreements**: Aspen entered into side agreements which changed the terms of sales agreements so that it could prematurely recognize revenue.

> **Consignment Sales**: Aspen improperly recognized software license revenue on consignment sales.  In this regard Aspen prematurely recorded revenue on the delivery of software licenses that were nothing more than consignment arrangements.

**Recognizing Revenue Before It Was Earned**: Aspen recognized unearned software license revenue. Aspen recognized revenue of software licenses before it had substantially performed its sales arrangement obligations entitling it to the benefits represented by the revenues.

**Improperly Recognizing Maintenance Revenue**: Aspen improperly recognized maintenance revenue through a variety of manipulations designed to allow it to prematurely record revenue.

4.     Aspen's improper accounting was orchestrated at the highest levels of the Company. Indeed, as detailed herein, according to former employees of Aspen, defendant Lawrence B. Evans ("Evans"), a co-founder of Aspen and its CEO until October 2003 referred to certain of Aspen's improper earnings management practices as keeping revenues "in the freezer." Defendant David L. McQuillin ("McQuillin"), who prior to serving as Aspen's President and CEO served as Aspen's head of sales inquired of the Company's sales forces "how do I orchestrate the deals to get the stock price up?" As Aspen's accounting scandal became known, both Defendant Evans and McQuillin were either forced out of Aspen or eased out of their positions.

5.     Aspen's accounting fraud came to light in a series of announcements starting in October 2004. On October 27, 2004, Aspen announced that its Audit Committee had undertaken a "detailed review" of the accounting for certain software and licensing service agreements and that as a result of that review it would not be able to release its financial results for its first quarter. Two days later, on October 29, 2004, Aspen announced that federal prosecutors had launched a probe of the Company's accounting practices. On November 18, 2004, Aspen announced that due to the delay in filing its Form 10-Q for the period ending September 30, 2004, it had received a letter from The NASDAQ Stock market indicating that the Company's common stock was subject to delisting. Then, on November 24, 2004, Aspen issued a press release announcing that its Audit Committee believed that the Company would have to restate its financial statements for fiscal years 2000 through 2004 and, accordingly, those financial statements should not be relied on. Aspen also

- 2 -

announced that its Board of Directors had asked McQuillin to resign his positions with the Company immediately. On January 31, 2005, Aspen announced that its Audit Committee had completed its work and had identified sixteen transactions that were entered into during fiscal years 2000 through 2002 which were improperly accounted for. Finally, on March 15, 2005, Aspen filed an amended Form 10-K for the year ended June 30, 2004, with the SEC (the "Amended 2004 10-K"). In the Amended 2004 10-K, Aspen detailed the full extent of its improper accounting and set forth restated financial figures. In response to these announcements, the price of Aspen stock declined significantly. Plaintiffs and the other members of the Class were damaged by purchasing Aspen stock at artificially inflated prices which declined once the true facts about the Company and its improper accounting practice became known to the market.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

8.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as and many of the acts and practices complained of herein occurred in substantial part in this District.

9.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.    (a)    Plaintiff City of Roseville Employees' Retirement System, as set forth in its certification filed previously with the Court and incorporated herein by reference, purchased Aspen Tech common stock during the Class Period and lost $470,613.84 on those purchases.

(b)    Plaintiff Operating Engineers Construction Industry and Miscellaneous Pension Fund, as set forth in its certification filed previously with the Court and incorporated herein by reference, purchased Aspen Tech common stock during the Class Period and lost $806,030.99 on those purchases.

11.    Defendant Aspen is a Delaware corporation with its principal place of business located at Ten Canal Park Cambridge, Massachusetts, 02141.  The Company supplies software products and services for the analysis, design and automation of process manufacturing facilities. The Company's software and services are used by companies in the chemical, petroleum, pharmaceuticals, pulp and paper, and metal industries.

12.    Defendant Evans served as Aspen's Chairman and was its Chief Executive Officer ("CEO") at all times relevant hereto until October 1, 2002, when he was replaced as CEO by McQuillin.  Evans resigned his position as Chairman shortly after the revelation of Aspen's improper accounting.

13.    Defendant Lisa W. Zappala ("Zappala") served as Aspen's Chief Financial Officer ("CFO") from the beginning of the Class Period to July 1, 2003.

14.    Defendant David L. McQuillin ("McQuillin") served as Aspen's President and CEO from October 1, 2002 to November 24, 2004, when he was forced out of his positions by Aspen's Board of Directors.

15.    Defendant Charles F. Kane ("Kane") has been Aspen's CFO since July 1, 2003.

- 4 -

16.     Defendants Evans, Zappala, McQuillin and Kane are collectively referred to herein as the "Individual Defendants."

17.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

18.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Aspen, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

19.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the

NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Aspen, each of the Individual Defendants had access to the adverse undisclosed information about Aspen's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Aspen and its business issued or adopted by the Company materially false and misleading.

21.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is

responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.     Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Aspen common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Aspen's business, financial statements, operations, management and the intrinsic value of Aspen common stock; (ii) enabled the Company to acquire ICARUS Corp. using its artificially inflated common stock as partial consideration; (iii) enabled the Company to complete a private placement of its common stock for gross proceeds of approximately $30 million; (iv) enabled the Company to complete a private placement of its common stock for gross proceeds of approximately $50 million, which were used for a significant corporate acquisition; (v) enabled the Company to obtain $100 million in private equity financing on more favorable terms than it otherwise would have received had the truth been known; and (vi) caused Plaintiffs and other members of the Class to purchase Aspen's common stock at artificially inflated prices.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

23.     Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of Aspen between December 7, 1999, and March 15, 2005, inclusive ("the Class") and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Aspen common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Aspen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

26.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

        (a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

        (b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Aspen; and

        (c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Aspen Admits that Its Financial Statements for Fiscal Years 2000-2004 Were Materially False and Misleading When Issued

29.    Defendant Aspen describes itself as the "leading supplier of integrated software and services to process industries, which consist of oil and gas, petroleum, chemicals, pharmaceuticals and other industries that manufacture and produce products from a chemical process."  In addition, according to the Company's SEC filings, Aspen offers system implementation, advanced process control, real-time optimization and other consulting services through its staff of project engineers.

30.    On March 15, 2005, the Company filed the Amended 2004 10-K with the SEC.  In the Amended 2004 10-K, Aspen advised that its previous SEC filings for the years 1999, 2000, 2001, 2002, 2003 and 2004, as well as the quarterly reports in these years filed on Form 10-Q, could not be relied upon.  The Form 10-K stated in pertinent part as follows:

> This Amendment . . . is being filed for the purpose of restating our consolidated balance sheets as of June 30, 2003 and 2004 and consolidated statements of operations, statements of stockholders' equity and comprehensive income (loss), statements of cash flows and related disclosures for the years ended June 30, 2002, 2003 and 2004.

> We have not amended our Annual Reports on Form 10−K for the fiscal years ended June 30, 1999, 2000, 2001, 2002, or 2003, or our Quarterly Reports on Form 10−Q for the quarterly periods included in these fiscal years, that reflect the effects of the restatement.  ***The information that has been previously filed or otherwise reported for these periods . . . should not be relied upon.***  [Emphasis added.]

The following chart illustrates the magnitude of the restatement on Aspen's operating (pre-tax) earnings and net (after-tax) earnings:

| Net Income (Loss) Applicable To Common Shareholders | As Reported ($1,000s) | As Restated ($1,000s) | % Overstated (Understated) |
|---|---|---|---|
| Fiscal 1999 | ($ 20,795) | ($ 27,595) | (24.6)% |
| Fiscal 2000 | $ 5,428 | ($ 3,226) | nm* |
| Fiscal 2001 | ($ 20,375) | ($ 36,809) | (44.7)% |
| Fiscal 2002 | ($ 83,466) | ($ 82,298) | 1.4% |
| Fiscal 2003 | ($ 170,017) | ($ 148,398) | 14.6% |
| Fiscal 2004 | ($ 35,048) | ($ 28,164) | 24.4% |
| Operating Income (Loss) | As Reported ($1,000s) | As Restated ($1,000s) | % Overstated (Understated) |
| Fiscal 1999 | N/A** | N/A | N/A |
| Fiscal 2000 | $ 3,582 | ($ 4,218) | nm |
| Fiscal 2001 | ($ 29,575) | ($ 44,347) | (33.3)% |
| Fiscal 2002 | ($ 66,122) | ($ 62,503) | 5.8% |
| Fiscal 2003 | ($ 161,590) | ($ 138,488) | 16.7% |
| Fiscal 2004 | ($ 11,918) | ($ 4,167) | 186.0% |
| * not meaningful ** Aspen has not made this information available. | | | |

31.     In the Amended 2004 10-K, Aspen admitted that the restatement was the result of a variety of improper accounting practices as follows:

(a)    **Aspen improperly recognized revenue on software license revenue that**

**was "outside of contractual terms"**

> Aspen's employees entered into side agreements (*i.e.*, verbal, written, letter, and/or electronic correspondence) which altered the terms of its sales arrangements so that Aspen could prematurely recognize revenue. As noted in the SEC's SAB No. 101, companies need to create and maintain internal controls sufficient to ensure that any agreements or alterations to sales contracts by "side agreements" are properly recognized.

(b)    **Aspen improperly recognized software license revenue on consignment**

**sales**

> As noted in SAB No. 101, consignment arrangements are not sales and do not qualify for revenue recognition because the seller retains the risks and rewards of ownership of the product shipped. Nonetheless, Aspen prematurely recorded revenue on the delivery of software licenses that were nothing more than consignment arrangements.

(c)    **Aspen recognized unearned software license revenue**

> In violation of GAAP and its stated accounting policies, Aspen recognized revenue of software licenses before it had substantially performed its sales arrangement obligations entitling it to the benefits represented by the revenues (*i.e.*, Aspen's software required significant production, modification or customization at the time revenue was recognized).

(d)    **Aspen improperly recognized maintenance revenue**

> In violation of GAAP and its own policies, Aspen improperly recognized revenue of maintenance services when: (a) it assigned an unfair value to the service component of a software arrangement; (b) its employees entered into side agreements to prematurely recognize maintenance revenue; and (c) it recognized maintenance revenue before Aspen assessed a customer's creditworthiness and/or the customer accepted the sales arrangement with Aspen.

32.    Aspen restated its financial statements for each of the six consecutive years ending

June 30, 2004. In so doing, Aspen has made the determination that such financial statements were

materially misstated because GAAP provides that only previously issued financial statements which

are materially misstated are to be retroactively restated.  *See* Accounting Principles Board ("APB") Opinion No. 20.

33.     Defendants knew of Aspen's improper accounting practices or recklessly disregarded them.  According to numerous former Aspen employees, Aspen's accounting fraud was known at the highest levels of the Company.

34.     According to CI 1,[1] a former Aspen sales manager, "there were certainly more than sixteen deals that were shady."  CI 1 specifically identified three licensing transactions – Aeris Tech Chemicals, Star Enterprises and Union Carbide – as examples where Defendants' intentionally delayed the recognition of revenue on transactions so that Aspen could report sales as needed to stabilize Aspen's quarterly earnings and meet Wall Street estimates.  With respect to the Union Carbide transaction, CI 1 recalled that in a December 1999 sales meeting ***defendant McQuillin stated that "we are going to keep this [Union Carbide revenue] in the freezer" in order to "smooth out the numbers."***  Aspen publicly announced the Union Carbide license transaction on December 7, 1999, the first day of the Class Period.  *See* ¶42.  CI 1 further stated that defendant McQuillin stated in several sales meetings that "my stock options are getting too low and we need to get them up," and "***how do I orchestrate the deals to get the stock price up?***"

_____

[1] CI 1 was employed by Aspen from March 1998 until April 2001.  CI 1 was based in Aspen's Houston, TX office and reported directly to Lance Edwards, Vice President of the Oil & Gas Sales Division.  Edwards in turn reported to John Heg.  CI 1 also had reporting responsibilities to Ron Chandler, who also was a sales manager.  Chandler reported to Jack Leahy who in turn reported to defendant McQuillin.  During CI 1's tenure McQuillin was Aspen's Executive Vice President of Worldwide Sales and Marketing and Co-Chief Operating Officer.  Plaintiffs' allegations herein are based upon CI 1's personal knowledge of the subjects discussed at regularly scheduled sales department meetings attended by CI 1 and defendant McQuillin.

35.    CI 2,[2] a former director of business development, confirmed that Defendants improperly managed Aspen's reported earnings. CI 2 stated that both defendants Evans and McQuillin euphemistically referred to this practice as keeping revenues "in the freezer."

36.    CI 1 also stated that, in most instances during his tenure with the Company (from 1998 through 2001), Aspen's senior management pressured its sales personnel to meet quarterly sales targets "at any cost," encouraging sales personnel to agree to almost any term or contingency in order to get a sale recorded. The pressure asserted by Defendants to meet unrealistic sales targets was so high that it created a great deal of strife within the ranks, including fist-fights between team members in the hallways. For example, senior level management told its sales force to persuade the customer NOT to complete the order or contract date so that Aspen could prematurely record the sales, or, in certain situations, to ask the customer to back-date an order so that it could meet sales targets. CI 1 stated that Aspen was also notorious for "hanging its books open a couple days" if a deal was not completed on time so that it could be posted and recognized in the previous quarter.

37.    In addition CI 1 stated that, in other instances, Aspen recognized revenue when it sold "tokens" to customers which provided the customers access to Aspen's online library of software. Aspen's recognition of revenue at the time it sold such "tokens" violated GAAP's criteria of revenue recognition because at such time: (1) the revenue was not earned; (2) persuasive evidence of a software arrangement did not exist; (3) the software had not been delivered; and (4) and the fee arrangement was not fixed determinable. In particular CI 1 stated that Aspen's former Chief

---

[2] CI 2 worked at Aspen from January 1997 to October 2002. CI 2 was employed as a senior account executive and commercial manager and during fiscal 2001, as the director of business development for Aspen's polymer business. CI 2 was based in Aspen's Houston, Texas office and since at least 1999 was the commercial manager for Aspen's alliance with Union Carbide, a leading manufacturer of polymer products.

Operating Officer, David Mushin, approved a "token" sales transaction with Occidental Chemical that resulted in the overstatement of at least $250,000 in license fees during Aspen's second quarter of fiscal 2000, ended December 31, 1999.

38.    These examples depict a long-term and widespread culture of financial manipulation at Aspen which was known to and condoned by the Defendants during the Class Period.

39.    According to CI 2, a former director of business development, beginning in late 2000 Aspen was attempting to sell $4 million worth of software licenses and services to Equate Petrochemical Company ("Equate"), which is based in Kuwait and is a joint venture affiliate of Union Carbide Corp. ("UCC").  According to CI 2 the $4 million sale with Equate was for about $2 million in license revenues and $2 million in services revenues.  Equate was not involved in the negotiations directly with Aspen, but instead acted through an intermediary, Petroleum Services Company, W.L.L. ("PSC") and PSC's general manager, Edmond Chammas ("Chammas").  Aspen, through CI 2 and Aspen's sales account manager for Europe, Paul Davis ("Davis"), as well as Aspen's senior vice president of international sales, Michael Boettcher ("Boettcher"), directly interacted with PSC and Chammas on the Equate transaction.  CI 2 as the commercial manager for Aspen's alliance with UCC, also had direct interaction with certain of UCC's sales representatives. It was CI 2's understanding that PSC would purchase software from Aspen if and only if PSC had a firm purchase commitment from Equate, the end-user of the software.

