UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re ASPEN TECHNOLOGY, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 04-cv-12375-RCL |
| | ) | CLASS ACTION |
| | ) | |
| This Document Relates To: | ) ) | LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR |
| ALL ACTIONS. | ) ) ) | FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS |

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ...................................................................................1

II.   BACKGROUND AND HISTORY OF THE ACTION .......................................................2

III.  THE STANDARD FOR JUDICIAL APPROVAL OF CLASS ACTION
      SETTLEMENTS UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(e) ...............6

IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ............................7

      A.    The Parties Entered into the Settlement as a Result of Protracted Arm's-
            Length Negotiations Following Extensive Investigation.........................................7

      B.    The Settlement Represents an Excellent Recovery for the Class ...........................8

      C.    Lead Plaintiffs' Counsel Recommends Approval of the Settlement ......................9

      D.    Lead Plaintiffs and the Class Faced Substantial Risks in Establishing
            Liability and Damages and Defeating Defendants' Affirmative Defenses ..........10

      E.    The Complexity, Expense and Likely Duration of the Litigation ........................11

      F.    The Favorable Reaction of the Class Supports Approval.....................................11

V.    FINAL CLASS CERTIFICATION FOR PURPOSES OF THE PROPOSED
      SETTLEMENT IS APPROPRIATE .................................................................................12

      A.    The Class Is Sufficiently Numerous ...................................................................13

      B.    Common Questions of Law or Fact Exist.............................................................13

      C.    Lead Plaintiffs' Claims Are Typical of Those of the Class ..................................14

      D.    Lead Plaintiffs Are Adequate Class Representatives............................................15

      E.    The Proposed Class Satisfies Rule 23(b)(3) .......................................................15

            1.    Common Questions of Law and Fact Predominate Over Individual
                  Questions...................................................................................................16

            2.    A Class Action Is Superior to Other Available Methods for
                  Resolving This Controversy ......................................................................16

VI.   THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE
      AND SHOULD BE APPROVED ....................................................................................17

**Page**

VII.    CONCLUSION..................................................................................................................20

# TABLE OF AUTHORITIES

**Page**

*Amchem Prods. v. Windsor*,
    521 U.S. 591 (1997).........................................................................................12, 13, 16

*Backman v. Polaroid Corp.*,
    910 F.2d 10 (1st Cir. 1990)...........................................................................................11

*Beecher v. Able*,
    575 F.2d 1010 (2d Cir. 1978).........................................................................................17

*Blackie v. Barrack*,
    524 F.2d 891 (9th Cir. 1975) .........................................................................................14

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)..........................................................................................................6

*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 1992) .......................................................................................17

*Durrett v. Housing Auth. of Providence*,
    896 F.2d 600 (1st Cir. 1990)...........................................................................................6

*Hughes Tool Co. v. Trans World Airlines, Inc.*,
    409 U.S. 363 (1973)......................................................................................................11

*In re Chicken Antitrust Litig. Am. Poultry*,
    669 F.2d 228 (5th Cir. 1982) .........................................................................................17

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003).........................................................................................7

*In re Corrugated Container Antitrust Litig.*,
    643 F.2d 195 (5th Cir. 1981) ...........................................................................................7

*In re Global Crossing Sec. & ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ...................................................................................18

*In re Gulf Oil/Cities Serv. Tender Offer Litig.*,
    142 F.R.D. 588 (S.D.N.Y. 1992) ...................................................................................17

*In re Indigo Sec. Litig.*,
    No. 96-MD-1111 WGY, 1998 U.S. Dist. LEXIS 3157
    (D. Mass. Mar. 5, 1998)..................................................................................................6

**Page**

*In re Lease Oil Antitrust Litig.*,
     186 F.R.D. 403 (S.D. Tex.  1999)................................................................12, 13

*In re Lupron Mktg. and Sales Practices Litig.*,
     228 F.R.D. 75 (D. Mass. 2005)........................................................................13

*In re Relafen Antitrust Litig.*,
     231 F.R.D. 52 (D. Mass. 2005)................................................................ *passim*

*In re Twinlab Corp., Sec. Litig.*,
     187 F. Supp. 2d 80 (E.D.N.Y. 2002) ..............................................................17

*In re Viatron Computer Sys. Corp. Litig.*,
     614 F.2d 11 (1st Cir. 1980)................................................................................6

*In re Xcel Energy, Inc.*,
     364 F. Supp. 2d 980 (D. Minn. 2005)................................................................8

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*,
     671 F. Supp. 819 (D. Mass. 1987)................................................................7, 12

*Maley v. Del Global Techs. Corp.*,
     186 F. Supp. 2d 358 (S.D.N.Y. 2002)..............................................................17

*McLaughlin v. Liberty Mut. Ins. Co.*,
     224 F.R.D. 304 (D. Mass. 2004)......................................................................13

*Newby v. Enron Corp.*,
     394 F.3d 296 (5th Cir. 2004) .............................................................................7

*Payne v. Goodyear Tire & Rubber Co.*,
     216 F.R.D. 21 (D. Mass. 2003)....................................................................13, 14