40.    According to CI 2, as the end of March 2001 approached, Equate through PSC told Aspen's sales representatives that it "doesn't look like the deal can happen."  This potential cancellation greatly impacted the sales team, as they were trying to get the deal finalized before fiscal 3Q01, ended March 31, 2001.  CI 2 stated, based on his personal knowledge, that in an attempt to 'save' the sale, Davis and Boettcher gave a letter to Chammas, PSC's representative, which stated

that *if PSC will buy the software on paper by March 31, 2001, Aspen will accept PSC's return of the software to Aspen if Equate does not purchase the software by the end of June 2001.*  Armed with knowledge of the questionable terms of this agreement, CI 2 notified defendant McQuillin about what had been taking place.  McQuillin told CI 2 that he was "going to look into it."  However, CI 2 never heard anything from McQuillin again, and Petroleum Services ended up agreeing to this side arrangement by March 31, 2001 (last day of 3Q01) and took delivery of the software shipment shortly thereafter.

41.     According to CI 2, Equate eventually closed the deal sometime in 4Q01, but Aspen did not receive payment until approximately July-August 2001 [fiscal 2002].  CI 2 said that PSC "started getting nervous" when Aspen began sending invoices to PSC for the $4 million at the end of April 2001.  PSC repeatedly asked the sales team how the invoices and requests for payment should be handled.  CI 2 confirmed that Equate eventually closed the deal and Aspen received its money in approximately July-August 2001.  CI 2 also stated that this was highly questionable because the Company booked the revenue in the quarter ending March 31, 2001, but did not receive payment until sometime in fiscal 1Q02.

### Materially False and Misleading
### Statements Issued During the Class Period

42.     On or about December 7, 1999, the first day of the Class Period, Aspen issued a press release announcing that it had entered into a licensing agreement with Union Carbide Corporation ("UCC") for certain enterprise optimization software that would be implemented throughout UCC's worldwide operations.  Aspen reported that a only a portion of the licensing revenue would be recognized in the current quarter, the press release stated in pertinent part as follows:

> [Aspen] , the leading supplier of manufacturing enterprise optimization solutions for the process industries, today announced that [UCC] has licensed its Enterprise Optimization software, which combines AspenTech's Plantelligence(TM) manufacturing software with its Aspen Supply Chain Suite(TM), for all of [UCC]'s

operations worldwide. The software will link real-time manufacturing operations and processes with the Enterprise Resource Planning (ERP) systems implemented by Union Carbide during the past two years.

*A portion of the license revenue is recognizable by AspenTech in the present quarter ending December 31, 1999, with the remainder to be recognized in subsequent quarters.*

The companies also announced that they plan to create a strategic alliance to offer a configured software solution, including manufacturing and work- process best practices, to licensees of Carbide's proprietary chemical processes and other process industries.

*    *    *

"By deploying our Enterprise Optimization software at all of its facilities, Union Carbide will be able to link ERP, supply chain and plant manufacturing systems to optimize its key business processes," said Larry Evans, Chairman and CEO of AspenTech. "We are looking forward to leveraging the strengths of both companies." Mr. Evans added that AspenTech's Plantelligence solution is uniquely able to generate accurate computer models of process manufacturing plant performance, and then continually optimize plants in real time. [Emphasis added.]

43.    On or about January 25, 2000, Aspen issued a press release announcing its financial results for the second quarter fiscal 2000, ended December 31, 1999. For the quarter, Aspen reported total revenues of $61.8 million compared to $61.7 million in the second quarter 1999 and net income of $1.6 million or $0.06 per diluted share, compared with net income of $0.5 million or $0.02 per diluted share in the prior year. According to analysts (SG Cowen dtd Jan. 26, 2000), *Aspen's reported earnings exceeded consensus Wall Street estimates*. Aspen also reported that license revenue grew to $29.0 million, a 35 percent increase from license fees reported in same period last year, while services revenues totaled $32.8 million for the quarter. The Company also reported that the "most significant license transaction" of the quarter was an agreement with Union Carbide. Defendants Evans and Zappala commented on Aspen's seemingly robust financial results, stating in pertinent part, as follows:

- 16 -

*Evans*

We saw our core markets rebound significantly in the second quarter, evidenced by sharp growth in our license revenues and a return to profitable operations. We are experiencing strong momentum in the marketplace due to improved demand in our core vertical markets, continued gains beyond the refining and petrochemicals industries, and incremental market penetration with our supply chain solutions. We achieved a number of strategic objectives in the quarter, including . . . the establishment of a relationship with Union Carbide . . . .

*     *     *

*Zappala*

Strong demand for our technology and solid execution helped us to exceed expectations for revenues and profitability in the second quarter. Year-over-year earnings per share tripled in the second quarter in spite of a significant increase in the number of weighted average shares outstanding.

44.      On or about February 14, 2000, Aspen filed with SEC Form 10-Q for the quarter ended December 31, 1999. The 10-Q, signed by defendant Zapala, reaffirmed the Company's previously announced financial results and included the following representations concerning Aspen's accounting policies and operating results:

License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists to allocate the total fee to all delivered and undelivered elements of the arrangement. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been

performed are recorded as unearned revenue in the accompanying consolidated condensed balance sheets.[3]

\*    \*    \*

Software license revenue represented 47.0% of total revenue for the three months ended December 31, 1999, as compared to 46.5% in fiscal 1999. Revenues from software licenses for the three months ended December 31, 1999 were $29.0 million, an increase of $0.3 million, or 1.2%, from $28.7 million in fiscal 1999. Software license revenue represented 44.0% of total revenue for the six months ended December 31, 1999, as compared to 41.2% in fiscal 1999. Revenues from software licenses for the six months ended December 31, 1999 were $50.5 million, an increase of $5.8 million, or 13.0%, from $44.7 million in the comparable period of fiscal 1999. During the second quarter of fiscal 2000, the Company entered into a significant license contract with a customer to license certain of the Company's software for its worldwide operations. ***A portion of this license revenue was recognized in the second quarter of fiscal 2000 with the remainder to be recognized in subsequent quarters.***

\*    \*    \*

Revenues from service and other for the three months ended December 31, 1999 were $32.8 million, a slight decrease of $0.2 million, or 1.0%, from $33.0 million in the comparable period in fiscal 1999. Revenues from service and other for the six months ended December 31, 1999 were $64.2 million, an increase of $0.5 million, or 1.0%, from $63.7 million in the comparable period in fiscal 1999.

\*    \*    \*

In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation. [Emphasis added.]

---

[3] Substantially identical representations, except as noted herein, concerning the Company's accounting policies for software license sales, maintenance and service revenues were made in the each of the Company's Class Period SEC filings on Form 10-Q (see filing on or about May 15, 2000; November 14, 2000; February 14, 2001; May 15, 2001; November 14, 2001; February 14, 2002; May 15, 2002; November 14, 2002; February 14, 2003; May 15, 2003; November 14, 2003; February 17, 2004; and May 17, 2004) and Form 10-K (see filing on or about September 28, 2000; 2001; September 30, 2002; September 29,2003; and September 13, 2004). For the purpose of brevity, these subsequent representations are hereby incorporated by reference.

45.    Immediately following the Company's earnings press release, certain market analysts issued highly positive reports concerning Aspen's current and future prospects:

(a)    On or about January 25, 2000, Jeffries & CO., Inc. (analysts Richard T. Williams and Patrick J. McElroy), published a report reiterating its "BUY" recommendation on Aspen common stock and raising the 12-18 month share price target to $56 from $37 – an increase of more than 51 percent – based on a "5X" multiplier of Aspen's estimated fiscal 2001 revenues of $295.5 million.  According to the report, defendant Zappala "guided the Street to expect improving results on the top line," including "25% license [revenue] growth."   The report also included summaries of Aspen management's comments concerning significant product sales during the second quarter fiscal 2000, including the agreement with Union Carbide, the report stated in pertinent part as follows:

> [Aspen's] win with Union Carbide is particularly significant as it provides a high visibility endorsement and creates a unique 'private label' integrated product with Carbide's name to automate process plants. There are more than 100 plants like the polymer line implementation at Union Carbide. Not only will [Aspen] deploy across Carbides' entire enterprise, but each of the other 100 plants become high probability prospects . . . .

(b)    Similarly, on or about January 26, 2000, SG Cowen Securities Corporation (analysts Rob Schwartz and David Gremmels), published a report maintaining its "BUY rating on Aspen common stock and raising its share price target to $50 based on guidance of "25% license [revenue] growth going forward."

46.    Aspen's fraudulent scheme had its intended effect as the price of Aspen common stock closed at $50.00 per share on or about February 4, 2000, representing a price increase of more than 25 percent since the beginning of the Class Period.

47.    The statements referenced above in ¶¶42-45 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's representations concerning its revenues and earnings in press releases and periodic SEC filings were materially false and misleading as they overstated the Company's reported financial results.  Aspen has now admitted that the Company's financial statements were materially false and misleading as it has restated those financial statements and attributed the restatement to numerous improper accounting practices as detailed herein;

(b)    that the Company's internal controls and procedures were materially deficient in a number of respects, including but not limited to: (i) the inability to identify multiple element contractual arrangements in order to properly recognize license and service fee components in accordance with the Company's publicly stated accounting policies, GAAP and SEC reporting requirements; (ii) the failure to maintain controls that could detect and/or prevent side agreements with customers, through which sales of the Company's products and services were artificially inflated; (iii) the failure to identify and track 'consignment' sales to resellers; (iv) the failure to maintain sufficient and qualified financial accounting and reporting staff; and (v) the failure to monitor and asses the creditworthiness of Aspen's new and existing customers; in fact, Aspen has now admitted to material deficiencies in its internal controls and procedures during the Class Period and has represented its undertaken steps to mollify the adverse effects such deficiencies continue to have on the Company's ability to provide meaningful information to investors;

(c)    that the Company's financial statements did not include all material adjustments in conformity with generally accepted accounting principles ("GAAP"), Aspen's Class Period violations of the Company's own accounting policies, GAAP and SEC reporting requirements are set forth in detail at ¶¶120-45 below;

(d)    that Aspen's reported revenues were materially overstated due to the Company's undisclosed practice of executing 'side agreements' contemporaneously with sales of

license and/or services and/or maintenance agreements.  These side agreements frequently allowed the customer the right to terminate its sales agreement and/or granted the customer variable pricing terms, among other consideration; Defendants knowingly or recklessly ignored the terms of the side agreements (which rendered the underlying license or service agreement conditional or contingent) when recognizing and reporting licensing, services and maintenance revenues to Aspen's shareholders;  Aspen has now admitted that its license, services and maintenance revenues were materially overstated due to these undisclosed and improper practices and has restated its historical financial results for the past six years – 1999 through 2004, inclusive;

(e)    that Aspen was prematurely and improperly recognizing revenue on consignment sales to resellers.  Aspen has now admitted that the Company's sales to resellers during the fiscal years 1999, 2000, 2001 and 2002 were subject to rights of return and price concessions; Defendants knowingly or recklessly ignored these contractual terms when they caused the Company to recognize revenues prior to expiration of the right of return and/or the determination of a fixed sales price; Aspen has now admitted that its license, services and maintenance revenues were materially overstated due to these undisclosed and improper practices and has restated its historical financial results for the past six years – 1999 through 2004, inclusive;

(f)    that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" (as detailed in ¶¶34-35 above) which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's second quarter 2000 Form 10-Q that license revenues would be recognized over several quarters was misleading because it failed to disclose Aspen's improper earnings management practices;

(g)    that Aspen's originally reported fiscal 2000 and fiscal 1999 revenues were materially overstated by at least $7.0 million and $6.8 million, respectively, due to improper recognition of license, service and maintenance revenues on contingent and/or consignment sales to resellers and other customers; and

(h)    as a result of the foregoing (i) defendant Evans' statement concerning the "sharp growth in [Aspen's second quarter 2000] license revenues" due to a "significant rebound" in Aspen's "core markets," (ii) defendant Zappala's statement that "[s]trong demand" and "solid execution" allowed the Company to "exceed expectations for revenues and profitability in the second quarter [fiscal 2000]," and (iii) defendant Zappala's statements to analysts concerning Aspen's fiscal 2001 revenue and earnings guidance, were not true.

48.    On or about April 24, 2000, Aspen issued a press release announcing its financial results for the third quarter fiscal 2000, ended March 31, 2000.  Under the banner headline "Aspen Technology Reports 54 Percent Increase in . . . License Revenue," the Company reported total revenues of $67.8 million compared with $54.2 million in the same period last year, an increase of 25 percent year-over-year.  According to the press release, license revenue grew 54 percent to $34.2 million, from $22.2 million in the third quarter of fiscal 1999 and services revenues totaled $33.6 million.  The Company also reported that net income for the third quarter was $2.9 million or $0.10 per diluted share, an 87 percent sequential increase from net income in the second quarter 1999. Defendants Evans and Zappala commented on Aspen's seemingly robust financial results, in pertinent part, as follows:

*Evans*

In the third quarter, our focus on integrated solutions contributed significantly to our growth.  License revenues included a number of Plantelligence(TM) solution sales, where our offerings are combined to optimize performance of a single manufacturing plant . . . our solutions that extend optimization across the entire supply chain were an important contributor to our performance this quarter. Of particular note was

- 22 -

continued customer interest in and our first signed contract for the Aspen eBusiness product, powered by Extricity Software.

\*      \*      \*

*Zappala*

We are particularly gratified with the growth of our license revenues during the third quarter, which allowed us to significantly improve our profitability. Demand was strong across all of our core markets and we saw customers returning to capital investments that had been deferred in a more difficult economic environment.

49.      On or about May 15, 2000, Aspen filed with SEC Form 10-Q for the quarter ended

March 31, 2000. The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously

announced financial results and included the following representations concerning its operations:

Software license revenue represented 50.4% of total revenue for the three months ended March 31, as compared to 40.9% in fiscal 1999. Revenues from software licenses for the three months ended March 31, 2000 were $34.2 million, an increase of $12.0 million, or 53.9%, from $22.2 million in fiscal 1999. Software license revenue represented 46.4% of total revenue for the nine months ended March 31, as compared to 41.1% in fiscal 1999. Revenues from software licenses for the nine months ended March 31, 2000 were $84.6 million, an increase of $17.8 million, or 26.6%, from $66.9 million in the comparable period of fiscal 1999. During the second quarter of fiscal 2000, we entered into a significant license contract with a customer to license certain of our software for the customer's worldwide operations. ***A portion of this license revenue was recognized in the second and third quarters of fiscal 2000 based on requested delivery dates.*** [Emphasis added.]

\*      \*      \*

Revenues from service and other for the three months ended March 31, 2000 were $33.6 million, an increase of $1.6 million, or 5.0%, from $32.0 million in the comparable period in fiscal 1999. Revenues from service and other for the nine months ended March 31, 2000 were $97.8 million, an increase of $2.1 million, or 2.2%, from $95.7 million in the comparable period in fiscal 1999.

\*      \*      \*

In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation.