*Piper v. Chris-Craft Indus.*,
     430 U.S. 1 (1977)..............................................................................................11

*Rodrigues v. Members Mortgage Co.*,
     226 F.R.D. 147 (D. Mass. 2005)..................................................................14, 15

*Tardiff v. Knox County*,
     365 F.3d 1 (1st Cir. 2004)................................................................................13

Page

*White v. NFL,*
  822 F. Supp. 1389 (D. Minn. 1993).................................................................17

*Williams v. First Nat'l Bank,*
  216 U.S. 582 (1910).........................................................................................6

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
  §78j(b).............................................................................................................14

Local Rule 16.4(a) ..............................................................................................16

Federal Rules of Civil Procedure
  Rule 1 ...............................................................................................................8
  Rule 23(a)(1).....................................................................................................13
  Rule 23(e)........................................................................................................1, 6
  Rule 23(b)(3)........................................................................................... *passim*

Lead Plaintiffs City of Roseville Employees' Retirement System and Operating Engineers Construction Industry and Miscellaneous Pension Fund (Local 66) respectfully submit this memorandum of law in support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds (the "Motion"), filed herewith. By this Motion, Lead Plaintiffs move this Court, pursuant to Federal Rule of Civil Procedure 23(e), to grant final approval of the proposed settlement of this class action (the "Settlement"), finally certify the Class, enter the proposed Order and Final Judgment and approve the Plan of Allocation of settlement proceeds.

## I.    PRELIMINARY STATEMENT[1]

Lead Plaintiffs are pleased to submit to the Court a Settlement in this action for $5,600,000, plus interest, for the benefit of the Class. The Settlement represents the culmination of nearly two years of litigation concerning representations Aspen Technology, Inc. ("AspenTech" or the "Company") and its senior officers made to the Company's shareholders and the investing public regarding the Company's financial results. Through an extensive independent investigation, including the identification, location and interview of witnesses, Lead Plaintiffs were able to plead a detailed complaint that they believe brought Defendants to the negotiating table at an early stage of the litigation. Nevertheless, Lead Plaintiffs were faced with many obstacles to a successful resolution of the case. Specifically, the parties vigorously disagreed on Lead Plaintiffs' ability to establish Defendants' scienter regarding their Class Period statements and, if established, the level of

---

[1]    An overview of Lead Plaintiffs' claims, the substantial efforts by plaintiffs' counsel and the negotiations leading to this Settlement are detailed in the Declaration of Samuel H. Rudman in Support of Lead Plaintiffs' Motion for (1) Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds; and (2) Application for an Award of Attorneys' Fees and Reimbursement of Expenses ("Rudman Decl.") and the Court is respectfully referred thereto. The Rudman Declaration is incorporated by reference herein.

damages suffered by the Class. Defendants consistently took the position (based on their damage expert's opinion) that there were little or no damages in the case. Ultimately, the parties agreed to mediate the case before Eric Green, Esq., a well-respected mediator of complex litigations such as this one, and, after a full day mediation and subsequent discussions between the parties with the participation of the Court-appointed Lead Plaintiffs, an agreement to settle the litigation for $5.6 million was reached.

As detailed herein and in the Rudman Declaration, the Settlement constitutes a very favorable result for the members of the Class and meets all the criteria required for approval. According to Lead Plaintiffs' damage expert, the $5,600,000 Settlement represents a recovery for the benefit of the Class of more than 21% of the maximum damages that might be recovered after trial, and is more than 100% of Defendants' estimate of damages.[2] Under this analysis, the Settlement represents a more than reasonable recovery for the Class. Moreover, the Settlement provides a guaranteed recovery and avoids the risk, delay, uncertainty, and expense of further litigation. The popularity of the Settlement with the members of the Class is seen from both the lack of any objection to the Settlement and that only 11 members of the Class have requested to be excluded from the action.

## II.    BACKGROUND AND HISTORY OF THE ACTION

Lead Plaintiffs' Consolidated Amended Complaint, filed on August 26, 2005, alleged, among other things, that throughout the Class Period, AspenTech engaged in improper accounting which artificially inflated and distorted the Company's financial results. Rudman Decl., ¶10. Specifically, the Consolidated Amended Complaint alleged that: AspenTech entered into side agreements with

---

[2]    Defendants' damage expert also performed a "plaintiff's-style" damage analysis and the Settlement represents more than 55% of that calculation.

customers which changed the terms of sales agreements so that the Company could prematurely recognize revenue; improperly recognized software license revenues on what were nothing more than consignment sales; recognized unearned software license revenue before it had substantially performed its sales arrangement obligations entitling it to the benefits represented by the revenues; and improperly and prematurely recognized maintenance revenue through a variety of manipulations. Rudman Decl., ¶18. The Consolidated Amended Complaint further alleged that Lead Plaintiffs and other Class Members purchased AspenTech common stock in reliance on the integrity of the market price of that stock and market information relating to AspenTech, or in the alternative, upon Defendants' misleading statements, and in ignorance of the adverse, undisclosed information known to Defendants, and have been damaged thereby.