- 23 -

50.     The statements referenced above in ¶¶48-49 were each materially false and misleading for the reasons stated in ¶47(a)-(e). In addition the statements in ¶¶48-49 failed to disclose and misrepresented the following adverse facts:

(a)     that Aspen's reported revenues were materially misstated due to the Company's improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers.  In fact, Defendants have now admitted that Aspen's originally reported fiscal 2000 and fiscal 1999 revenues were materially overstated by at least $7.0 million and $6.8 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers and other customers;

(b)     that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer," which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; the statement in Aspen's third quarter 2000 Form 10-Q that license revenues would be recognized over several quarters due to customer "requested delivery dates" was misleading because it failed to disclose Aspen's improper earnings management practices.  *See, e.g.*, ¶34 *supra*; and

(c)     as a result of the foregoing, Evans' and Zappala's statements concerning the significant growth in Aspen's second quarter 2000 license revenues and Aspen's continued "profitability" was not true.

51.     On or about August 8, 2000, Aspen issued a press release announcing its financial results for the fourth quarter and fiscal year ended June 30, 2000.  For fiscal 2000, Aspen reported total revenues of $268.1 million and net income of $6.5 million or $0.21 per diluted share, compared with total revenues of $226.5 and a net loss of $10.6 million or $0.39 per diluted share in fiscal 1999, excluding restructuring and other charges.  The Company also reported fiscal 2000 license revenues

of $132.8 million, compared with $97.1 million in fiscal 1999. Defendant Evans commented on the Company's performance, stating in pertinent part, as follows:

> We are pleased to have ***exceeded our goals for both growth and profitability in the fourth quarter and fiscal year***. The rapid growth in our license revenues continued to be driven by strong demand for our integrated Enterprise Optimization(TM) and supply chain solutions, as process manufacturers increasingly invest in technology to improve their manufacturing productivity and optimize their supply chains.
>
> We are pleased with the performance of our supply chain solutions this past year, where license revenue more than doubled, and we are excited about our prospects for the year ahead. [Emphasis added.]

52.    On or about August 9, 2000, following the Company's highly positive earnings announcement, Aspen common stock recorded a single-day price rise of more than 27 percent to close at $46.25 per share on heavy trading volume.

53.    On or about September 28, 2000, Aspen filed with the SEC Form 10-K for the fiscal year ended June 30, 2000. The 10-K, signed by defendants Evans and Zappala, among others, reaffirmed the Company's previously announced financial results and included the following representations concerning Aspen's fiscal 2000 and fiscal 1999 operating results, stating in pertinent part, as follows:

> Software license revenues represented 49.6% and 42.9% of total revenues for fiscal 2000 and 1999, respectively. Revenues from software licenses in fiscal 2000 increased 36.8% to $132.8 million from $97.1 million in fiscal 1999. Software license revenues are attributable to software license renewals covering existing users, the expansion of existing customer relationships through licenses covering additional users, licenses of additional software products, and, to a lesser extent, to the addition of new customers. The lower license revenues in fiscal 1999 resulted primarily from delayed decision making driven by economic difficulties among customers in our core vertical markets of refining, chemicals and petrochemicals.

>                                 *        *        *

> Software license revenues represented 42.9% and 55.3% of total revenues for fiscal 1999 and 1998, respectively. Revenues from software licenses in fiscal 1999 decreased 31.1% to $97.1 million from $140.9 million in fiscal 1998. The decrease in fiscal 1999 license revenues resulted primarily from delayed decision making

- 25 -

driven by economic difficulties among customers in our core vertical markets of refining, chemicals, and petrochemicals.

\*       \*       \*

Revenues from service and other for fiscal 2000 increased 4.5% to $135.3 million from $129.4 million for fiscal 1999. This increase reflected a continued focus during fiscal 2000 on providing high value−added consulting and training services to existing customers. Revenues from service and other for both fiscal 2000 and 1999 were adversely affected by lower−than−planned levels of consultant utilization. The lower utilization was attributable to the delay of project starts by clients. Growth in the services business was slower than our license business as a result of (1) our decision to utilize partners to help deploy our solutions and (2) the effect on post−contract support revenues of slower license revenue growth in prior periods.

\*       \*       \*

Revenues from service and other for fiscal 1999 increased 13.6% to $129.4 million from $113.9 million for fiscal 1998.  This increase reflected a continued focus during fiscal 1999 on providing high value−added consulting and training services to existing customers.  The lower fiscal 1999 utilization was attributable to the delay of project starts by clients . . .

\*       \*       \*

[The] quarterly consolidated statement of operations . . . for fiscal 1999 and 2000 . . . in our opinion, reflect all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of these data in accordance with generally accepted accounting principles.

54.    The statements referenced above in ¶¶51 and 53 were each materially false and misleading for the reasons stated in ¶47(a)-(e).  In addition the statements in ¶¶51 and 53 failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below; in fact, Defendants have now admitted: (i) that the Company's fiscal 2000 revenues were actually $261.1 million and not $268.1 million as originally reported; (ii) that the Company's fiscal 1999 revenues

- 26 -

were actually $219.7 million and not $226.5 million as originally reported; (iii) that the Company's

fiscal 2000 net loss was actually $3.2 million and not earnings of $6.5 million as originally reported;

and (iv) that the Company's fiscal 1999 net loss was actually $17.4 million and not $10.6 million as

originally reported;

(b)    that Aspen's reported revenues were materially misstated due to Defendants

improper practice of keeping certain revenues "in the freezer" which meant that only amounts

needed to meet or exceed the Company's previously issued guidance were reported to shareholders;

the statement in Aspen's fiscal 2000 Form 10-K that revenue increases were attributable to "higher

fiscal 2000 license revenues" was misleading because it failed to disclose Aspen's improper earnings

management practices; and

(c)    as a result of the foregoing, defendant Evans' statement that Aspen "exceeded

[its] goals for both growth and profitability" during fiscal 2000 was not true.

55.    On or about October 24, 2000, Aspen issued a press release announcing its financial

results for the first quarter fiscal 2001, ended September 30, 2000.  For the quarter, the Company

reported total revenues of $69.5 million and *pro forma net earnings of $0.5 million, or $0.02 per*

*share. The Company's reported pro forma earnings exceeded Wall Street consensus estimates by*

*approximately $0.02 per share.*[4]  The Company also reported that software license revenues for the

quarter grew 52 percent to $32.6 million, while services revenues rose 16 percent to $36.9 million.

---

[4] During fiscal 2001 Aspen's began to report 'pro forma' operating results (*i.e.*, non-GAAP results
excluding certain loss items) prominently in the Company's quarterly earnings announcements,
usually in the first paragraph of the first page of such announcement.  By contrast Aspen's ***GAAP
net loss***, which in the current quarter was more than $3.7 million, was much less accessible to
investors – merely appearing as a line item in the Company's "Consolidated Statement of
Operations" on a following page of the earnings release.

In the press release, Defendant Evans attributed the "primary driver of the [purported] growth" in Aspen's revenues to sales of Aspen's "supply chain solutions."

56.    On or about October 25, 2000, Jefferies & Company, Inc. (analyst Richard T. Williams) published a report maintaining its "BUY" rating and raising its share price target for Aspen common stock to $77.  Jeffries' analysts stated that the Company's first quarter 2001 reported revenues exceeded estimates by approximately $3.5 million.  Based on guidance provided by Defendants, Jeffries raised their estimates of the Company's fiscal 2001 earnings by more than 17% to approximately $0.40 per share.

57.    On or about October 31, 2000, Aspen registered for sale to the public more than 660,000 shares of its common stock previously issued in connection with its acquisition of Petrolsoft Corporation ("Petrolsoft") at an aggregate offering price of $24.2 million.  On or about June 1, 2000, Aspen acquired Petrolsoft by issuing 2,641,101 shares of common stock in a private placement transaction, valued on the date of the acquisition at $22.93 per share or $60.6 million.  The registration statement and prospectus, signed by defendants Evans and Zappala, among others, filed in connection with the offering incorporated by reference Aspen's consolidated balance sheets as of June 30, 2000 and 1999 and the consolidated income statements for each of the years in the three−year period ended June 30, 2000. Defendants have now conceded that each of those financial reports was materially false and misleading when issued.

58.    On or about November 14, 2000, Aspen filed with the SEC Form 10-Q for the quarter ended September 30, 2000.  The 10-Q, signed by defendant Zappala, confirmed the Company's previously announced financial results and included the following representations concerning the Company's performance, stating in pertinent part as follows:

> Software license revenues represented 46.9% of total revenues for the three months ended September 30, 2000, as compared to 40.3% in the comparable period of fiscal

2000.  Revenues from software licenses for the three months ended September 30, 2000 were $32.6 million, an increase of 51.5% from $21.5 million in the comparable period of fiscal 2000.  This percentage increase was primarily attributable to an increased penetration in the market as well as increased sales of our eSupply Chain suite of products.

*    *    *

Revenues from service and other for the three months ended December 31, 2000 were $41.1 million, an increase of 23.8% from $33.2 million in the comparable period in fiscal 2000.  Revenues from service and other for the six months ended December 31, 2000 were $78.0 million, an increase of 19.9% from $65.0 million in the comparable period in fiscal 2000.  These increases reflect an improvement in our support and maintenance business resulting from last year's license growth . . .

*    *    *

In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation.

59.    On or about November 29, 2000, Aspen registered for sale to the public more than 124,000 shares of its common stock previously issued in connection with its acquisition of ICARUS Corporation and ICARUS Services Limited ("ICARUS") at an aggregate offering price of $4.9 million.  On or about August 29, 2000, Aspen acquired ICARUS for total consideration of $24.5 million, including 248,411 shares of Aspen common stock, valued on the date of acquisition at $50.0625 per share or $12.4 million.   The registration statement and prospectus, signed by defendants Evans and Zappala, among others, filed in connection with the offering incorporated by reference Aspen's consolidated balance sheets as of June 30, 2000 and 1999 and the consolidated income statements for each of the years in the three−year period ended June 30, 2000.  Defendants have now conceded that each of those financial reports was materially false and misleading when issued.

60. The statements referenced above in ¶¶55-59 were each materially false and misleading for the reasons stated in ¶47(a)-(e). In addition the statements in ¶¶55-59 failed to disclose and misrepresented the following adverse facts:

(a) that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below. In fact, Defendants have now admitted that Aspen's originally reported fiscal 2001 and 2000 revenues were materially overstated by at least $12.5 million and $7.0 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b) that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's first quarter 2001 Form 10-Q that license revenues increased due to "increased market penetration" was misleading because it failed to disclose Aspen's improper earnings management practices; and

(c) as a result of the foregoing, defendant Evans' statement that the "primary driver of [Aspen's revenue] growth" was sales of the Company's "supply chain solutions" was not true.

61. On or about January 24, 2001, Aspen issued a press release announcing its financial results for the second quarter fiscal 2001, ended December 31, 2000. For the quarter, the Company reported total revenues of $81.7 million and a net loss of $2.9 million or $0.09 per share. ***On a pro-***

*forma basis, the Company reported net earnings of $4.3 million, or $0.13 per share* excluding certain research and development charges and expenses related to Aspen's PetroVantage investment.[5]  According to FirstCall/Thompson Financial, *the Company's pro-forma earnings nearly doubled consensus analyst estimates of $0.07 per share*.  Aspen also reported that license revenues for the second quarter grew 39 percent to $40.6 million, while services revenue increased 24 percent to $41.1 million.  Defendant Evans commented on the Company's performance, stating in pertinent part, as follows:

> Services revenue and profitability showed dramatic year-over-year improvement as a result of investments we have made to expand our supply chain implementation capacity and productivity.

62.    On or about February 14, 2001, Aspen filed with the SEC Form 10-Q for the quarter ended December 31, 2000.  The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously announced financial results and included the following representations concerning the Company's performance, stating in pertinent part as follows:

> Software license revenues represented 49.7% of total revenues for the three months ended December 31, 2000, as compared to 46.9% in the comparable period of fiscal 2000. Revenues from software licenses for the three months ended December 31, 2000 were $40.6 million, an increase of 38.6% from $29.3 million in the comparable period of fiscal 2000.  Software license revenues represented 48.4% of total revenues for the six months ended December 31, 2000, as compared to 43.9% in the comparable period of fiscal 2000.  Revenues from software licenses for the six months ended December 31, 2000 were $73.2 million, an increase of 44.0% from $50.8 million in the comparable period of fiscal 2000.  These percentage increases were primarily attributable to an *increased penetration in the market* as well as increased sales of our eSupply Chain suite of products and license revenues derived from our acquisitions [of e−Chemicals and Broner Systems] . . .

*    *    *

---

[5] The Company's actual GAAP result for the quarter was a net loss of more than $2.6 million.

Revenues from service and other for the three months ended December 31, 2000 were $41.1 million, an increase of 23.8% from $33.2 million in the comparable period in fiscal 2000. Revenues from service and other for the six months ended December 31, 2000 were $78.0 million, an increase of 19.9% from $65.0 million in the comparable period in fiscal 2000. These increases reflect an improvement in our support and maintenance business resulting from last year's license growth, as well as improvements in the pricing and productivity of our supply chain services businesses.

\*    \*    \*

In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation.

63.    The statements referenced above in ¶¶61-62 were each materially false and misleading for the reasons stated in ¶47(a)-(e). In addition the statements in ¶¶61-62 failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers before such fees were collectible, among other things; Aspen's routine violation of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below. In fact, Defendants have now admitted that Aspen's originally reported fiscal 2001 and 2000 revenues were materially overstated by at least $12.5 million and $7.0 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b)    that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's second quarter 2001 Form 10-Q that license revenues increased

due to "increased penetration in the market" was misleading because it failed to disclose Aspen's improper earnings management practices; and

(c)     as a result of the foregoing, defendant Evans' statement that Aspen's reported financial results were further evidence of the Company's "dramatic year-over-year improvement" in "profitability" was not true.

64.    On April 24, 2001, Aspen issued a press release announcing its financial results for the third quarter fiscal 2001, ended March 31, 2001. For the quarter, the Company reported total revenues of $76.4 million and ***a pro forma net loss of $3.2 million*** or $0.11 per share, excluding expenses relating to PetroVantage and amortization of goodwill.[6] Aspen also reported that license revenues for the third quarter totaled $34.2 million and services revenues were $42.2 million for the quarter ending March 31, 2001. Defendant Evans commented on the Company's performance, stating in pertinent part, as follows:

> We saw a number of customers make significant investments in our technology during the quarter because of the tremendous value our solutions provide, closing ten deals that were greater than $1 million with customers such as Air Liquide, ConAgra Beef, Dupont, Mitsui Chemicals and PetroCanada. However, due to the uncertainty surrounding the economy, we saw a number of customers delay making software purchasing decisions at the end of March, which caused a shortfall in license revenues.