The Consolidated Amended Complaint alleged that as a result of Defendants' materially misleading statements and failures to disclose the truth about AspenTech and accurate financial results, AspenTech common stock traded at artificially-inflated prices during the Class Period, until AspenTech's accounting fraud came to light in a series of announcements starting in October 2004. On October 27, 2004, AspenTech announced that its Audit Committee had undertaken a "detailed review" of the accounting for certain software and licensing service agreements and that as a result of that review, it would not be able to release its financial results for its first quarter. Rudman Decl., ¶12. On October 29, 2004, AspenTech announced that federal prosecutors had launched a probe of the Company's accounting practices. *Id.* On November 18, 2004, AspenTech announced that due to the delay in filing its Form 10-Q for the period ending September 30, 2004, it had received a letter from the NASDAQ stock market indicating that the Company's common stock was subject to delisting. *Id.*

On November 24, 2004, AspenTech issued a press release announcing that its Audit Committee believed that the Company would have to restate its financial statements for fiscal years 2000 through 2004 and, accordingly, those financial statements should not be relied on. *Id*. at ¶13. AspenTech also announced that its Board of Directors had asked Defendant McQuillin to resign his positions with the Company immediately. *Id*.

On January 31, 2005, AspenTech announced that its Audit Committee had completed its work and had identified 16 specific transactions that were entered into during fiscal years 2000 through 2002 which were improperly accounted for. *Id*. Finally, on March 15, 2005, AspenTech filed with the SEC an amended Form 10-K for the year ended June 30, 2004. In that amended Form 10-K, AspenTech detailed the full extent of its improper accounting and set forth restated financial results. AspenTech's stock price declined over 27% during the period from October 18, 2004, to March 16, 2005. *Id*.

The parties agreed to mediate the case before Eric Green, and a full day mediation session took place on September 14, 2005. Although no settlement was reached during that mediation, discussions between the parties continued, and, as a result of the frank exchange of views on liability and damages, after several more weeks of negotiations, an agreement-in-principle to settle the litigation for $5.6 million in cash was reached.

Lead Plaintiffs' decision to enter into the Settlement with Defendants was made with the advice and counsel of Lead Plaintiffs' counsel, who are knowledgeable of the facts and circumstances underlying Lead Plaintiffs' claims and the strengths and weaknesses of those claims as against Defendants, including the risk that damages, if any, might be determined after trial to be less than the amount of the Settlement. In determining to settle the action, Lead Plaintiffs and their counsel have evaluated the pre-trial investigation performed and taken into account the expense and

length of time necessary to prosecute the action through trial, post-trial motions, and likely appeals, taking into consideration the significant uncertainties in predicting the outcome of this complex litigation.

The Court granted preliminary approval of the Settlement in an Order dated December 12, 2005 (the "Preliminary Approval Order"). In the Preliminary Approval Order the Court also, among other things: (1) approved the form of a Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Fairness Hearing (the "Notice") and ordered it to be mailed to each member of the Class who could be identified with reasonable effort; (2) approved the form of a summary notice (the "Summary Notice") and ordered it to be published in *The Wall Street Journal*; (3) conditionally certified the Class; (4) established February 14, 2006, as the deadline for members of the Class to serve any request to be excluded from the Class and the Settlement, or February 21, 2006 to file any objections to the Settlement or Plaintiffs' Counsel's application for an award of attorneys' fees and expenses; and (5) scheduled a hearing on final approval of the Settlement for March 6, 2006.

Pursuant to the Preliminary Approval Order, Lead Plaintiffs' Counsel caused the Notice to be mailed, on January 6, 2006, to 3,415 shareholders identified from records provided by AspenTech's transfer agent, and to 84 brokers, banks, and other nominees. After the initial mailing, an additional 33,678 Notices were mailed to potential Class Members. A total of 37,093 Notices were sent to Class Members and potential Class Members. *See* paragraphs 3-6 to the Declaration of Carole K. Sylvester Re A) Mailing of the Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Fairness Hearing, and the Proof of Claim and Release Form; and B) Publication of the Summary Notice ("Sylvester Decl."), submitted herewith. Lead Plaintiffs' counsel also caused the Summary Notice to be published in *The Wall Street Journal* on

- 5 -

January 13, 2006.  *See* Sylvester Decl., ¶8.  As of the filing of this memorandum, ***no objections to the Settlement, the Plan of Allocation or Lead Plaintiffs' counsel's application for an award of attorneys' fees and reimbursement of expenses have been filed with the Court or served on Lead Plaintiffs' counsel***.

Counsel for Lead Plaintiffs believe that the Settlement described herein confers a substantial benefit upon the Class and is fair, reasonable and adequate.  Based upon their consideration of all of these factors, Lead Plaintiffs and their counsel have concluded that it is in the best interest of Lead Plaintiffs and the Class to settle the action on the terms described herein.