65.    On or about May 15, 2001, Aspen's filed with the SEC its quarterly report Form 10-Q for quarter ended March 31, 2001. The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously issued financial results and included the following representations concerning the Aspen's accounting policies and operating results:

> Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include

---

[6] The Company's GAAP result for the quarter was a net loss of more than $5.3 million.

only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

\*      \*      \*

Software license revenues represented 44.8% of total revenues for the three months ended March 31, 2001, as compared to 50.4% in the comparable period of fiscal 2000. Revenues from software licenses for the three months ended March 31, 2001 were $34.2 million, a decrease of 2.0% from $34.7 million in the comparable period of fiscal 2000. Software license revenues represented 47.2% of total revenues for the nine months ended March 31, 2001, as compared to 46.3% in the comparable period of fiscal 2000. Revenues from software licenses for the nine months ended March 31, 2001 were $107.4 million, an increase of 25.6% from $85.6 million in the comparable period of fiscal 2000. The decrease in software license revenue for the third quarter of fiscal 2001, as compared to the same period in fiscal 2000, resulted from delayed decision–making among customers.

\*      \*      \*

Revenues from service and other for the three months ended March 31, 2001 were $42.2 million, an increase of 23.5% from $34.2 million in the comparable period in fiscal 2000. Revenues from service and other for the nine months ended March 31, 2001 were $120.2 million, an increase of 21.2% from $99.2 million in the comparable period in fiscal 2000. These increases reflect an improvement in our support and maintenance business resulting from last year's license growth, as well as improvements in the pricing and productivity of our supply chain services businesses.

\*      \*      \*

In the opinion of management, the accompanying consolidated condensed financial statements have been prepared in conformity with generally accepted accounting principles and include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation.

66.     The statements referenced above in ¶¶64-65 were each materially false and misleading for the reasons stated in ¶47(a)-(e). In addition the statements in ¶¶64-65 failed to disclose and misrepresented the following adverse facts:

(a)     that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and

- 34 -

other customers before such fees were collectible, among other things; Aspen's routine violation of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below.  In fact, Defendants have now admitted that Aspen's originally reported fiscal 2001 and 2000 revenues were materially overstated by at least $12.5 million and $7.0 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b)      that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's third quarter 2001 Form 10-Q that services revenues increased as a result of "last year's license growth" was materially misleading because it failed to disclose Aspen's improper earnings management practices; and

(c)      that Aspen's maintenance and services revenues were not being recognized ratably over the life of the contract period; in fact Aspen has now admitted that its services revenues were materially misstated due to the Company's inability to identify service arrangements within multiple element contracts; additionally Aspen admitted that it was recognizing services revenues without regard to contract contingencies.

67.      On August 7, 2001, Aspen issued a press release announcing its financial results for the fourth quarter and fiscal year 2001, ended June 30, 2001.  For the quarter, the Company reported total revenues of $83.0 million and *pro forma net income of $0.4 million or $0.01 per diluted share*, excluding charges and expenses relating to PetroVantage.[7]  Aspen also reported that fourth

---

[7] The Company's actual GAAP result for the quarter was a net loss of more than $8.7 million, and for the full year 2001, Aspen's GAAP net loss totaled more than $20.4 million.

quarter license revenues totaled $40.0 million and services revenues were $43.0 million for the

quarter ending June 30, 2001. *For the year Aspen reported* total revenues of $310.6 million, up 16

percent from $268.1 million reported in fiscal 2000 and *pro forma net income of $2.3 million* or

$0.07 per diluted share, excluding amortization of goodwill, one-time acquisition and restructuring

costs, write-off of e-Chemicals investment and costs related to PetroVantage.[8]  Defendant Evans

commented on the Company's performance, stating in pertinent part, as follows:

> We are pleased to have *exceeded expectations for both revenues and profitability*
> this quarter in what remains a very difficult environment . . . we closed significant
> multimillion dollar transactions with Jacobs Engineering, Pemex, SASOL in South
> Africa, Valero Refining and Yukos, a large Russian oil company.
>
> Looking ahead to the quarter ending September 30, 2001, AspenTech expects
> revenues to total between $63 and $66 million, with license revenues ranging
> between $24 and $26 million.  The company anticipates a first quarter loss per share
> of between $0.34 and $0.36, excluding non-operating charges.  For the full fiscal
> year 2002, AspenTech expects to report revenues in the range of $340 million, with
> license revenue growth of approximately 13 percent over fiscal 2001 levels.  Fiscal
> 2002 reported earnings per share are anticipated to be between $0.15 and $0.17.
> Excluding investments in PetroVantage, pro forma earnings per share are expected to
> be between $0.42 and $0.44.  [Emphasis added.]

68.     Aspen's press release also identified the following risk factors related to Aspen's

future performance:

> AspenTech's lengthy sales cycle . . . makes it difficult to predict quarterly operating
> results; fluctuations in AspenTech's quarterly operating results; AspenTech's
> dependence on customers in the cyclical chemicals, petrochemicals and petroleum
> industries; AspenTech's dependence on key employees; intense competition;
> AspenTech's dependence on systems integrators and other strategic partners . . .

69.     On or about September 28, 2001, Aspen filed with the SEC Form 10-K for the year

ended June 30, 2001.  The 10-K, signed by defendants Evans and Zappala, among others, reaffirmed

---

[8] *Id.*

the Company's previously announced financial results and included the following representations

concerning Aspen's performance, stating in pertinent part, as follows:

> Software license revenues represented 47.5% and 49.6% of total revenues for fiscal
> 2001 and 2000, respectively. Revenues from software licenses in fiscal 2001
> increased 11.0% to $147.4 million from $132.8 million in fiscal 2000. Software
> license revenues are attributable to software license renewals covering existing users,
> the expansion of existing customer relationships through licenses covering additional
> users, licenses of additional software products, and, to a lesser extent, to the addition
> of new customers. Higher software license revenues in fiscal 2001 were driven by
> strong demand from the petroleum sector and a 44% increase in sales in the first half
> of the fiscal year compared to the first half of fiscal 2000. In the second half of fiscal
> 2001, we saw a general delay in decision making from many customers, which
> resulted in license revenues for the whole fiscal year 2001 being lower than our
> initially anticipated levels, but still higher than license revenues in fiscal 2000.

> Revenues from service and other consist of consulting services, post−contract
> support on software licenses, training and sales of documentation. Revenues from
> service and other for fiscal 2001 increased 20.6% to $163.2 million from $135.3
> million for fiscal 2000. This increase during fiscal 2001 reflects an improvement in
> our support and maintenance business resulting from the higher level of license
> revenues in fiscal 2001, as well as improvements in the pricing and utilization of our
> consulting services business, particularly within the value chain portion.

> \*    \*    \*

> [The ] quarterly consolidated statement of operations . . . for fiscal 2000 and 2001 . . .
> in our opinion, reflect all adjustments, consisting only of normal recurring
> adjustments, necessary for a fair presentation of these data in accordance with
> accounting principles generally accepted in the United States.

70.     The statements referenced above in ¶¶67-69 were each materially false and

misleading for the reasons stated in ¶47(a)-(e). In addition the statements in ¶¶67-69 failed to

disclose and misrepresented the following adverse facts:

(a)     that Aspen's reported revenue was materially overstated due to Defendants'

improper practice of recognizing revenue on contingent and/or consignment sales to resellers and

other customers before such fees were collectible, among other things; Aspen's routine violation of

its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed

in ¶¶120-45 below. In fact, Defendants have now admitted: (i) that the Company's fiscal 2001

revenues were actually $298.1 million and not $310.6 million as originally reported; and (ii) that the Company's fiscal 2001 pro-forma net loss was actually $19.9 million and not $3.5 million as originally reported;

(b)     that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; the statement in Aspen's fiscal 2001 Form 10-K that reported revenue increases were "driven by strong demand from the petroleum sector" was misleading because it failed to disclose Aspen's improper earnings management practices;

(c)     the statements concerning Aspen's risk factors failed to warn investors of the misrepresentations and omissions that were then operating to materially inflate the Company's financial results; and

(d)     as a result of the foregoing, defendant Evans' statement that Aspen "exceeded expectations for both revenues and profitability" during the fourth quarter fiscal 2001, as well as his statements regarding Aspen's projected fiscal 2002 financial results, lacked a reasonable basis at all times and were therefore materially false and misleading.

71.     On October 25, 2001, Aspen issued a press release announcing its financial results for the first quarter fiscal 2002, ended September 30, 2001.  For the quarter, the Company reported total revenues of $61.2 million, with services revenues of $42.0 million and license revenues of $19.2 million, and ***pro forma losses of $10.4 million*** or $0.33 per share, which excludes a one-time restructuring charge and approximately $0.07 per share of losses attributable to Aspen's investment

in PetroVantage.[9]   The Company also reported that for the quarter ending December 31, 2001, Aspen expects revenues to total between $75 and $77 million, with license revenues ranging between $33 and $35 million and second quarter earnings per share of between ($0.02) and $0.00. For the full fiscal year 2002, Aspen stated that it "expects to report modest year-over-year revenue growth." Defendant Evans commented on the Company's performance, stating in pertinent part, as follows:

Due to slower activity during the summer months, ***a larger portion of our first quarter revenues close in September [2001], which made last month's terrorist attacks particularly disruptive to several end-of-quarter transactions*** in an already challenging business climate.  Fortunately, these license delays were largely offset by stronger-than-expected services revenues, where we continued to maintain gross margins in excess of forty percent, and by carefully controlled spending.

Some of our largest customers have expressed intentions to close significant license transactions in the second quarter.  These indications make us cautiously optimistic, as customers focus on spending year-end budget surpluses in an environment where some of our end-user markets are showing early signs of stabilizing.  We believe that stronger license revenues and continued operating efficiencies from our previously announced cost-cutting efforts will enable us to approach breakeven operations in the second quarter.

Defendant Zappala added, in pertinent part, as follows:

Our strong services revenue and expanding services backlog, which increased to $125 million this quarter, are indicative of continued investment by our customers in our solutions.  This investment gives us confidence that demand for our software solutions will improve in the coming months, as these major transactions are evidence of the compelling return on investment that Aspen's solutions provide. [Emphasis added]

72.    On or about November 14, 2001, Aspen filed with the SEC Form 10-Q for the first quarter fiscal 2002, ended September 30, 2001. The 10-Q, signed by defendant Zappala, reaffirmed

---

[9] The Company's GAAP result for the quarter was actually a net loss of more than $14.4 million.

the Company's previously announced financial results and included the following representations concerning the Company's operations:

> Software license revenues represented 31.4% of total revenues for the three months ended September 30, 2001, as compared to 46.9% in the comparable period of fiscal 2001. Revenues from software licenses for the three months ended September 30, 2001 were $19.2 million, a decrease of 41.0% from $32.6 million in the comparable period of fiscal 2001.  These decreases are due to the current uncertain economic environment, combined with the impact of the September 11, 2001 attacks, negatively affecting the close rate of software deals at the end of September.

> *    *    *

> Revenues from service and other for the three months ended September 30, 2001 were $42.0 million, an increase of 13.8% from $36.9 million in the comparable period in fiscal 2001.  This increase reflects an improvement in our support and maintenance business resulting from the higher level of license revenues in late fiscal 2000 and early fiscal 2001 as compared to the comparable prior periods, as well as improvements in the pricing and utilization of our consulting services business.

> *    *    *

> In the opinion of management, the accompanying unaudited interim consolidated financial statements have been prepared in conformity with generally accepted accounting principles for interim financial information and pursuant to the rules and regulations of the [SEC] for reporting on Form 10−Q.

73.    On or about December 17, 2001, Aspen registered for sale to the public more than 562,000 shares of its common stock previously issued in connection with its acquisitions of Houston Consulting Group, L.P. ("Houston Consulting") and Coppermine LLC, a subsidiary of Computerized Process Unlimited, L.L.C. ("Coppermine") at an aggregate offering price of $7.0 million.  On or about  June 15, 2001, Aspen acquired Houston Consulting and Coppermine by issuing 764,792 shares of common stock in private placements.  The registration statement and prospectus, signed by defendants Evans and Zappala, among others, filed in connection with the offering incorporated by reference Aspen's consolidated balance sheets as of June 30, 2001 and 2000 and the consolidated income statements for each of the years in the three−year period ended June 30,

2001. Defendants have now admitted that each of those financial reports were materially false and misleading when issued.

74.    The statements referenced above in ¶¶71-73 were each materially false and misleading for the reasons stated in ¶47(a)-(e).  In addition the statements in ¶¶71-73 failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers before such fees were collectible, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below.  In fact, Defendants have now admitted that Aspen's originally reported fiscal 2002 and 2001 revenues were materially overstated by at least $11.0 million and $12.5 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b)    that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's first quarter 2002 Form 10-Q that license revenues were negatively impacted due to lower "close rate of software deals at the end of September [2001]" was materially misleading because it failed to disclose Aspen's improper earnings management practices;

(c)    that Aspen's maintenance and services revenues were not being recognized ratably over the life of the contract period; in fact Aspen has now admitted that its services revenues were materially misstated due to the Company's inability to identify service arrangements within

multiple element contracts; additionally Aspen has also admitted that it was recognizing services revenues without regard to contract contingencies;

(d)      as a result of the foregoing:  (i) defendant Evans' statement Aspen's license revenues were "disrupted" because "a larger portion of our first quarter revenues close[d] in September [2001];" (ii) defendant Zappala's statement that "demand for [Aspens'] software solutions will improve in the coming months;" and (iii) Aspen's statement that it expected "second quarter [2002] earnings per share of between ($0.02) and $0.0" lacked a reasonable basis at all times and were therefore materially false and misleading when made.

75.      On January 23, 2002, Aspen issued a press release announcing its financial results for the second quarter of fiscal 2002, the period ending December 31, 2001.  For the quarter, the Company reported total revenues of $81.9 million with license revenues of $39.9 million – more than doubling sequentially – up 108% from the previous quarter, and services revenue of $42.0 million.  Aspen also reported ***breakeven operations***" on a GAAP basis and ***pro forma net earnings of $2.1 million*** or $0.06 per share, excluding expenses of PetroVantage.[10]

76.      Additionally, Aspen provided earnings guidance for the next quarter, ending March 31, 2002, expecting to report total revenues of approximately $83 to $85 million and earnings per share in the range of $0.02 to $0.03.  For the quarter ending June 30, 2002, the Company expected to report total revenue of approximately $92 to $94 million and earnings per share in the range of $0.13 – $0.15.  For calendar year 2002, Aspen expected total revenues to be in the range of $345 to $350 million and expected to report earnings per share of approximately $0.30.  Defendant Evans

---

[10] Following escalating revelations concerning the Enron scandal, Aspen began reporting its GAAP results more prominently in its quarterly earnings releases.

commented on the Company's performance, stating in pertinent part, "*[Aspen's ] revenue growth significantly exceeded our expectations*."  [Emphasis added.]

77.    On or about February 14, 2002, Aspen filed with the SEC Form 10-Q for the quarter ended December 31, 2001.  The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously announced financial results and included the following representations concerning Aspen's operations:

> Software license revenues represented 41.3% of total revenues for the six months ended December 31, 2001, as compared to 48.4% in the comparable period of fiscal 2001. Revenues from software licenses for the six months ended December 31, 2001 were $59.2 million, a decrease of 19.2% from $73.2 million in the comparable period of fiscal 2001.  This decrease was due to continued weakness in the economy as compared to the prior years first quarter, combined with the impact of the terrorist attacks on the United States on September 11, 2001 that negatively affected the close rate of software deals at the end of the first quarter fiscal 2002.
>
> *          *          *
>
> Revenues from service and other consist of consulting services, post contract support on software licenses, training and sales of documentation. Revenues from service and other for the three months ended December 31, 2001 were $42.0 million, an increase of 2.3% from $41.1 million in the comparable period in fiscal 2001. Revenues from service and other for the six months ended December 31, 2001 were $84.0 million, an increase of 7.8% from $78.0 million in the comparable period in fiscal 2001. These increases reflected an improvement in our support and maintenance business resulting from the higher level of license revenues in late fiscal 2000 and early fiscal 2001 as compared to the comparable prior periods, as well as additional revenue-generating employees hired to support the expanding consulting services business.
>
> *          *          *
>
> In the opinion of management, the accompanying unaudited interim consolidated financial statements have been prepared in conformity with generally accepted accounting principles for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10-Q.