## III.    THE STANDARD FOR JUDICIAL APPROVAL OF CLASS ACTION SETTLEMENTS UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(e)

It is well-established that courts favor settlements of lawsuits over continued litigation.  *See, e.g., Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910); *Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990); *In re Viatron Computer Sys. Corp. Litig.*, 614 F.2d 11, 15 (1st Cir. 1980); *see also* Local Rule 16.4(a) (providing that the "judicial officer shall encourage the resolution of disputes by settlement").

Before granting final approval of a proposed class action settlement, the court must find that the settlement is "fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23 (e); *In re Indigo Sec. Litig.*, No. 96-MD-1111 1998 U.S. Dist. LEXIS 3157, *4 (D. Mass. Mar. 5, 1998) (Young, C. J.).  In conducting its evaluation, however, the court should not decide the merits of the case.  *Carson v. Am. Brands, Inc*., 450 U.S. 79, 88 n.14 (1981).

Among the factors traditionally considered in evaluating the fairness of a class action settlement are the following: (i) whether the settlement negotiations were at arm's length; (ii) the stage of the litigation and the amount of discovery completed; (iii) the amount of the settlement compared to the amount at issue in the case; (iv) plaintiff's likelihood of succeeding on the merits

and recovering damages on the claims; (v) class counsel's recommendations; and (vi) the nature and merit of any objections. *See, e.g., In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 206 (D. Me. 2003); *M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822-23 (D. Mass. 1987).

In the case at bar, an examination of the foregoing factors demonstrates that the proposed Settlement is fair, reasonable, and adequate to the members of the Class and should be approved by the Court.

## IV.   THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE

### A.   The Parties Entered into the Settlement as a Result of Protracted Arm's-Length Negotiations Following Extensive Investigation

As noted above, this case was exhaustively investigated and meticulously pled before the Settlement was reached. Lead Plaintiffs' thorough investigation led to their understanding of their claims, despite the limitations imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") mandated discovery stay. Settlement negotiations took place at arm's length before a highly respected mediator and then among the parties themselves. The parties exchanged mediation statements which set forth the merits of their respective positions along with an estimate of damages suffered by the Class. These negotiations ultimately resulted in the Settlement currently before the Court.

As a result of the efforts by both sides, both Lead Plaintiffs and Defendants are in an unusually good position at an early stage of the litigation to understand the strengths and weaknesses of their respective positions. A great deal of formal discovery is not a "necessary ticket to the bargaining table." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) (citation omitted). *See also Newby v. Enron Corp.*, 394 F.3d 296, 307 (5th Cir. 2004) ("The overriding theme of our caselaw is that formal discovery is not necessary as long as (1) the interests

of the class are not prejudiced by the settlement negotiations and (2) there are substantial factual

bases on which to premise settlement.").  In fact, given the PSLRA-mandated discovery stay during

the pendency of motions to dismiss, when early settlements are reached, rarely has any formal

discovery occurred prior to resolution of the case.  Nevertheless, in order to plead a complaint

designed to withstand a motion to dismiss under the heightened pleading standards of the PSLRA,

Lead Plaintiffs' counsel expended significant resources on investigations and informal discovery.  It

was this investigation which gave Lead Plaintiffs the information they needed to knowledgeably

discuss and negotiate a settlement with Defendants.

The comprehensive investigative efforts initiated by Lead Plaintiffs' counsel in this case

provided Lead Plaintiffs not only with a clear picture of the strengths of their own case, but also of

the legal and factual defenses that Defendants would likely raise at trial.  Having completed an

exhaustive investigation which allowed them to properly evaluate the case, Lead Plaintiffs' counsel

have succeeded in obtaining an outstanding settlement without unduly prolonging it and without

undertaking an expensive trial.  *See In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 992 (D. Minn.

2005) ("The Federal Rules of Civil Procedure 'shall be construed and administered to ensure the

***just, speedy, and inexpensive determination*** of every action.'") (quoting Fed. R. Civ. P. 1)

(emphasis in original).  "Under Rule 1, as officers of the court, attorneys share the responsibility

with the court of ensuring that cases are 'resolved not only fairly, but without undue cost or delay.'"

*Id*. (citing Fed. R. Civ. P. 1 Advisory Committee Notes, 1993 Amendments).  Lead Plaintiffs are

satisfied that the Settlement was reached after lengthy investigation and research to enable them and

their counsel to knowledgeably settle the case.

### B.    The Settlement Represents an Excellent Recovery for the Class

Under the terms of the Stipulation and Agreement of Compromise, Settlement and Release of

Securities Action dated as of November 16, 2005, the settlement consideration consists of

$5,600,000, plus interest, for the benefit of Lead Plaintiffs and the Class. In light of the risks, costs, and delays that would result from proceeding to trial and appeal of any trial verdict, as discussed below, the Settlement provides a reasonable recovery for the members of the Class. According to Lead Plaintiffs' damage expert, the Settlement represents a recovery for the benefit of the Class of more than 21% of the maximum provable damages. On the other hand, Defendants have prepared various damage estimates, and, under one of these scenarios, the settlement represents ***more than 100%*** of their damages estimate. Even under Defendants' "plaintiff's-style" damage analysis, the settlement represents more than 55% of maximum provable damages. Under any analysis, therefore, the Settlement represents an excellent recovery for the Class. "A fine-tuned equation by which to determine the reasonableness of the size of a settlement fund does not exist." *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 73 (D. Mass. 2005).