78.    The statements referenced above in ¶¶76-77 were each materially false and misleading for the reasons stated in ¶47(a)-(e).  In addition the statements in ¶¶76-77 failed to disclose and misrepresented the following adverse facts:

- 43 -

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers before such fees were collectible, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below.  In fact, Defendants have now admitted that Aspen's originally reported fiscal 2002 and 2001 revenues were materially overstated by at least $11.0 million and $12.5 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers, among other things;

(b)    that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's second quarter 2002 Form 10-Q that license revenues were negatively impacted by "weakness in the economy . . . combined with the impact of the terrorist attacks on the United States on September 11, 2001" was materially misleading because it failed to disclose Aspen's improper earnings management practices;

(c)    that Aspen's maintenance and services revenues were not being recognized ratably over the life of the contract period; in fact Aspen has now admitted that its services revenues were materially misstated due to the Company's inability to identify service arrangements within multiple element contracts; additionally Aspen has also admitted that it was recognizing services revenues without regard to contract contingencies;

(d)    as a result of the foregoing: (i) defendant Evans' statement that "[Aspen's ] revenue growth significantly exceeded our expectations;" and (ii) Aspen's statement that it expected

"[third quarter 2002] earnings per share in the range of $0.02 to $0.03" lacked a reasonable basis at all times and therefore were materially false and misleading.

79.     On April 25, 2002, Aspen issued a press release announcing its financial results for the third quarter of fiscal 2002, the period ending March 31, 2002.  For the quarter, the Company reported total revenues of $83.5 million with license revenues totaling $37.4 million and services revenues totaling $46.1 million, and an operating loss of $6.9 million, resulting in a pro forma loss of $0.15 per diluted share.  Aspen also reported that "[d]emand from [Aspen]'s core vertical markets was robust."  Defendant Evans commented on the Company's performance, stating in pertinent part, as follows:

> We are one hundred percent committed to doing whatever it takes to restore [Aspen] to sustained profitability.  Due to the current economic environment, we have taken difficult, but necessary, short-term actions that should enable us to make money in the current quarter.  Our fourth quarter is seasonally our strongest and we possess a robust pipeline of sales opportunities that we believe will close by the end of June.

80.     On or about May 15, 2002, Aspen's filed with the SEC Form 10-Q for the quarter ended March 31, 2002.  The 10-Q, signed by defendant Zappala, reaffirmed the Company's previously announced results and included the following representations concerning Aspen's operations:

> Software license revenues represented 44.8% of total revenues for the three months ended March 31, 2002, as compared to 42.6% in the comparable period of fiscal 2001. Revenues from software licenses for the three months ended March 31, 2002 were $37.4 million, an increase of 9.2% from $34.2 million in the comparable period of fiscal 2001.  Software license revenues represented 40.8% of total revenues for the nine months ended March 31, 2002, as compared to 45.0% in the comparable period of fiscal 2001.  Revenues from software licenses for the nine months ended March 31, 2002 were $96.6 million, a decrease of 10.1% from $107.4 million in the comparable period of fiscal 2001.  This decrease was due to weakness in the economy during the first two quarters of fiscal 2002, as compared to the comparable period of fiscal 2001, combined with the impact of the terrorist attacks on the United States on September 11, 2001.

*     *     *

- 45 -

Revenues from service and other for the three months ended March 31, 2002 were $46.1 million, unchanged from the comparable period in fiscal 2001. Revenues from service and other for the nine months ended March 31, 2002 were $140.1 million, an increase of 6.5% from $131.5 million in the comparable period in fiscal 2001

\*      \*      \*

In the opinion of management, the accompanying unaudited interim consolidated financial statements have been prepared in conformity with generally accepted accounting principles for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10-Q.

81.    The statements referenced above in ¶¶79-80 were each materially false and misleading for the reasons stated in ¶47(a)-(e).  In addition the statements in ¶¶79-80 failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers, among other things; Aspen's routine violations of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below.  In fact, Defendants have now admitted that Aspen's originally reported fiscal 2002 and 2001 revenues were materially overstated by at least $11.0 million and $12.5 million, respectively, due to improper recognition of license, service and maintenance fees on contingent and/or consignment sales to resellers and other customers, among other things;

(b)    that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts needed to meet or exceed the Company's previously issued guidance were reported to shareholders; therefore the statement in Aspen's third quarter 2002 Form 10-Q that license revenues were negatively impacted by "weakness in the economy…combined with the impact of the terrorist

- 46 -

attacks on the United States on September 11, 2001" was materially misleading because it failed to disclose Aspen's improper earnings management practices;

(c)    that Aspen's maintenance and services revenues were not being recognized ratably over the life of the contract period; in fact Aspen has now admitted that its services revenues were materially misstated due to the Company's inability to identify service arrangements within multiple element contracts; additionally Aspen has also admitted that it was recognizing services revenues without regard to contract contingencies; and

(d)    as a result of the foregoing defendant Evans' statement that Aspen was being restored to "sustained profitability" lacked a reasonable basis at all times.

82.    On or about July 8, 2002, Aspen registered for sale to the public 15.4 million shares of common stock in two concurrent offerings for aggregate estimated proceeds to the selling shareholders of more than $156.6 million.  A majority of the shares offered included previously issued common stock, convertible preferred stock and warrants by Aspen in a series of private placements during February, March and May of 2002, generating $100 million in proceeds.  Aspen used $50 million of the proceeds to fund, in part, its acquisition of Hyprotech, Ltd. ("Hyprotech"). The registration statements, signed by defendants Evans and Zappala, filed in connection with the offerings incorporated by reference Aspen's Form 10−K for the fiscal year ended June 30, 2001 and quarterly reports on Form 10−Q for the fiscal quarters ended September 30, 2001, December 31, 2001, and March 31, 2002.  Defendants have now admitted that each of these financial reports was materially false and misleading when issued.

83.    On August 15, 2002, Aspen issued a press release announcing its financial results for the fourth quarter and fiscal year 2002, the period ending June 30, 2002.  For the quarter, the Company reported total revenues of $84.0 million with license revenues totaling $37.4 million and

services revenues totaling $46.6 million, and a loss of $60.0 million, or $1.72 per share.  For the

fiscal year, Aspen recorded total revenues of $320.6 million, compared with $326.9 million reported

in fiscal 2001 and a net loss of $83.5 million, or $2.56 per share.

84.    Aspen also reported guidance for the first quarter of fiscal 2003, ending September

30, 2002, expecting total revenues of approximately $84 million.  For the second fiscal quarter of

fiscal 2003, Aspen reported it will record total revenues of approximately $92 million.  For fiscal

year 2003, the Company reported expected revenues to range between $380 and $385 million.

Defendant Evans commented on the Company's performance, stating in pertinent part, as follows:

> We have taken aggressive actions intended to return us *to operating profitability and
> positive cash flow* by the end of this calendar year . . . .  We have also made
> significant changes in our sales and product development leadership and improved
> our organizational efficiency.  We believe this will add more *predictability to our
> financial results*, while allowing us to develop and market our solutions more
> rapidly and efficiently.  [Aspen]'s reputation for technical excellence and process
> industry expertise has never been stronger, and in the year ahead we are committed
> to delivering financial results that reflect this valuable industry leadership.
> [Emphasis added.]

85.    On or about September 30, 2002, Aspen filed with the SEC Form 10-K filed for the

fiscal year ended June 30, 2002.  The 10-K, signed by defendants Evans and Zappala, among others,

reaffirmed the Company's previously announced financial results and included the following

representations concerning Aspen's operations:

> Software license revenues represented 41.8% and 45.1% of total revenues for fiscal
> 2002 and 2001, respectively.  Revenues from software licenses in fiscal 2002
> decreased 9.2% to $133.9 million from $147.4 million in fiscal 2001 . . . .  Lower
> software license revenues in fiscal 2002 were driven by significant delays in
> purchases by our customers in the process industries, due to the struggling economic
> environments in the United States and Europe, which resulted in license revenues for
> the whole fiscal year 2002 being lower than our initially anticipated levels, all of
> which was offset by software licenses revenues recorded by Hyprotech in fiscal
> 2002.

*    *    *

Revenues from service and other consist of consulting services, post−contract support on software licenses, training and sales of documentation. Revenues from service and other for fiscal 2002 increased 4.0% to $186.7 million from $179.5 million for fiscal 2001. Excluding reimbursable out−of−pocket expenses of $18.8 million and $16.3 million in fiscal 2002 and 2001, respectively, revenues from service and other increased 2.9% or $4.7 million from fiscal 2001 to fiscal 2002.

*        *        *

Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States (GAAP). The preparation of our financial statements requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, expenses and related disclosures. We base our estimates on historical experience and various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

86.    The statements referenced above in ¶¶82-85 were each materially false and misleading for the reasons stated in ¶47(a)-(e). In addition the statements in ¶¶82-85 failed to disclose and misrepresented the following adverse facts:

(a)    that Aspen's reported revenue was materially overstated due to Defendants' improper practice of recognizing revenue on contingent and/or consignment sales to resellers and other customers before such fees were collectible, among other things; Aspen's routine violation of its publicly stated revenue recognition policies, GAAP and SEC reporting requirements are detailed in ¶¶120-45 below. In fact, Defendants have now admitted: (i) that the Company's fiscal 2002 revenues were actually $322.4 million and not $320.6 million as originally reported, which included an overstatement of approximately $11.0 million of license revenues related to reseller consignment sales; and (ii) that the Company's fiscal 2002 net loss was actually $82.3 million and not $83.5 million as originally reported;

(b)    that Aspen's reported revenues were materially misstated due to Defendants improper practice of keeping certain revenues "in the freezer" which meant that only amounts

- 49 -

needed to meet or exceed the Company's previously issued guidance were reported to shareholders; the statement in Aspen's fiscal 2002 Form 10-K that reported revenue declines were "driven by significant delays in purchases by our customers in the process industries" was misleading because it failed to disclose Aspen's improper earnings management practices; and

(c)    as a result of the foregoing, defendant Evans' statements concerning Aspen's return "to operating profitability and positive cash flow" and of providing greater "predictability to [Aspen's] financial results," as well as Aspen's statements regarding the Company's projected fiscal 2003 financial results, lacked a reasonable basis at all times and therefore were materially false and misleading.

87.    On October 24, 2002, Aspen issued a press release announcing its financial results for the first quarter fiscal 2003, ended September 30, 2002. For the quarter, the Company reported total revenues of $77.3 million with license revenues totaling $29.7 million and services revenues totaling $47.6 million, and a net loss of $10.7 million, or $0.28 per share. The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter ended September 30, 2001.

88.    On or about November 14, 2002, Aspen filed with the SEC Form 10-Q for the quarter ended September 30, 2002. The 10-Q, signed by defendants McQuillin and Zappala, reaffirmed the Company's previously announced financial results. The Form 10-Q superficially complied with the recently enacted Sarbanes-Oxley Act ("Sarbanes-Oxley") by including an expanded explanation of the Company's accounting policies as well as defendants McQuillin and Zappala's statement that Aspen's disclosure controls and procedures were "operating in an effective manner." The Form 10-Q stated in pertinent part as follows:

> We recognize software license revenue in accordance with American Institute of Certified Public Accountants (AICPA) Statement of Position, or SOP, No. 97-2,

"Software Revenue Recognition", as amended by SOP No. 98-4 and SOP No. 98-9, as well as the various interpretations and clarifications of those statements. These statements require that four basic criteria must be satisfied before software license revenue can be recognized:

• persuasive evidence of an arrangement between ourselves and a third party exists;

• delivery of our product has occurred;

• the sales price for the product is fixed or determinable; and

• collection of the sales price is probable.

*Our management uses its judgment concerning the satisfaction of these criteria, particularly the criteria relating to the determination of whether the fee is fixed and determinable and the criteria relating to the collectibility of the receivables relating to such sales. Should changes and conditions cause management to determine that these criteria are not met for certain future transactions, all or substantially all of the software license revenue recognized for such transactions could be deferred.*

\*       \*       \*

We recognize revenue associated with fixed-fee service contracts in accordance with AICPA SOP No. 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts", using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount of the anticipated loss is provided currently. *Our management uses its judgment concerning the estimation of the total costs to complete the contract, considering a number of factors, including the experience of the personnel that are performing the services and the overall complexity of the project.* Should changes and conditions cause actual results to differ significantly from management's estimates, revenue recognized in future periods could be adversely affected. [Emphasis added.]

\*       \*       \*

Software license revenues represented 38.4% of total revenues for the three months ended September 30, 2002, as compared to 29.1% in the three months ended September 30, 2001. Revenues from software licenses for the three months ended September 30, 2002 increased 54.2% to $29.6 million from $19.2 million in the three months ended September 30, 2001. This increase was due to the inclusion in the three months ended September 30, 2002 of software license revenue associated with Hyprotech, which we acquired in May 2002, and the negative impact of the September 11, 2001 attacks on the closure rate of license agreements in the final weeks of the three months ended September 30, 2001.

- 51 -

Revenues from service and other for the three months ended September 30, 2002 increased 1.4% to $47.6 million, from $47.0 million in the three months ended September 30, 2001. This increase reflects the inclusion in the three months ended September 30, 2002 of service and other revenue associated with Hyprotech, which acquired in May 2002, partially offset by a decline in revenues from our consulting business. The decline in consulting revenue is due to the general economic slow−down, which has influenced companies to delay initiating large, capital−intensive consulting projects.

*     *     *

Based on their evaluation of our disclosure controls and procedures (as defined in Rules 13a−14(c) and 15d−14(c) under the Securities Exchange Act of 1934) as of a date within 90 days of the filing date of this quarterly report, our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and are operating in an effective manner.

*     *     *

In the opinion of management, the accompanying unaudited interim consolidated condensed financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10−Q. [Emphasis added.]

89.     The statements in ¶¶87-88 were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts:

(a)     that the Company had been engaged in a massive multi-year accounting fraud which had distorted its reported earnings figures and rendered it impossible to gauge the Company's performance;

(b)     that the Company's reported financial results did not reflect its true financial performance as those figures were distorted by the Company's improper accounting practices. Indeed, Aspen has admitted that its financial statements were materially false and misleading when issued and has restated those financial statements; and

- 52 -

(c)    Defendants' statements that Aspen's disclosure procedures were "operating effectively" failed to disclose the material weaknesses in Aspen's financial disclosure controls and procedures that were then adversely affecting the Company's ability to provide meaningful financial information to investors in accordance with SEC reporting regulations.

90.    On or about January 30, 2003, Aspen issued a press release announcing its financial results for the second quarter fiscal 2003, ended December 31, 2002.  For the quarter, the Company reported total revenues of $83.0 million and a net loss of $136.9 million, or $3.59 per share.  The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter ended December 31, 2001.