### C. Lead Plaintiffs' Counsel Recommends Approval of the Settlement

Lead Plaintiffs' counsel have extensive experience in litigating class actions and have negotiated scores of class action settlements that have been approved by courts in this District and throughout the country. Lead Plaintiffs' counsel negotiated the Settlement with the benefit of the extensive analysis of the applicable law and the relevant facts which Lead Plaintiffs' counsel gained from extensively investigating the alleged wrongdoing. Lead Plaintiffs' counsel agreed to the Settlement after considering the strengths and weaknesses of the claims asserted in the action and the significant benefits to the Class in light of the risks, the delay, and the additional expense of continuing this complex litigation. It is the informed judgment of Lead Plaintiffs' counsel that the Settlement fully satisfies the requirement of Rule 23(e) that a settlement be fair, reasonable and adequate to the members of the Class.

**D.    Lead Plaintiffs and the Class Faced Substantial Risks in Establishing Liability and Damages and Defeating Defendants' Affirmative Defenses**

Lead Plaintiffs and the Class faced significant risks in establishing liability and damages and defeating Defendants' affirmative defenses.  While Lead Plaintiffs' counsel believe that Lead Plaintiffs' liability case is strong, Defendants made several arguments that Lead Plaintiffs would have to overcome.  First, Defendants have continuously maintained that the restatement of results was the product of just 16 specific transactions that fell outside their published policies for revenue recognition and as a result of revisions to their accounting policies to more accurately reflect the reality to AspenTech's on-going business relationships with customers and resellers.  Rudman Decl., ¶37(a).  With respect to Defendants' scienter, Defendants have argued that Lead Plaintiffs will be unable to prove that Defendants knew that the financial statements at issue were false when made.  Short of obtaining an admission of liability from Defendants themselves, this proof would necessarily be in the form of circumstantial evidence which is primarily within the control of the Defendants.  Finally, with respect to loss causation and damages, these issues would require expert testimony, and would undoubtedly be reduced to a "battle of experts."  Defendants claimed that no purchaser of AspenTech common stock after August 15, 2002 (or more than two years prior to the end of the Class Period) could have sustained damage because AspenTech's restated results show that the Company's originally reported financial statements *understated* the Company's earnings and therefore could not have resulted in artificially inflated prices of AspenTech common stock.  Rudman Decl., ¶37(c).  There is no guarantee that the fact finder would accept the opinions of Lead Plaintiffs' experts.  This could have materially reduced the damages suffered by the Class.

The Settlement therefore provides a guaranteed recovery for each member of the Class and avoids the risks of continued litigation – including those risks described above.  Accordingly, these circumstances militate in favor of granting final approval of the Settlement.

### E.    The Complexity, Expense and Likely Duration of the Litigation

As the preceding sections have shown, this action was replete with complexity and uncertainty in establishing liability, overcoming Defendants' defenses, and establishing damages. The parties would have had to brief Defendants' motion to dismiss, discovery would be prolonged and expensive, and additional experts would have been retained. Moreover, whatever the outcome at trial with respect to liability and damages, there would inevitably have been post-trial motions and an appeal. Further proceedings after trial could well prolong the case for several more years, with, of course, no certainty of a recovery for the Class. *See, e.g., Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (judgment for plaintiffs reversed on appeal after 11 years of litigation); *Piper v. Chris-Craft Indus.*, 430 U.S. 1 (1977) (reversing award of damages after eight years of litigation); *Hughes Tool Co. v. Trans World Airlines, Inc.*, 409 U.S. 363 (1973) (reversing treble damage judgment of $145,000,000 in action begun 12 years earlier).

Accordingly, the uncertainty, expense and likely duration of the case, through trial and appeals, also support approval of the Settlement.

### F.    The Favorable Reaction of the Class Supports Approval

The highly favorable reaction of the members of the Class to the Settlement also supports its approval. Pursuant to the Preliminary Approval Order, Lead Plaintiffs' counsel caused the Notice to be mailed, starting on January 6, 2006, to a total of 37,093 Class Members and potential Class Members. *See* Sylvester Decl., ¶¶3-6. Pursuant to the Preliminary Approval Order, Lead Plaintiffs' counsel also caused the Summary Notice to be published in *The Wall Street Journal* on January 13, 2006. *See* Sylvester Decl., ¶8. Both the Notice and the Summary Notice informed the Class Members, inter alia: (i) that the action has been settled, subject to the Court's final approval at the final approval hearing on March 6, 2006; (ii) of the terms of the Settlement including a description of the settlement consideration that the Class Members would receive in exchange for releasing their

claims; (iii) that they could request to be excluded from the Settlement, by submitting a request for exclusion by February 14, 2006; (iv) that Lead Plaintiffs' counsel would seek from the Court an award of attorneys' fees of 25% of the Settlement Fund and reimbursement of expenses of approximately $150,000; and (v) that the Class Members are entitled to be heard at the final approval hearing as to any objections to the Settlement, the Plan of Allocation or to Lead Plaintiffs' counsel's fee application, provided that any member of the Class wishing to object file a written notice of such objection by February 21, 2006.