91.    Aspen's financial results for the quarter ended December 31, 2002, were repeated in the Company's Form 10-Q filed with the SEC on or about February 14, 2003, which was signed by defendants McQuillin and Zappala.  Concerning the Company's accounting policies and disclosure controls, the 10-Q stated, in pertinent part, as follows:

> Based on their evaluation of our disclosure controls and procedures (as defined in Rules 13a−14(c) and 15d−14(c) under the Securities Exchange Act of 1934) as of a date within 90 days of the filing date of this quarterly report, our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and are operating in an effective manner.

*      *      *

> In the opinion of management, the accompanying unaudited interim consolidated condensed financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10−Q.

92.    On or about April 29, 2003, Aspen issued a press release announcing its financial results for the third quarter fiscal 2003, ended March 31, 2003.  For the quarter, the Company

reported total revenues of $79.7 million and a net loss to common shareholders of $2.0 million, or $0.05 per share.  The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter and fiscal year ended March 31, 2002.

93.    Aspen's financial results for the third quarter of fiscal 2003, the period ending March 31, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 15, 2003, which was signed by defendants McQuillin and Zappala.  Concerning the Company's accounting policies and disclosure controls, the 10-Q stated, in pertinent part, as follows:

> Based on their evaluation of our disclosure controls and procedures (as defined in Rules 13a−14(c) and 15d−14(c) under the Securities Exchange Act of 1934) as of a date within 90 days of the filing date of this quarterly report, our chief executive officer and chief financial officer have concluded that our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the rules and forms of the SEC and are operating in an effective manner.
>
> \*       \*       \*
>
> In the opinion of management, the accompanying unaudited interim consolidated condensed financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10−Q.

94.    On or about August 7, 2003, Aspen issued a press release announcing its financial results for the fourth quarter and year end of fiscal 2003, the period ending June 30, 2003.  For the quarter, the Company reported total revenues of $82.8 million and a net loss to common shareholders of $18.2 million, or $0.47 per share.  The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter and fiscal year ended June 30, 2002.

95.    Aspen's financial results for the fourth quarter and fiscal year 2003, ended June 30, 2003 were repeated in the Company's Report on Form 10-K filed with the SEC on or about

September 29, 2003, which was signed by defendants McQuillin and Kane, among others. Concerning the Company's accounting policies and disclosure controls, the 10-K stated, in pertinent part, as follows:

> Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a−15(e) and 15d−15(e) under the Securities Exchange Act of 1934, as amended, which we refer to as the Exchange Act) as of June 30, 2003. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of June 30, 2003, our disclosure controls and procedures were (1) designed to ensure that material information relating to AspenTech, including our consolidated subsidiaries, is made known to our chief executive officer and chief financial officer by others within AspenTech and our subsidiaries, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by AspenTech in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; but also **concluded that there are certain weaknesses in our foreign subsidiary translation process.** We have dedicated resources to correcting these issues and have implemented the necessary corrections. These weaknesses did not have a material impact on the accuracy of our financial statements.

> Other than the steps we have taken to correct certain weaknesses in the foreign subsidiary translation process, no change in our internal control over financial reporting (as defined in Rules 13a−15(f) and 15d−15(f) under the Exchange Act) occurred during the fiscal quarter ended June 30, 2003 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

> *        *        *

> Our consolidated financial statements are prepared in accordance with accounting principles generally accepted in the United States (GAAP). The preparation of our financial statements requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, expenses and related disclosures. We base our estimates on historical experience and various other assumptions that we believe to be reasonable under the circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

96.    On or about October 29, 2003, Aspen issued a press release announcing its financial results for the first quarter of fiscal 2004, the period ending September 30, 2003. For the quarter, the

- 55 -

Company reported total revenues of $77.0 million and diluted earnings per share to common shareholders of $0.10 per share. The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter ended September 30, 2002.

97.     Aspen's financial results for the period ended September 30, 2003, were repeated in the Company's Report Form 10-Q filed with the SEC on or about November 14, 2003, which was signed by defendants McQuillin and Kane. Concerning the Company's accounting policies and disclosure controls, the 10-Q stated, in pertinent part, as follows:

> Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of the our disclosure controls and procedures (as defined in Rules 13a−15(e) and 15d−15(e) under the Exchange Act) as of September 30, 2003. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of September 30, 2003, our disclosure controls and procedures were (1) designed to ensure that material information relating to AspenTech is made known to the our chief executive officer and chief financial officer by others within AspenTech, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by AspenTech in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

> *       *       *

> In the opinion of management, the accompanying unaudited interim consolidated condensed financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10−Q.

98.     On January 22, 2004, Aspen issued a press release announcing its financial results for the second quarter of fiscal 2004, the period ending December 31, 2003. For the quarter, the Company reported total revenues of $80.4 million and net income of $560,000, or $0.01 per diluted share. The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter ended December 31, 2001.

99.    Aspen's financial results for the second quarter of fiscal 2004, the period ending December 31, 2003, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about February 17, 2004, which was signed by defendants McQuillin and Kane.  Concerning the Company's accounting procedures and disclosure controls, the 10-Q stated, in pertinent part, as follows:

> Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a−15(e) and 15d−15(e) under the Exchange Act) as of December 31, 2003. Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of December 31, 2003, our disclosure controls and procedures were (1) designed to ensure that material information relating to our company is made known to our chief executive officer and chief financial officer by others within our company, particularly during the period in which this report was being prepared and (2) effective, in that they provide reasonable assurance that information required to be disclosed by us in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms.

> \*        \*        \*

> In the opinion of management, the accompanying unaudited interim consolidated condensed financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America for interim financial information and pursuant to the rules and regulations of the Securities and Exchange Commission (SEC) for reporting on Form 10−Q.

100.    On April 29, 2004, Aspen issued a press release announcing its financial results for the third quarter of fiscal 2004, the period ended March 31, 2004.  For the quarter, the Company reported total revenues of $80.7 million and net income of $1.5 million, or $0.03 per diluted share. The press release also republished and reaffirmed the Company's false and misleading financial statements for the quarter ended March 31, 2002.

101.    Aspen's financial results for the third quarter ended March 31, 2004, were repeated in the Company's Report on Form 10-Q filed with the SEC on or about May 17, 2004, which was

signed by defendants McQuillin and Kane.  Concerning the Company's accounting procedures and

disclosure controls the 10-Q stated, in pertinent part, as follows:

> Our management, with the participation of our chief executive officer and chief
> financial officer, evaluated the effectiveness of our disclosure controls and
> procedures (as defined in Rules 13a−15(e) and 15d−15(e) under the Exchange Act)
> as of March 31, 2004. Based on this evaluation, our chief executive officer and chief
> financial officer concluded that, as of March 31, 2004, our disclosure controls and
> procedures were (1) designed to ensure that material information relating to our
> company, including our consolidated subsidiaries, is made known to our chief
> executive officer and chief financial officer by others within our company and our
> consolidated subsidiaries, particularly during the period in which this report was
> being prepared and (2) effective, in that they provide reasonable assurance that
> information required to be disclosed by us in the reports that we file or submit under
> the Exchange Act is recorded, processed, summarized and reported within the time
> periods specified in the SEC's rules and forms.

*     *     *

> In the opinion of management, the accompanying unaudited interim consolidated
> condensed financial statements have been prepared in conformity with accounting
> principles generally accepted in the United States of America for interim financial
> information and pursuant to the rules and regulations of the Securities and Exchange
> Commission (SEC) for reporting on Form 10−Q.

102.    On August 4, 2004, Aspen issued a press release announcing its financial results for

the fourth quarter and year end of fiscal 2004, the period ending June 30, 2004.  For the quarter, the

Company reported total revenues of $87.6 million and a net loss of $41.4 million, or $1.00 per

diluted share.  The press release also republished and reaffirmed the Company's false and misleading

financial statements for the quarter and fiscal year ended June 30, 2002

103.    Aspen's financial results for the fourth quarter and year end of fiscal 2004, the period

ending June 30, 2004, were repeated in the Company's Report on Form 10-K filed with the SEC on

or about September 13, 2004, which was signed by defendants McQuillin and Kane.

104.    The statements referenced above in ¶¶90-103 were each materially false and

misleading when made for the reasons stated in ¶89 above.

### The Truth Begins to Emerge

105.    On October 27, 2004, Aspen shocked the market when it issued a press release announcing that its Audit Committee had undertaken a detailed review of the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during fiscal years 2000-2002.  The Committee is reassessing the time periods in which revenue was recognized for these transactions and whether any of these transactions have prior or current material financial statement impact.  The review could lead to a restatement.  The press release continued, in pertinent part, as follows:

> Based on its preliminary review to date, the Audit Committee believes that one software license transaction in fiscal third quarter 2000 and two transactions in fiscal second quarter 2001 were included in [Aspen]'s results for such periods without reflecting the impacts of associated arrangements between [Aspen] and those customers, which may require revised accounting treatment.

> The Committee has also identified a potential contingency associated with a fourth transaction recorded in the fourth fiscal quarter of 2001 which was not reflected in prior accounting, which may require revised accounting treatment.

106.    Upon this news, on October 28, 2004, shares of the Company's stock fell to an intraday low of $5.50 per share, or approximately 20%, before closing at $6.68 per share, on unusually heavy trading volume.

107.    On October 29, 2004, Aspen announced that federal prosecutors launched a probe into the Company's accounting practices from 2000 through 2002.  The Company said it received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents relating to transactions that it entered into during those years, and other documents dating from January 1, 1999.

108.    Upon this news, shares of the Company's stock fell an additional $0.67 per, or approximately 10%, to close at $6.01 on October 29, 2004, on unusually heavy trading volume. On

November 1, 2004, in a continued reaction to the news, Aspen common stock declined to $5.77 per share.

109.    On November 18, 2004, Aspen issued a press release announcing that due to the delay in filing its Form 10-Q for the period ending September 30, 2004, it had received a letter from the NASDAQ Stock Market indicating that the Company's stock was subject to delisting.  The Company further reported that the delay in filing was related to the Company's previously announced accounting investigation.

110.    In response to this news, the price of Aspen stock declined 7.5% from $6.02 per share to $5.57 per share.

111.    On November 24, 2004, Aspen issued a press release announcing that based on the review of its Audit Committee it expected to restate its financial statements for fiscal years 2000-2004 and advised investors that financial statements for the fiscal years ended June 30, 2000 through June 30, 2004 should not be relied upon.  The press release stated in pertinent part as follows:

> The Committee has made significant progress toward completion of its review of certain transactions entered into during the fiscal years 2000 through 2002. Additionally, the Committee has decided to continue its investigation of transactions entered into during the fiscal years 2000, 2001 and 2002 and to evaluate certain transactions entered into during fiscal years 2003 and 2004. The Committee remains committed to completing its financial review at the earliest possible time, but is unable to provide an estimated completion date. Because the investigation is ongoing, and because the scope of its work is subject to continuing review, the Committee may have further assessments of these and any other transactions it reviews, as well as of associated Company controls and practices. Consequently, the final results of the Committee's review may vary materially from this preliminary assessment.

The press release also announced that Aspen's Board of Directors had asked McQuillin to resign his posts and that he had agreed to do so.

112.    In response to this news, the price of Aspen stock declined 3.7% from $5.79 per share to $5.57 per share.

113.    On or about January 31, 2005, Aspen issued a press release announcing that its Audit Committee's investigation was substantially completed.  As a result of the review, Aspen's Audit Committee identified transactions entered into during fiscal years 2000, 2001 and 2002 that were accounted for improperly.  The press release stated in pertinent part as follows:

> The smallest of these transactions involved recorded license revenue of approximately $207,000 and the largest involved recorded license revenue of approximately $4.3 million. Recorded license revenue associated with these sixteen transactions totaled $18.5 million during the fiscal years 2000 through 2002 . . . . The Audit Committee has concluded that the reported license revenue associated with these sixteen transactions was overstated during the fiscal years 2000 through 2002 and was understated during the fiscal years 2003 and 2004. Therefore, the Company's consolidated financial statements for each of its fiscal years ended June 30, 2000 through June 30, 2004 will be restated.

> Additionally, the Audit Committee has determined, based on its assessment of transactional histories, that the accounting for software license sales to resellers beginning in the fiscal year ended June 30, 2001 should have been recorded on a sell-through or consignment basis of accounting rather than a sell-in or upfront basis of accounting. The adjustments associated with these transactions, some of which are also among those sixteen referenced above, will result in the deferral of license revenue from the period in which it was originally recorded to the period in which the products were sold by the reseller to end users.

> License revenues potentially subject to restatement associated with reseller transactions as originally recorded were approximately $16.8 million in fiscal year 2001, $11.0 million in fiscal year 2002, $0.3 million in fiscal year 2003, and $0.4 million in fiscal year 2004.

114.    Then, on or about March 15, 2005, Aspen filed with the SEC Form 10-K/A amending its previously filed fiscal 2004 10-K to include restated financial statements for the fiscal years ended 1999, 2000, 2001, 2003 and 2004.  The Amended 2004 10-K stated in pertinent part as follows:

> This Amendment No. 1 on Form 10−K/A to our Annual Report on Form 10−K for the fiscal year ended June 30, 2004, originally filed with the United States Securities and Exchange Commission (SEC) on September 13, 2004, is being filed for the purpose of restating our consolidated balance sheets as of June 30, 2003 and 2004 and consolidated statements of operations, statements of stockholders' equity and comprehensive income (loss), statements of cash flows and related disclosures for the years ended June 30, 2002, 2003 and 2004. See Note 18 to the Consolidated

Financial Statements for a discussion of the restatement. Items 6, 7, 8, 9A and 15 have been updated for the effects of the restatement and are included in this Amendment No. 1.

This Amendment No. 1 on Form 10−K/A has not been updated for events occurring after the filing of the original Annual Report on Form 10−K on September 13, 2004, except (1) to reflect the restatement as described above and (2) to reflect certain subsequent events that are relevant to the reader.

We have not amended our Annual Reports on Form 10−K for the fiscal years ended June 30, 1999, 2000, 2001, 2002, or 2003, or our Quarterly Reports on Form 10−Q for the quarterly periods included in these fiscal years, that reflect the effects of the restatement. *The information that has been previously filed or otherwise reported for these periods is superseded by the information in this Form 10−K/A, and the financial statements and related financial information contained in such annual and quarterly reports should not be relied upon.*

*    *    *

The restatement adjustments decreased revenue and increased net loss applicable to common stockholders for the year ended June 30, 1999 by $6.8 million and $6.8 million, respectively. The restatement adjustments decreased revenue and increased net loss applicable to common stockholders for the year ended June 30, 2000 by $7.0 million and $8.7 million, respectively. The restatement adjustments decreased revenue and increased net loss applicable to common stockholders for the year ended June 30, 2001, by $12.5 million and $16.4 million.