*No objections to the Settlement or Lead Plaintiff's counsel's application for an award of attorneys' fees and expenses have been filed with the Court or served on Lead Plaintiffs' counsel* and only 11 members of the Class have submitted requests for exclusion from the Settlement.

The absence of objections by Class Members is, of course, an important factor in evaluating the fairness, reasonableness and adequacy of the Settlement. *See, e.g., M. Berenson*, 671 F. Supp. at 824. The Class Members' uniformly positive reaction to the proposed Settlement also supports approval of the Settlement.

## V.   FINAL CLASS CERTIFICATION FOR PURPOSES OF THE PROPOSED SETTLEMENT IS APPROPRIATE

The Court's Preliminary Approval Order certified the Class, for purposes of effectuating the Settlement only, as "all Persons who purchased the common stock of Aspen Technology, Inc. between October 29, 1999 and March 15, 2005, inclusive." Final certification of the Class should now be entered for purposes of settlement.

If all of Rule 23's requirements are met, a class may be certified for purposes of a settlement. *Amchem Prods. v. Windsor*, 521 U.S. 591 (1997); *Relafen*, 231 F.R.D. at 68. "[A] district court must first find that a class satisfies the requirements of Rule 23, regardless of whether it is certifying the class for trial or for settlement." *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403, 418 (S.D. Tex.

- 12 -

1999); *see also Amchem*, 521 U.S. at 621 ("The safeguards provided by the Rule 23(a) and (b) class-qualifying criteria, we emphasize, are not impractical impediments – checks shorn of utility – in the settlement class context."). However, "the district court may take the proposed settlement into consideration when examining the question of certification. *Amchem*, [521 U.S. 620-21]. . . . [Additionally], 'a district court [determining whether to certify a class for settlement purposes only] need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial.'" *Lease Oil*, 186 F.R.D. at 418 (quoting *Amchem,* 521 U.S. at 620). Moreover, "the law favors class action settlements." *In re Lupron® Mktg. and Sales Practices Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005).

In order to be certified, a class must satisfy the four requirements of Rule 23(a), and fit with one of the categories of class actions set forth in Rule 23(b). *Tardiff v. Knox County*, 365 F.3d 1, 4 (1st Cir. 2004). The Class here easily satisfies all of Rule 23's requirements and should be certified.

## A. The Class Is Sufficiently Numerous

For a class action to be appropriate, the proposed class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1). There is no fixed number of class members which either compels or precludes the certification; indeed, classes consisting of 40 members generally are sufficient to establish numerosity. *McLaughlin v. Liberty Mut. Ins. Co.*, 224 F.R.D. 304, 307 (D. Mass. 2004). Here, as the Sylvester Declaration sets forth, over 37,000 individual Notices were sent to Class Members throughout the country. Moreover, over 600 million shares of AspenTech common stock were traded during the Class Period. Therefore, the threshold for a presumption of impracticability of joinder is thus easily exceeded.

## B. Common Questions of Law or Fact Exist

The commonality requirement of Rule 23(a)(2) is satisfied when common questions of law or fact are present. *See Payne v. Goodyear Tire & Rubber Co.*, 216 F.R.D. 21, 25 (D. Mass. 2003). It

is not necessary that all issues of fact and law be common. *Relafen*, 231 F.R.D. at 69. Here, the Consolidated Amended Complaint spells out a "common course of conduct," the hallmark of Rule 10b-5 securities class actions. *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975). The fraudulent scheme alleged here is similar to that found in *Blackie*, where the Ninth Circuit held:

> The overwhelming weight of authority holds that repeated misrepresentations of the sort alleged here satisfy the "common question" requirement. Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Id.* at 902. Thus, class certification is proper when, as here, a class of stock purchasers is defrauded over a period of time by similar misrepresentations due to defendants' common course of conduct. *See id.* at 904-05. In this case, Lead Plaintiffs alleged that material misrepresentations and omissions were contained in (or omitted from) Defendants' public statements, thereby similarly deceiving each purchaser of AspenTech common stock during the Class Period. Rule 23(a)(2) is therefore satisfied.

## C.  Lead Plaintiffs' Claims Are Typical of Those of the Class

The Lead Plaintiffs' claims are typical of Class Members' claims. Under Rule 23(a)(3), claims are typical where the "'named plaintiffs' claims arise from the same course of conduct that gave rise to the claims of the absent [class] members.'" *Rodrigues v. Members Mortgage Co.*, 226 F.R.D. 147, 151 (D. Mass. 2005) (citation omitted). Typicality requires "the same essential characteristics" among claims. *Payne*, 216 F.R.D. at 26. "For purposes of demonstrating typicality, '[a] sufficient nexus is established if the claims or defenses of the class and the class representative arise from the same event or pattern or practice and are based on the same legal theory.'" *Relafen*, 231 F.R.D. at 69 (citation omitted).