115.    Additionally, Defendants admitted to an avalanche of material weaknesses in the Company's disclosure controls and procedures. The Amended 2004 Form 10-K stated in pertinent part as follows:

Our management concluded that the following factors contributed significantly to the material weakness with respect to our software license revenue recognition controls:

(a) need for improved and redundant procedures and cross−checks to reasonably assure the identification of arrangements including both software license and services components;

(b) need for improved and redundant procedures and cross−checks to reasonably assure the detection and prevention of unauthorized arrangements with customers entered into contemporaneously with software license agreements;

(c) inadequate systems to track sales by resellers of software licenses to end−users;

(d) lack of a sufficient number of qualified finance personnel to review and provide guidance on revenue recognition for complex software license transactions; and

(e) need for routinization of our processes to assess the creditworthiness of new or existing customers.

116.    In response to the revelations contained in the Amended 2004 Form 10-K, the price of Aspen stock declined 6.5% from $6.29 per share to $5.88 per share on heavy trading volume.

## UNDISCLOSED ADVERSE INFORMATION

117.    The market for Aspen's common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Aspen's common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Aspen common stock relying upon the integrity of the market price of Aspen's common stock and market information relating to Aspen, and have been damaged thereby.

118.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Aspen's common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

119.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Aspen's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Aspen and its business, prospects and operations, thus causing the Company's common stock to be

overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

### ASPEN'S FINANCIAL STATEMENTS AND FINANCIAL DISCLOSURES DURING THE CLASS PERIOD WERE MATERIALLY FALSE AND MISLEADING

120.    At all relevant times during the Class Period, Aspen represented that its financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[11] These representations were materially false and misleading because Aspen, as it has now admitted, employed improper accounting practices throughout the Class Period which violated GAAP and the SEC's accounting and disclosure rules and regulations and materially distorted the Company's true operating performance during the Class Period.

121.    Aspen's improper accounting practices deceived investors during the Class Period because, as set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") Statement No. 1, 42:

> Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluation of past enterprise performance.

---

[11] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Generally Accepted Auditing Standard ("GAAS") §AU 411.02. Regulation S-X [17 C.F.S §210.4-01(a)(1)] states that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

**Defendants Have Conceded Aspen's Financial Statements
During the Class Period Did Not Conform with GAAP**

122.    During the Class Period, Defendants had the obligation to assure that the financial information disseminated by Aspen, including the financial statements contained in filings made with the SEC and press releases, were fairly stated in compliance with GAAP and Aspen's stated accounting policies.

123.    GAAP provides that revenue should not be recognized until it is realized or realizable and earned.  The conditions for revenue recognition ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is reasonably assured and when the entity has substantially performed the obligations which entitle it to the benefits represented by the revenue. SEC SAB Nos. 101 and 104;[12] FASB Concept Statement Nos. 2 and 5; FASB Statement of Financial Accounting Standards ("SFAS") No. 48; Accounting Research Bulletin ("ARB") No. 43; APB Opinion No. 10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP") 97-2.[13]

124.    Defendants have now admitted that Aspen violated the above provisions of GAAP during the Class Period.  In addition, GAAP, in APB Opinion No. 22, provides that the usefulness of

---

[12] In December 2003, SAB No. 101 was superceded by SAB No. 104, which updated portions of SAB No. 101 to make it consistent with then current authoritative accounting guidance.  The principal revisions to SAB No. 101 included the deletion of certain interpretive guidance because of the issuance of private sector U.S. GAAP, and the incorporation of certain sections of the SEC's Staff's interpretation of "Revenue Recognition in Financial Statements "Frequently Asked Questions and Answers" into SAB No. 101.

[13] SOP 97-2 was amended in 1998 by SOP 98-4 and further amended more recently by SOP 98-9.  In addition, the AICPA publishes Technical Practice Aids ("TPA") which provide answers to technical questions about software revenue recognition.

financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company and that information about the accounting policies adopted by a reporting company is "essential" for financial statement users.

125.    As Defendants knew, or recklessly ignored, Aspen failed to provide the disclosure required by GAAP associated with its true revenue recognition policies.  To the contrary, Aspen falsely disclosed the following with respect to its revenue recognition practices:

**Fiscal Year Ended June 30, 2000**

> Effective July 1, 1998, the Company adopted Statement of Position (SOP) No. 97-2, "Software Revenue Recognition".  SOP 97-2 was issued by the American Institute of Certified Public Accountants in October 1997 in order to provide guidance on applying generally accepted accounting principles in recognizing revenue on software transactions.  The adoption of SOP 97-2 did not have a material impact on the Company's financial position, results of operations or cash flows.  License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence exists for all undelivered elements to allow allocation of the total fee to all delivered and undelivered elements of the arrangement.  Revenues under such arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions."  Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned.  The Company has established sufficient vendor specific objective evidence for professional services, training and maintenance and support services.  Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services.  The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

> Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract.  When a loss is anticipated on a contract, the full amount thereof is provided currently.  Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been

performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

Installments receivable represent the present value of future payments related to the financing of noncancellable term and perpetual license agreements that provide for payment in installments over a one-to five-year period. A portion of each installment agreement is recognized as interest income in the accompanying consolidated statements of operations. The interest rates utilized for the years ended June 30, 1998, 1999 and 2000 were 8.5%, 8.5%, and 8.5% to 9% respectively.

In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition in Financial Statements." SAB 101 provides guidance on the recognition, disclosure and presentation of revenue in financial statements. SAB 101, as amended by SAB 101A and SAB 101B, is required to be implemented no later than the fourth fiscal quarter of fiscal years beginning after December 15, 1999. We are currently evaluating the impact of SAB 101 on our financial statements and related disclosures, but we do not expect that any impact will be material.

## Fiscal Year Ended June 30, 2001

The Company recognizes revenue in accordance with Statement of Position (SOP) No. 97-2, "Software Revenue Recognition," as amended and interpreted. License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence (VSOE) exists for all undelivered elements. The Company determines VSOE based upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when they sell their consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenue is recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

- 67 -

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include only unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the percentage-of-completion method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets.

Installments receivable represent the present value of future payments related to the financing of noncancellable term and perpetual license agreements that provide for payment in installments, generally over a one- to five-year period. A portion of each installment agreement is recognized as interest income in the accompanying consolidated statements of operations. The interest rates utilized for the years ended June 30, 1999, 2000, and 2001 ranged from 8.5% to 9.0%.

In December 1999, the Securities and Exchange Commission issued Staff Accounting Bulletin (SAB) No. 101, "Revenue Recognition in Financial Statements." SAB 101 provides guidance on the recognition, disclosure and presentation of revenue in financial statements. The adoption of SAB 101 by the Company in the fourth quarter of the fiscal year ended June 30, 2001 did not have a material impact on the Company's financial position, results of operations, or cash flows.

126.    This disclosure was repeated in all material respects in Aspen's financial statements

for the year ended June 30, 2002. Aspen's financial statements for the years ended June 30, 2003

and 2004 disclosed:

The Company recognizes revenue in accordance with Statement of Position (SOP) No. 97-2, "Software Revenue Recognition," as amended and interpreted. License revenue, including license renewals, consists principally of revenue earned under fixed-term and perpetual software license agreements and is generally recognized upon shipment of the software if collection of the resulting receivable is probable, the fee is fixed or determinable, and vendor-specific objective evidence (VSOE) of fair value exists for all undelivered elements. The Company determines VSOE based

upon the price charged when the same element is sold separately. Maintenance and support VSOE represents a consistent percentage of the license fees charged to customers. Consulting services VSOE represents standard rates, which the Company charges its customers when the Company sells its consulting services separately. For an element not yet being sold separately, VSOE represents the price established by management having the relevant authority when it is probable that the price, once established, will not change before the separate introduction of the element into the marketplace. Revenue under license arrangements, which may include several different software products and services sold together, are allocated to each element based on the residual method in accordance with SOP 98-9, "Modification of SOP 97-2, Software Revenue Recognition, with Respect to Certain Transactions." Under the residual method, the fair value of the undelivered elements is deferred and subsequently recognized when earned. The Company has established sufficient VSOE for professional services, training and maintenance and support services. Accordingly, software license revenues are recognized under the residual method in arrangements in which software is licensed with professional services, training and maintenance and support services. The Company uses installment contracts as a standard business practice and has a history of successfully collecting under the original payment terms without making concessions on payments, products or services.

Maintenance and support services are recognized ratably over the life of the maintenance and support contract period. Maintenance and support services include telephone support and unspecified rights to product upgrades and enhancements. These services are typically sold for a one-year term and are sold either as part of a multiple element arrangement with software licenses or are sold independently at time of renewal. The Company does not provide specified upgrades to its customers in connection with the licensing of its software products.

Service revenues from fixed-price contracts are recognized using the proportional performance method, measured by the percentage of costs (primarily labor) incurred to date as compared to the estimated total costs (primarily labor) for each contract. When a loss is anticipated on a contract, the full amount thereof is provided currently. Service revenues from time and expense contracts and consulting and training revenue are recognized as the related services are performed. Services that have been performed but for which billings have not been made are recorded as unbilled services, and billings that have been recorded before the services have been performed are recorded as unearned revenue in the accompanying consolidated balance sheets. In accordance with the Emerging Issues Task Force (EITF) released Issue No. 01-14, "Income Statement Characterization of Reimbursements Received for "Out-of-Pocket' Expenses Incurred," reimbursement received for out-of-pocket expenses is recorded as revenue and not as a reduction of expenses

127.    The above representations were materially false and misleading when made because, as Defendants knew, or recklessly disregarded, Aspen did not recognize revenue in accordance with its publicly stated accounting polices.

128.    In addition, Defendants knew, or recklessly ignored, that Aspen recognized revenue on shipments to its distributors and resellers when such shipments were tantamount to consignment sales because the obligation to pay for Aspen's products were, in substance, contingent on factors such as the resale of the product by the distributor to the end users.[14]

129.    Indeed, Defendants knew, or recklessly ignored, that such policy violated GAAP because during the Class Period, the SEC had issued numerous statements warning to its registrants to be ever vigilant about their revenue recognition practices.   In addition, Defendants had the responsibility to select generally accepted accounting principles that were appropriate to reflect Aspen's business activities in accordance with Section 13 of the Exchange Act of 1934.

130.    As Section 13 of the Securities Exchange Act of 1934 provides:

Every issuer which has a class of securities registered pursuant to Section 12 of this title and every issuer which is required to file reports pursuant to Section 15(d) of this title shall –

A.    make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

B.    devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.    transactions are executed in accordance with management's general or specific authorization;

---

[14] As noted in SAB No. 101, consignment arrangements are not sales and do not qualify for revenue recognition because the seller retains the risks and rewards of ownership of the product shipped.

ii.    transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets;

iii.    access to assets is permitted only in accordance with management's general or specific authorization; and

iv.    the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**Aspen's False and Misleading Reporting and**
**Certifications of Disclosure and Internal Controls**

131.    Directly contradicting their representations during the Class Period, Defendants have now admitted that Aspen's internal control policies and procedures were materially deficient in numerous respects.  In fact, Aspen has admitted that:

In March 2005, in connection with its audit of the restated financial statements for the years ended June 30, 2002, 2003 and 2004 included in this Form 10-K/A, Deloitte & Touche LLP made a report (again under the interim standards of the PCAOB) regarding certain elements of our system of internal controls to the audit committee of (1) a "material weakness" with respect to our software license revenue recognition controls and (2) a "reportable condition" with respect to our processes for recording restructuring accruals that did not constitute a material weakness.  Our management considered both of these reports in re-evaluating our disclosure controls and procedures as of June 30, 2004 in connection with the filing of this Form 10-K/A. Our management concluded that the following factors contributed significantly to the material weakness with respect to our software license revenue recognition controls:

(a)    need for improved and redundant procedures and cross-checks to reasonably assure the identification of arrangements including both software license and services components;

(b)    need for improved and redundant procedures and cross-checks to reasonably assure the detection and prevention of unauthorized arrangements with customers entered into contemporaneously with software license agreements;

(c)    inadequate systems to track sales by resellers of software licenses to end-users;

(d)     lack of a sufficient number of qualified finance personnel to review and provide guidance on revenue recognition for complex software license transactions; and

(e)     need for routinization of our processes to assess the creditworthiness of new or existing customers.

132.    As a result of the rash of recent corporate accounting scandals, Congress enacted the Sarbanes-Oxley Act ("SOX") in 2002, in part, to heighten the responsibility of public company directors and senior managers associated with the quality of financial reporting and disclosures made by their companies.  Pursuant to Section 906 of SOX, Aspen's fiscal 2003 Form 10-K, which included the Company's false and misleading financial statements and/or financial information for the years ended June 30, 2003, 2002, 2001, 2000, and 1999, included the following certifications by defendants McQuillin and Kane, which they knew, or recklessly ignored, were materially false and misleading when made for the reasons set forth herein:

In connection with the Annual Report on Form 10-K of Aspen Technology, Inc. (the "Company") for the period ended June 30, 2003 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), the undersigned, . . . , hereby certifies, pursuant to 18 U.S.C. Section 1350, that:

(1)     *The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934*; and

(2)     *The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*. [Emphasis Added.]

133.    Defendants repeated the above certifications in all material respects, which Aspen included as an exhibit to its fiscal 2004 Form 10-K and Forms 10-Q.  In addition, Defendants McQuillin and Zappala signed similar certifications which Aspen included in its March 31, 2003 Form 10-Q that it filed with the SEC.

134.    As a result of SOX, the SEC also revised Item 307 and added Item 308 of Regulation S-K [17 C.F.R. 229.307 and 308] during the Class Period, which required Aspen to disclose the

conclusions of its principal executive and principal financial officers on the effectiveness of the Company's disclosure controls and procedures and disclose a report by management on Aspen's internal control over its financial reporting.[15]

As a result, Aspen's fiscal 2003 Form 10-K disclosed:

*Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures* (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, which we refer to as the Exchange Act) as of June 30, 2003. *Based on this evaluation, our chief executive officer and chief financial officer concluded that*, as of June 30, 2003, *our disclosure controls and procedures were (1) designed to ensure that material information* relating to AspenTech, including our consolidated subsidiaries, *is made known to our chief executive officer and chief financial officer* by others within AspenTech and our subsidiaries, particularly during the period in which this report was being prepared **and** (2) *effective, in that they provide reasonable assurance that information required to be disclosed by AspenTech in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms*; but also concluded that there are certain weaknesses in our foreign subsidiary translation process. We have dedicated resources to correcting these issues and have implemented the necessary corrections. These weaknesses did not have a material impact on the accuracy of our financial statements.

Other than the steps we have taken to correct certain weaknesses in the foreign subsidiary translation process, no change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the fiscal quarter ended June 30, 2003 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. [Emphasis added.]

_____

[15] The Securities Exchange Act Rules and Regulations defines disclosure controls: (1) as controls and other procedures designed to ensure that the information required to be disclosed to investors under The Securities Exchange Act is recorded, processed, summarized and reported; and internal control over financial reporting as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP.

135.     This representation, which was false and misleading for the reasons alleged herein, was wrongfully certified by Defendants McQuillin and Kane and included as part of Aspen's June 30, 2003 Form 10-K:[16]

I, . . . certify that:

1.     I have reviewed this annual report on Form 10-K of Aspen Technology, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     [Paragraph omitted in accordance with SEC transition instructions contained in SEC Release 34-47986];

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report)

---

[16] Aspen made similar representations and defendants McQuillin and Zappala signed similar certifications which Aspen included in its March 31, 2003 Form 10-Q that it filed with the SEC.

that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

     5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     (a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     (b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

136.    The above representations (with the exception of the reference to the foreign subsidiary translation process) and certifications were repeated in all material respects and included as part of Aspen's fiscal 2004 Forms 10-Q.