In this case, the typicality requirement is met. There is no conflict or antagonism here between the Lead Plaintiffs' interests and those of the members of the Class because the claims of all

Class Members derive from the same legal theories and allege the same set of operative facts. Like all of the Class Members, Lead Plaintiffs purchased their AspenTech common stock at prices artificially inflated by Defendants' materially false and misleading statements or omissions, without knowledge of material facts Defendants either knew or concealed. Therefore, all Class Members were victims of the same course of alleged conduct.

### D.    Lead Plaintiffs Are Adequate Class Representatives

Under Rule 23(a)(4), plaintiffs must also "fairly and adequately protect the interests of the class." Adequacy "'requires that Plaintiff demonstrate that [his] interests will not conflict with those of class members and that [his] counsel is qualified, experienced and able to vigorously conduct the proposed litigation.'" *Rodrigues*, 226 F.R.D. at 151 (citation omitted). Only a conflict that goes to the very subject matter of the litigation will defeat a finding of adequacy. No such conflict exists here. Moreover, "'[i]n complex actions such as this one, named plaintiffs are not required to have expert knowledge of all details in the case, . . . and a great deal of reliance on the expertise of counsel is to be expected.'" *Relafen*, 231 F.R.D. at 69.

The adequacy test is met here. The Lead Plaintiffs' interests are co-extensive, do not conflict with the Class Members' interests, and are typical of the clams of the Class. Substantial common questions of fact and law exist and the Lead Plaintiffs' interests are aligned with those of the Class. The Lead Plaintiffs have retained experienced counsel to prosecute this case, and have participated in all aspects of the litigation. Lead Plaintiffs' counsel possess extensive experience in the area of securities litigation and have successfully prosecuted scores of securities fraud class actions across the country. *See* declarations of Plaintiffs' Counsel, submitted herewith.

### E.    The Proposed Class Satisfies Rule 23(b)(3)

Rule 23(b)(3) authorizes certification where, in addition to the prerequisites of Rule 23(a), common questions of law or fact predominate over any individual questions and a class action is

- 15 -

superior to other available means of adjudication.  *Amchem*, 521 U.S. at 591-94.  This case easily

meets Rule 23(b)(3)'s requirements.

### 1.    Common Questions of Law and Fact Predominate Over Individual Questions

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently

cohesive to warrant adjudication by representation."  *Amchem*, 521 U.S. at 623.  As discussed above,

there are a host of common questions of law and fact as to the members of the Class which Lead

Plaintiffs seek to represent.  These questions clearly predominate over individual questions because

Defendants' alleged conduct affected all Class Members in the same manner – by artificially

inflating the price of AspenTech stock.  "Predominance is a test readily met in certain cases alleging

consumer or securities fraud or violations of the antitrust laws."  *Id.* at 625.  The First Circuit does

not require an "entire universe" of common issues, but does require a "'sufficient constellation'" of

them.  *Relafen*, 231 F.R.D. at 70 (citation omitted).  As described above, this requirement is clearly

met.

### 2.    A Class Action Is Superior to Other Available Methods for Resolving This Controversy

The second prong of Rule 23(b)(3) is essentially satisfied by the Settlement itself.  The

requirement of superiority "ensures that resolution by class action will 'achieve economics of time,

effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without

sacrificing procedural fairness or bringing about other undesirable results.'"  *Relafen*, 291 F.R.D. at

70 (citing *Amchem*, 521 U.S. at 615).  As further explained in *Amchem*, "[c]onfronted with a request

for settlement-only class certification, a district court need not inquire whether the case, if tried,

would present intractable management problems, *see* Fed. R. Civ. P. 23(b)(3)(D), for proposal is that

there be no trial."  521 U.S. at 620.  Any management problems that may have existed here are

- 16 -

eliminated by the Settlement. Therefore, because each of the other elements of Rule 23 are satisfied, a class action is the superior method of adjudicating the relatively small claims of Class Members.

## VI.    THE PLAN OF ALLOCATION IS FAIR, REASONABLE AND ADEQUATE AND SHOULD BE APPROVED

Assessment of a plan of allocation of settlement proceeds in a class action under Rule 23 of the Federal Rules of Civil Procedure is governed by the same standards of review applicable to the settlement as a whole – the plan must be fair, reasonable and adequate.  *See Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1284 (9th Cir. 1992); *In re Twinlab Corp., Sec. Litig.*, 187 F. Supp. 2d 80, 84 (E.D.N.Y. 2002); *Maley v. Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002). District courts enjoy "broad supervisory powers over the administration of class-action settlements to allocate the proceeds among the claiming class members . . . equitably."  *Beecher v. Able*, 575 F.2d 1010, 1016 (2d Cir. 1978); *accord In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).  An allocation formula need only have a reasonable, rational basis, particularly if recommended by "experienced and competent" class counsel.  *White v. NFL*, 822 F. Supp. 1389, 1420-24 (D. Minn. 1993); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 596 (S.D.N.Y. 1992).