137.    In Aspen's fiscal 2004 Form 10-K, Defendants represented:

Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, which we refer to as the Exchange Act) as of June 30, 2004.  As part of the evaluation we considered the report to our audit committee by our independent auditors, Deloitte & Touche, LLP, of a "material weakness" and a "reportable condition" under standards established by the American Institute of Certified Public Accountants regarding certain elements of our system of internal controls.  Our independent auditors noted a material weakness with respect to our accounting for income taxes, due to errors in the computations of the provision for sales taxes, the domestic and foreign provision for income taxes, and the computation and classification of deferred income taxes.  They also cited a reportable condition with respect to our property record-keeping processes that did not constitute a material weakness.

In designing and evaluating our disclosure controls and procedures, our management recognized that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives, and our management necessarily applied its judgment in evaluating the cost-benefit relationship of possible controls and procedures.  Based on this evaluation, our chief executive officer and chief financial officer concluded that, as of June 30, 2004, as a result of the material weakness in our internal controls over financial reporting

- 75 -

described in our auditors report, our disclosure controls and procedures were not effective with respect to our accounting for income taxes and required implementation of the changes discussed below. We have evaluated the impact of the internal control weakness and reportable condition discussed above. Based on our evaluation, we do not believe that the control weakness and reportable condition noted above led to any material misstatements in the consolidated financial statements included in this report.

138.    This representation, which was false and misleading for the reasons alleged herein, was knowingly or with reckless disregard certified by defendants McQuillin and Kane and included as part of Aspen's June 30, 2004 Form 10-K.

**Internal Control Deficiencies**

139.    Subsequent to the Class Period, Defendants conceded, in Aspen's amended June 30, 2004 Form 10-K that their representations about its internal controls during the Class Period were materially false and misleading when made in, at least, the following respects:

(a)    A "material weakness" with respect to Aspen's software license revenue recognition controls existed during the Class Period;

(b)    The following deficiencies, which were elementary to any system of software license revenue recognition controls, existed:

(i)    Aspen failed to establish controls and procedures sufficient to reasonably identify software arrangements that included both software license and services components;

(ii)    Aspen's customer authorization controls and procedures were deficient;

(iii)    Aspen failed to establish controls and procedures sufficient to adequately track sales of software licenses by resellers to end-users;

(iv)    Aspen's accounting personnel were not sufficiently trained and/or knowledgeable to review and provide guidance on revenue recognition;

(v)       Aspen failed to establish controls and procedures sufficient to adequately assess the creditworthiness of new or existing customers; and

(c)       A "reportable condition" with respect to Aspen's processes for recording restructuring accruals existed during the Class Period.

**Disclosure Control Deficiencies**

140.    During the Class Period, Defendants' disclosures associated with Aspen's disclosure controls were repeatedly false and misleading because:

(a)       Aspen's revenue was reported in violation of its stated revenue recognition policies

(b)       Aspen's revenue recognition policy with respect to its resellers violated GAAP;

(c)       Aspen's management materially manipulated and misstated its reported earnings during the Class Period;

(d)       Aspen failed to disclose the numerous internal control deficiencies associated with its revenue recognition practices;

(e)       Defendants McQuillin, Kane and Zappala failed to design and evaluate the effectiveness of Aspen's disclosure controls and procedures;

(f)       Defendants McQuillin, Kane and Zappala falsely certified Aspen's representations concerning its internal and disclosure controls; and

(g)       Aspen failed to disclose the internal control deficiencies associated with its processes for recording restructuring accruals.

141.    As noted above, the disclosure and internal control deficiencies alleged herein existed and were known to the Defendants to be in existence as early as 1998. In fact, Defendants, actually pressured Aspen's sales personal into violating the very internal and disclosure controls and

procedures they purportedly designed, implemented and evaluated by manipulating the Company's reported sales so that Aspen could hit Wall Street estimates.

142.    In fact, Aspen's senior management pressured its sales personnel to meet quarterly sales targets "at any cost."  Indeed, former Aspen employees stated that senior level management instructed its sales force NOT to complete the order or contract date on sales orders and/or contracts so that Aspen could prematurely record a sales or back-date an order so that it could meet sales targets.  In addition, Aspen also held open its accounting periods so that sales could be posted and recognized in the previous quarter, and Aspen shipped empty boxes so it could falsely inflate its reported revenue.

143.    These practices required the coordination and approval of numerous departments within Aspen and could only have been accomplished with the complicity of Aspen's management at the highest levels.

**Defendants' Additional GAAP Violations**

144.    In addition to the accounting improprieties stated above, Aspen presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(a)    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, 34);

(b)    The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, 40);

(c)    The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, 50);

(d)    The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, 42);

(e)    The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, 58-59);

(f)    The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, 79); and

(g)    The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, 95, 97).

145.    In failing to file financial statements with the SEC which conformed to the requirements of GAAP, Aspen disseminated financial statements that were presumptively

misleading and inaccurate.  The Company's Class Period Forms 10-Q filed with the SEC were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

### ADDITIONAL SCIENTER ALLEGATIONS

146.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Aspen, their control over, and/or receipt and/or modification of Aspen's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Aspen, participated in the fraudulent scheme alleged herein.

147.    Prior to disclosing these adverse facts to the investing public, Aspen was further motivated to perpetuate this fraud in order to: (i) acquire ICARUS Corp. using its overvalued shares as partial consideration; (ii) complete a private placement of its common stock for gross proceeds of approximately $30 million; (iii) complete a private placement of its common stock for gross proceeds of approximately $50 million and use those proceeds as partial payment for its acquisition of Hyprotech Ltd.; and (iv) enable the Company to sign a definitive agreement for $100 million in private equity financing on favorable terms.

148.    On June 1, 2000 the Company acquired Petrolsoft Corporation and subsidiary (collectively "Petrolsoft"), a supplier of web−enabled supply chain software for the downstream petroleum industry.  The Company exchanged 2,641,101 shares of its common stock for all of the outstanding shares of Petrolsoft.

149.    On September 5, 2000, the Company announced that it closed a transaction to acquire ICARUS Corporation, the market leader in providing software that is used by the process manufacturing industries to estimate plant capital costs and evaluate project economics for $24.5 million in a combination of cash and stock.

150.    On or about June 15, 2001, Aspen acquired Houston Consulting and Coppermine by issuing 764,792 shares of common stock in private placements.  Subsequently, on or about December 17, 2001, Aspen registered for sale to the public more than 562,000 shares of its common stock issued in connection with its acquisitions of Houston Consulting and Coppermine at an aggregate offering price of $7.0 million.

151.    On February 7, 2002, the Company issued a press release announcing that it had completed a private placement of redeemable convertible preferred stock from which the Company received gross proceeds of $30.0 million.

152.    On May 10, 2002, the Company issued a press release announcing that it had agreed to a private placement of common stock to a small group of current institutional and new individual investors, raising gross proceeds of approximately $50 million.  The Company further stated that it intends to use the proceeds from the private placement, together with approximately $50 million of its cash on hand, to fund the acquisition of Hyprotech, Ltd., a leading supplier of process simulation and engineering software and services to the petroleum industry.

153.    On August 13, 2003, the Company issued a press release announcing the results of voting at its special meeting of stockholders. At the special meeting, stockholders approved the Company's proposed $100 million private equity investment from funds managed by Advent International Corporation.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

154.    At all relevant times, the market for Aspen's common stock was an efficient market for the following reasons, among others:

(a)    Aspen's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, Aspen filed periodic public reports with the SEC and the NASDAQ;

(c)    Aspen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Aspen was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

155.    As a result of the foregoing, the market for Aspen's common stock promptly digested current information regarding Aspen from all publicly available sources and reflected such information in Aspen's stock price. Under these circumstances, all purchasers of Aspen's common

stock during the Class Period suffered similar injury through their purchase of Aspen's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

156.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aspen who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

157.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Aspen's stock price and operated as a fraud or deceit on Class Period purchasers of Aspen stock by misrepresenting the Company's financial results, business success and future business prospects, and concealing the extent and seriousness of manipulations involving Aspen's revenue streams and true financial condition. Defendants achieved this façade of success, growth and strong future business prospects by blatantly concealing the fraudulent conduct and misrepresenting Aspen's business.  Later, however, when Defendants' prior misrepresentations were disclosed and became apparent to the market, Aspen stock fell precipitously as the prior artificial inflation came out of Aspen's stock price.  As a result of

their purchases of Aspen stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

158.    By improperly concealing its conduct, the Defendants presented a misleading picture of Aspen's business and prospects.  Thus, instead of truthfully disclosing during the Class Period that Aspen's earnings did not reflect its true operating results, Defendants caused Aspen to conceal its violation of SEC and NASDAQ rules.  During the Class Period, Defendants repeatedly emphasized Aspen's improving financial condition which would lead to enhanced future results.

159.    These claims of financial improvement caused and maintained the artificial inflation in Aspen's stock price throughout the Class Period and until the truth was revealed to the market.

160.    Concurrent with the concealment of the improprieties by high level Aspen officials, Defendants also misled Plaintiffs by repeatedly asserting that Aspen's reported financial results "exceeded expectations for both revenues and profitability" throughout the Class Period.

161.    Defendants' false and misleading statements had the intended effect and caused Aspen stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $53.50 per share.

162.    In a series of disclosures beginning in late October 2004 and continuing through March 15, 2005, the truth concerning Defendants' false and misleading representations during the Class Period became known.  Following each of these announcements the artificial inflation caused by Defendants' misrepresentations came out of the price of Aspen common stock. The resulting price declines caused real economic loss to Aspen's public investors. For example:

(a)    On October 27, 2004, Defendants were forced to disclose that Aspen's Audit Committee had undertaken a detailed review of the accounting for certain software license and service agreement transactions entered into with certain alliance partners and other customers during

fiscal years 2000-2002. Preliminary findings of the Audit Committee revealed numerous instances of accounting irregularities which improperly overstated Aspen's revenues and earnings. Following this announcement the price of Aspen common stock fell to an intraday low of $5.50 per share on October 28, 2004, or approximately 20%, before closing at $6.68 per share, on unusually heavy trading volume.

(b)     On October 29, 2004, the Company announced that federal prosecutors launched a probe into the Company's accounting practices from 2000 through 2002. The Company said it received a subpoena from the U.S. Attorney's Office for the Southern District of New York requesting documents relating to transactions that it entered into during those years, and other documents dating from January 1, 1999. Following this announcement Aspen common stock dropped an additional $0.67 per share, or approximately 10%, to close at $6.01 per share.

(c)     On November 18, 2004, Aspen issued a press release announcing that due to the delay in filing its Form 10-Q for the period ending September 30, 2004, it had received a letter from The NASDAQ Stock Market indicating that the Company's stock was subject to delisting. The Company further reported that the delay in filing was related to the Company's previously announced accounting investigation. In response to this news, the price of Aspen common stock declined 7.5% from $6.02 per share to $5.57 per share.

(d)     On November 24, 2004, Aspen issued a press release announcing that based on the review of its Audit Committee it expected to restate its financial statements for fiscal years 2000-2004 and advised investors that financial statements for the fiscal years ended June 30, 2000 through June 30, 2004 should not be relied upon. In addition, the press release also announced that Aspen's Board of Directors had asked McQuillin to resign his posts and that he had agreed to do so.

Following this news, the price of Aspen stock declined 3.7% from $5.79 per share to $5.57 per share.

(e)     Then, on the last day of the Class Period, March 15, 2005, Aspen filed with the SEC Form 10-K/A amending its previously filed fiscal 2004 10-K to include restated financial statements for the fiscal years ended 1999, 2000, 2001, 2003 and 2004. Additionally, Defendants admitted to an avalanche of material weaknesses in the Company's disclosure controls and procedures. In response to the revelations contained in the Amended 200410-K, the price of Aspen stock declined 6.5% from $6.29 per share to $5.88 per share on heavy trading volume.

163.    As a direct result of Defendants' admissions and public statements regarding the truth about Aspen's previously reported financial results and its actual business prospects going forward, the price of Aspen common stock declined. Each of these announcements further revealed the extent of Defendants' fraudulent conduct, draining additional artificial inflation from the price of Aspen stock, damaging investors. These drops removed the inflation from Aspen's stock price, causing real economic loss to investors who had purchased the stock during the Class Period.

164.    In sum, as the truth about Defendants' fraud and Aspen's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock and Plaintiffs and other members of the Class were damaged, suffering economic losses of at least $1.38 per share.

165.    The decline in Aspen's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Aspen's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. During

the same period in which Aspen's stock price fell from $6.88 per share as a result of Defendants' fraud being revealed, the Standard & Poor's 500 securities index and NASDAQ index rose slightly. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Aspen's stock price and the subsequent significant decline in the value of Aspen's stock when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

## COUNT I

### Violation of Section 10(b) of The Exchange Act Against and Rule 10b-5 Promulgated Thereunder Against All Defendants

166.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

167.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public regarding Aspen's business, operations, management and the intrinsic value of Aspen common stock; (ii) enable the Company to use its artificially inflated stock as partial payment for its acquisition of ICARUS Corp.; (iii) enable the Company to complete a private placement on favorable terms whereby the Company reaped $30 million in gross proceeds; (iv) enable the Company to complete a private placement on favorable terms whereby the Company reaped $50 million in gross proceeds and used those proceeds as partial payment for its acquisition of Hyprotech; (v) enable the Company to complete a $100 million private equity investment on favorable terms; and (vi) cause Plaintiffs and other members of the Class to purchase Aspen's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

168.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Aspen's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

169.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Aspen as specified herein.

170.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Aspen's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Aspen and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Aspen common stock during the Class Period.

171.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team

- 88 -

or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

172.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Aspen's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.    As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

173.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Aspen's common stock was artificially inflated during the Class Period.    In ignorance of the fact that market prices of

Aspen's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Aspen common stock during the Class Period at artificially high prices and were damaged thereby.

174.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Aspen's financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Aspen common stock, or, if they had acquired such common stock during the Class Period, they would not have done so at the artificially inflated prices which they paid.

175.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

176.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

177.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

178.    The Individual Defendants acted as controlling persons of Aspen within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

179.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

180.    As set forth above, Aspen and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Class Counsel;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: August 26, 2005                    City of Roseville Employees' Retirement System
                                          and Operating Engineers Construction Industry
                                          and Miscellaneous Pension Fund,

                                          By their attorneys,

                                          **/s/Theodore M. Hess-Mahan**
                                          Thomas G. Shapiro, BBO No. 454680
                                          Theodore M. Hess-Mahan, BBO No. 557109
                                          SHAPIRO HABER & URMY LLP
                                          53 State Street
                                          Boston, MA 02109
                                          (617) 439-3939

                                          Liaison Counsel

                                          LERACH COUGHLIN STOIA GELLER
                                            RUDMAN & ROBBINS LLP
                                          SAMUEL H. RUDMAN
                                          RUSSELL J. GUNYAN
                                          200 Broadhollow Road, Suite 406
                                          Melville, NY  11747
                                          (631) 367-7100

                                          Lead Counsel for Plaintiffs