The objective of the plan of allocation is to provide an equitable basis upon which to distribute the settlement fund among eligible class members.  Here, the Plan of Allocation was developed by Lead Plaintiffs' counsel in consultation with their damage consultant and reflects an assessment of the total damages that could have been recovered as well as an assessment of the individual Class Members' damages, based on when they bought and sold their stock, and it will result in a fair distribution of the available proceeds among those Class Members who submit valid claims.  The Plan of Allocation calculates and allocates damages consistent with Lead Plaintiffs' damage analyses, and also weighs the strength of plaintiffs' case at different times during the Class

Period. *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 462 (S.D.N.Y. 2004) ("A reasonable plan may consider the relative strength and values of different categories of claims.").  A claim will be calculated as follows:

1.    For shares of Aspen Technology common stock purchased from October 29, 1999 through October 28, 2004, and

(a)    sold prior to October 29, 2004, the claim per share is $0.

(b)    sold between October 29, 2004 and November 18, 2004, the claim per share is the lesser of (i) the purchase price less $5.196 (90-day average closing price), or (ii)  $0.670 per share (10/29/04 price decline).

(c)    sold between November 19, 2004 through March 15, 2005, the claim per share is the lesser of (i) the purchase price less $5.196 (90-day average closing price), or (ii) $1.120 per share (10/29/04 & 11/19/04 price declines).

(d)    retained at the end of March 15, 2005, the claim per share is the lesser of (i) the purchase price less $5.196 (90-day average closing price), or (ii) $1.530 per share (10/29/04, 11/19/04 & 3/16/05 price declines).

2.    For shares of Aspen Technology common stock purchased from October 29, 2004 through November 18, 2004, and

(a)    sold prior to November 19, 2004 the claim per share is $0.

(b)    sold between November 19, 2004 through March 15, 2005, the claim per share is the lesser of (i) the purchase price less $5.196 (90-day average closing price) , or (ii) $0.450 per share (11/19/04 price decline).

(c)  retained at the end of March 15, 2005, the claim per share is the lesser of (i) the purchase price less $5.196 (90-day average closing price), or (ii) $0.860 per share (11/19/04 & 3/16/05 price declines).

3.  For shares of Aspen Technology common stock purchased from November 19, 2004 through March 15, 2005, and

(a)  sold prior to March 16, 2005 the claim per share is $0.

(b)  retained at the end of March 15, 2005, the claim per share is the lesser of (i) the purchase price less $5.196 (90-day average closing price), or (ii) $0.410 per share (3/16/05 price decline).

For Class Members who held AspenTech common stock at the beginning of the Class Period or made multiple purchases or sales during the Class Period, the first-in, first-out ("FIFO") method will be applied to such holdings, purchases and sales for purposes of calculating a claim. Under the FIFO method, sales of securities during the Class Period will be matched, in chronological order, first against shares held at the beginning of the Class Period. The remaining sales of shares during the Class Period will then be matched, in chronological order, against shares purchased during the Class Period.

A Class Member will be eligible to receive a distribution from the Net Settlement Fund only if such Class Member had a net loss, after all profits from transactions in AspenTech common stock during the Class Period are subtracted from all losses. However, the proceeds from sales of shares which are matched against shares held at the beginning of the Class Period will not be used in the calculation of such net loss.

The decisions cited above recognize that the goal of an equitable plan is fairness to the class, taking into consideration the strength of claims based on available facts and evidence, as well as the

- 19 -

size of the fund to be distributed. The Plan of Allocation in this case is based on such principles, and it falls with the mainstream of allocation plans routinely approved.

This Plan of Allocation is equitable to all Class Members. Moreover, the information required from a Class Member is easily obtainable and is easily verifiable by the Claims Administrator. The Plan of Allocation is, perforce, a fair and reasonable method of allocating the proceeds of this Settlement among Class Members. No objections to the Plan of Allocation by Class Members have been received.

Therefore, for all of the foregoing reasons, Lead Plaintiffs' counsel respectfully request that the Court approve the Plan of Allocation as submitted.

## VII.    CONCLUSION

For the reasons set forth above, Lead Plaintiffs respectfully request that this Court approve the Settlement as fair, reasonable and adequate, enter the proposed Order and Final Judgment certifying the Class, and approve the Plan of Allocation of settlement proceeds as fair, reasonable and adequate.

DATED: February 27, 2006                    Respectfully Submitted,


                                    /s/Theodore M. Hess-Mahan
                                    Thomas G. Shapiro BBO #454680
                                    Theodore M. Hess-Mahan BBO #557109
                                    Shapiro Haber & Urmy LLP
                                    53 State Street
                                    Boston, MA  02109
                                    Telephone:  617/439-3939

                                    Liaison Counsel

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA, JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
WILLIAM S. LERACH
DARREN J. ROBBINS
ELLEN GUSIKOFF STEWART
RAMZI ABADOU
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058

Lead Plaintiffs' Counsel

## CERTIFICATE OF SERVICE

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on February 27, 2006.

                           **/s/Theodore M. Hess-Mahan**
                           Theodore M. Hess-Mahan