UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re ASPEN TECHNOLOGY, INC. SECURITIES LITIGATION | ) ) ) | Master File No. 04-cv-12375-RCL |
| | ) | CLASS ACTION |
| This Document Relates To: | ) ) ) | DECLARATION OF SAMUEL H. RUDMAN IN SUPPORT OF LEAD |
| ALL ACTIONS. | ) ) ) | PLAINTIFFS' MOTION FOR (1) FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT PROCEEDS; AND (2) APPLICATION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ........................................................................................1

II.     TERMS OF THE SETTLEMENT.............................................................2

III.    BACKGROUND REGARDING THE DEFENDANTS IN THIS ACTION....................2

IV.    BACKGROUND, HISTORY AND CLAIMS ASSERTED IN THE ACTION ................3

V.     PLAINTIFFS' PROSECUTION OF THE CASE .........................................5

     A.    The Filing of the Litigation........................................................5

     B.    Appointment of Lead Plaintiffs ..................................................5

     C.    Lead Plaintiffs' Investigation and Filing of a Consolidated Amended Complaint..............................................................................5

     D.    Lead Counsel's Use of Consultants ............................................7

     E.    Settlement Negotiations..........................................................8

     F.    Confirmatory Discovery ..........................................................9

     G.    Preliminary Approval of Settlement and Mailing and Publication of Notice of Settlement ......................................................................10

VI.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT .........................11

     A.    The Settlement Was Fairly and Aggressively Negotiated by Counsel .................11

     B.    Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt..................................................................11

     C.    The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement................................13

VII.   THE PLAN OF ALLOCATION ..............................................................14

VIII.  FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD ................................................................17

     A.    Extent of Litigation...............................................................18

     B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases ..........................18

**Page**

C.    Standing and Expertise of Plaintiffs' Counsel ..........................................................21

D.    Standing and Caliber of Opposition Counsel ..........................................................21

IX.    CONCLUSION .........................................................................................................22

I, SAMUEL H. RUDMAN, declare as follows:

I, Samuel H. Rudman, respectfully submit this declaration (the "Declaration"), pursuant to Federal Rule of Civil Procedure 23(e), in support of: (i) Lead Plaintiffs' motion for this Court's final approval of the settlement of this class action and the proposed Plan of Allocation, which this Court preliminarily approved by the Order Preliminarily Approving Settlement, Providing for Notice and Scheduling Settlement Hearing ("Preliminary Approval Order"), dated December 12, 2005; and (ii) the application of Lead Plaintiffs' counsel for attorneys' fees and reimbursement of expenses.

## I.    INTRODUCTION

1.    I am a member of the law firm of Lerach Coughlin Stoia Geller Rudman & Robbins LLP, lead counsel for plaintiffs in this litigation. I have personal knowledge of the matters set forth herein based on my active participation in all material aspects of the prosecution and settlement of this litigation. I have also been kept informed of developments in the litigation by attorneys working under my direction. The information set forth in this Declaration is based on the personal knowledge gained during the course of this action and the settlement negotiations in this action, as well as through the information communicated to me by attorneys working under my supervision.

2.    This Declaration is submitted in support of the Court's consideration of: (a) the fairness, reasonableness and adequacy of the settlement of this action (the "Settlement") and the proposed Plan of Allocation, on the terms and conditions reflected in the Stipulation and Agreement of Compromise, Settlement and Release of Security Action, dated November 16, 2005 (the "Stipulation"); and (b) the application of Lead Plaintiffs' counsel for an award of attorneys' fees and reimbursement of expenses. Because this Declaration is submitted in support of a settlement, it is therefore privileged and inadmissible in any subsequent proceeding, other than in connection with the Settlement. This Declaration and the statements contained herein are without prejudice to Lead Plaintiffs' position on the merits in the event that the Settlement is not approved by the Court.

3.      As set forth herein, Lead Plaintiffs' counsel[1] expended 595.45 hours, valued at $225,419.75, in successfully litigating this case.

## II.   TERMS OF THE SETTLEMENT

4.      The Stipulation, entered into by the parties through their counsel, provides for payment of $5.6 million in cash, which was deposited in escrow and is earning interest for the benefit of the Class (the "Settlement Fund").[2]

5.      The settlement resolves all claims asserted by Lead Plaintiffs and the Class in this action against Aspen Technology, Inc. ("AspenTech" or the "Company") and individual defendants Lawrence B. Evans ("Evans"), David L. McQuillin ("McQuillin") , Lisa W. Zappala ("Zappala"), and Charles F. Kane ("Kane") (collectively, the "Individual Defendants,") (together with AspenTech, "Defendants").  Upon approval of the Settlement, this action shall be dismissed with prejudice, subject to the terms of the Stipulation and Order and Final Judgment.  The proposed settlement represents 100% of Defendants' damage estimate and 56% of their damage estimate based on a "plaintiff's model" of damages.  For the additional reasons set forth below, the terms of the Settlement and Plan of Allocation are fair, reasonable and adequate in all respects and, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, should be approved by this Court.

## III.   BACKGROUND REGARDING THE DEFENDANTS IN THIS ACTION

6.      The Class is defined as all persons or entities who purchased the common stock of AspenTech common stock between October 29, 1999 and March 15, 2005 – and who suffered

---

[1]      On July 1, 2004, the law firm of Geller Rudman PLLC merged with the law firm of Lerach Coughlin Stoia & Robbins LLP, forming Lerach Coughlin Stoia Geller Rudman & Robbins LLP. Accordingly, the time and expenses of both of these firms reflect the efforts of Lead Counsel.

[2]      All capitalized terms not defined herein shall have the same meanings as set forth in the Stipulation.

substantial damages as a result of the allegedly wrongful acts of Defendants. Excluded from the Class are Defendants, all of the officers, directors and partners thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any of the foregoing have or had a controlling interest.

7.      Defendant AspenTech supplies software products and services for the analysis, design and automation of process manufacturing facilities. The Company's software and services are used by companies in the chemical, petroleum, pharmaceuticals, pulp and paper, and metal industries. Its approximately 42.7 million publicly-traded shares of common stock are listed on the NASDAQ National Market ("NASDAQ") and actively trade under the symbol "AZPN."

8.      The Individual Defendants were officers of AspenTech during the Class Period, as follows:

(a)      Defendant Evans served as AspenTech's Chairman and was its Chief Executive Officer ("CEO") at all times relevant hereto until October 1, 2002, when he was replaced as CEO by McQuillin.

(b)      Defendant Zappala served as AspenTech's Chief Financial Officer ("CFO") from the beginning of the Class Period to July 1, 2003.

(c)      Defendant McQuillin served as AspenTech's President and CEO from October 1, 2002 to November 24, 2004, when he was forced out of his positions by AspenTech's Board of Directors.

(d)      Defendant Charles F. Kane ("Kane") has been AspenTech's CFO since July 1, 2003.

## IV.    BACKGROUND, HISTORY AND CLAIMS ASSERTED IN THE ACTION

9.      Lead Plaintiffs' claims relate to statements made by Defendants concerning the Company's financial condition and results of operations, including misrepresentations concerning

- 3 -

the Company's accounting and revenue policies and the filing of false and misleading financial statements with the SEC.

10.    The Consolidated Amended Complaint alleged that AspenTech engaged in improper accounting over an extended period of time which artificially inflated and distorted its financial results and that this accounting fraud was orchestrated at the highest levels of the Company.

11.    AspenTech has admitted that its financial statements for fiscal years 2000 through 2004 were materially false and misleading when issued and has restated those period statements. The Company has further admitted that it engaged in the improper accounting practices which served to artificially inflate and/or distort its reported financial results.

12.    AspenTech's accounting fraud came to light in a series of announcements starting in October 2004.  On October  27, 2004, AspenTech announced that its Audit Committee had undertaken a "detailed review" of the accounting for certain software and licensing service agreements and that as a result of that review, it would not be able to release its financial results for its first quarter.  Two days later, on October 29, 2004, AspenTech announced that federal prosecutors had launched a probe of the Company's accounting practices.  On November 18, 2004, AspenTech announced that due to the delay in filing its Form 10-Q for the period ending September 30, 2004, it had received a letter from the NASDAQ stock market indicating that the Company's common stock was subject to delisting.

13.    Then, on November 24, 2004, AspenTech issued a press release announcing that its Audit Committee believed that the Company would have to restate its financial statements for fiscal years 2000 through 2004 and, accordingly, those financial statements should not be relied on. AspenTech also announced that its Board of Directors had asked McQuillin to resign his positions with the Company immediately.  On January 31, 2005, AspenTech announced that its Audit

- 4 -

Committee had completed its work and had identified 16 transactions that were entered into during fiscal years 2000 through 2002 which were improperly accounted for. Finally, on March 15, 2005, AspenTech filed an amended Form 10-K for the year ended June 30, 2004, with the Securities and Exchange Commission ("SEC") (the "Amended 2004 Form 10-K"). In the Amended 2004 Form 10-K, AspenTech detailed the full extent of its improper accounting and set forth restated financial figures. In response to these announcements, the price of AspenTech stock declined more than 27% during the period from October 18, 2004 to March 16, 2005.

## V.    PLAINTIFFS' PROSECUTION OF THE CASE

### A.    The Filing of the Litigation

14.    Commencing on November 9, 2004, two related securities class actions were filed in the United States District Court for the District of Massachusetts.

### B.    Appointment of Lead Plaintiffs

15.    By Order dated February 6, 2005, the Court consolidated the related actions, appointed Lead Plaintiffs under §21D(a)(3)(B) of the Exchange Act and approved Lead Plaintiffs' selection of Lead Counsel, pursuant to §21(D)(a)(3)(B)(v) of the Exchange Act as amended by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(B).

### C.    Lead Plaintiffs' Investigation and Filing of a Consolidated Amended Complaint

16.    Immediately following their appointment, Lead Plaintiffs initiated an aggressive wide-ranging investigation into the facts and circumstances surrounding the statements made by Defendants. Lead Counsel thoroughly reviewed all publicly available information regarding AspenTech, including but not limited to, its SEC filings, financial statements, press releases, conference calls with analysts, reports about AspenTech and a wealth of analysts' reports and notes rendered by analysts. Further in this regard, Lead Plaintiffs retained a private investigator who

interviewed former AspenTech employees and other third parties with knowledge of AspenTech relating to the claims alleged.  Witnesses were interviewed, both at the management level and day-to-day operations level, who provided detailed information concerning  AspenTech's operations and specifically as they related to Lead Plaintiffs' allegations. The information derived from these interviews was important and provided Lead Plaintiffs' counsel with valuable insight into the case.

17.    Based on these interviews it became apparent that the accounting fraud perpetuated by AspenTech over a multi-year period had been orchestrated at the highest levels of the Company. A former AspenTech sales manager employed during the relevant time period contacted during the course of these investigations disclosed that Defendant McQuillin was actively engaged in manipulating the Company's sales transactions in order to maximize the effect on the price of AspenTech stock.  This former employee recounted sales meetings during which McQuillin stated, "[M]y stock options are getting too low and we need to get them up," and "how do I orchestrate the deals to get the stock price up?"  Lead Plaintiffs' investigation revealed that McQuillin and other senior executives routinely referred to their earnings manipulation practices as "keeping revenue in the freezer" in order to meet Wall Street estimates and smooth out the Company's reported operating results.   Other aspects of Lead Plaintiffs' investigation revealed that the Company was systematically engaged in premature revenue recognition and accounted for "consignment sales" as final sales in its reports to investors and the SEC.

18.    On August 26, 2005, Lead Plaintiffs filed a 92-page Consolidated Amended Complaint, which detailed their allegations in 180 paragraphs.  The Consolidated Amended Complaint thoroughly analyzed the statements made by Defendants during the Class Period and the reasons they were alleged to be materially false and misleading. The Amended Complaint addressed Defendants' improper accounting practices, including:

- *Side Agreements*: AspenTech entered into side agreements which changed the terms of sales agreements so that it could prematurely recognize revenue.

- *Consignment Sales*: AspenTech improperly recognized software license revenue on consignment sales. In this regard AspenTech prematurely recorded revenue on the delivery of software licenses that were nothing more than consignment arrangements.

- *Recognizing Revenue Before It Was Earned*: AspenTech recognized unearned software license revenue. AspenTech recognized revenue of software licenses before it had substantially performed its sales arrangement obligations entitling it to the benefits represented by the revenues.

- *Improperly Recognizing Maintenance Revenue*: AspenTech improperly recognized maintenance revenue through a variety of manipulations designed to allow it to prematurely record revenue.

19.    On October 31, 2005, the parties executed and the Court entered a Joint Stipulation and Order extending the time for Defendants to respond to the Consolidated Amended Complaint pending the filing of the Stipulation and motion for preliminary approval of the Settlement.

### D.    Lead Counsel's Use of Consultants

20.    During the litigation, Lead Plaintiffs' counsel conferred on many occasions with forensic accountants and consultants with expertise about accounting issues (specifically Generally Accepted Accounting Principles issues relating to whether AspenTech engaged in premature revenue recognition and artificially manipulated its financial results and the Company's lack of internal controls), the materiality of alleged omissions and damage analysis.  Lead Plaintiffs' counsel's in-house forensic accountants assisted counsel in their preparation of the Consolidated Amended Complaint and in preparing the mediation statement.

21.    Lead Plaintiffs' damage consultants analyzed the potential recoverable damages and the materiality of the alleged false and misleading statements.  The information provided by these consultants was instrumental in conducting settlement negotiations with Defendants and in formulating the Plan of Allocation of settlement proceeds in connection with the Settlement.

E.    **Settlement Negotiations**

22.    The negotiations that produced this settlement were substantial.  Prior to the September 14, 2005 mediation before Eric Green, a highly regarded and respected mediator, the parties prepared and exchanged detailed mediation statements, which included each side's claims and defenses, as well as damage analyses.  While the parties made significant progress at that mediation, no resolution was reached. Following that mediation, though, the parties continued to discuss an early resolution of the case.  While the issue of liability was not a primary focus of the discussions, the issue of damages represented a significant risk to Lead Plaintiffs' ultimate success. During the negotiations, Lead Plaintiffs' counsel provided Defendants with the amount of their potential damages calculations.  The response to Lead Plaintiffs' analysis was that Defendants hotly contested the cognizable damages incurred by plaintiffs due to the specific facts and circumstances of this litigation.  The Supreme Court's *Dura Pharm. v. Broudo*, __ U.S. __, 125 S. Ct. 1627 (2005) decision was a complicating factor in the parties' discussions of damages, especially given the length of the Class Period and the period of time for which restatements were made.

23.    These negotiations were extensive and involved numerous discussions among the parties.  After several weeks of negotiations, an agreement-in-principle to settle this litigation was reached.  The parties then negotiated the specific terms of the Settlement and drafted and redrafted settlement documents.  Throughout the course of these negotiations, all parties were represented by counsel with extensive experience in securities class actions.  There can be no question that the Settlement was the result of an adversarial process.

24.    In view of the extensive investigation conducted and the discussions that occurred during the settlement negotiations, Lead Plaintiffs' counsel have been able to identify the issues that are critical to the outcome of this case.  Lead Plaintiffs' counsel have considered the risks of litigation, the likelihood of getting past the motion to dismiss and summary judgment after expensive

discovery (and a likely "battle of experts") and, if successful, the substantial risk, expense and length of time to prosecute the litigation through trial and the inevitable subsequent appeals. Lead Plaintiffs' counsel have also considered the substantial monetary benefit provided by the Settlement in light of the risk of taking the case to trial. The Lead Plaintiffs were participants in this assessment and were consulted with and kept apprised concerning the settlement negotiations.

25.    Lead Plaintiffs' counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. We believe that our reputations as attorneys who are unafraid to zealously carry a meritorious case through the trial and appellate levels gave us a strong position in engaging in settlement negotiations with Defendants, even under the difficult and challenging circumstances presented here.

26.    After substantial negotiations concerning the final terms of the parties' settlement, the parties executed the Stipulation and submitted it to the Court for preliminary approval.

27.    Lead Plaintiffs' counsel respectfully submit that the Settlement represents a very good result for the Class under the circumstances. The Settlement will provide Class Members with a benefit now, without the very real risk of no recovery if the litigation were to continue.

### F.    Confirmatory Discovery

28.    After an agreement-in-principle to settle the action was reached, in mid-November 2005, Lead Plaintiffs' counsel conducted confirmatory discovery of Lead Plaintiffs' claims. Defendants produced extensive documentation for the transactions which gave rise to the Company's restatement of its prior period financial statements. Lead Plaintiffs' counsel also met with AspenTech's current CFO, Defendant Kane and Defendants' counsel to discuss the results of the discovery process and obtain further details concerning the problematic transactions.

29.    Based on Lead Plaintiffs' counsel's thorough review of the documents produced and our discussions with the Defendants concerning the scope of the investigation undertaken by the

Company, it is Lead Plaintiffs' counsel's belief that all relevant transactions and facts pertinent to Lead Plaintiffs' claims have been identified and that further litigation of these claims through fact discovery is unlikely to result in any additional material benefits to the Class, and indeed is likely to dissipate a substantial portion of the benefits that Class Members stand to receive.

**G.    Preliminary Approval of Settlement and Mailing and Publication of Notice of Settlement**

30.    On December 12, 2005, the Court preliminarily approved the terms of the Settlement and directed that Lead Counsel cause the mailing of the Notice of Proposed Settlement of Class Action, Motion for Attorneys' Fees and Settlement Fairness Hearing (the "Notice") and the Proof of Claim and Release form (the "Proof of Claim") to all potential Class Members identifiable with reasonable effort (the "Notice Order").

31.    The Court's Notice Order also directed Lead Plaintiffs' counsel to cause the Summary Notice for publication ("Summary Notice"), to be published in *The Wall Street Journal*.

32.    Submitted herewith is the Declaration of Carole K. Sylvester of Gilardi & Co. LLC, the Claims Administrator, which attests that Notices have been mailed to 37,093 potential Class Members, and that the Summary Notice was published in *The Wall Street Journal* on January 13, 2006, as directed by the Court.

33.    The Notice informed Class Members of the terms of the Settlement, the Plan of Allocation of the settlement proceeds and that Lead Plaintiffs' counsel would apply for an award of attorneys' fees of 25% of the Settlement Fund and reimbursement of expenses of approximately $150,000.

34.    The Notice also provided that any objections to the Settlement, the Plan of Allocation or the application for attorneys' fees and reimbursement of expenses had to be filed 15 days prior to the Settlement Hearing, or February 21, 2006. That date has now passed, and no member of the

Class has objected to the Settlement, the Plan of Allocation or to Lead Plaintiffs' counsel's application for attorneys' fees and reimbursement of expenses.

## VI.    FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.    The Settlement Was Fairly and Aggressively Negotiated by Counsel

35.    As set forth above, the terms of the Settlement were negotiated by the parties at arm's length through adversarial but good faith negotiations. The Settlement was the product of numerous conferences occurring over several months involving Lead Plaintiffs' counsel and Defendants' counsel. Throughout the course of those negotiations, all parties were represented by attorneys with extensive experience in securities litigation in general and securities class actions in particular. The Settlement was the result of an adversarial process designed to produce a fair, reasonable and adequate compromise.

### B.    Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt

36.    Another factor considered in assessing the merits of class action settlements – whether serious questions of law and fact exist – supports the conclusion that the Settlement is fair, reasonable and adequate to the Class. As in every complex case of this kind, Lead Plaintiffs faced formidable obstacles to recovery, both with respect to liability and damages. While Lead Plaintiffs and their counsel believe that their allegations have substantial merit, these Defendants have denied liability and assert that they possess absolute defenses to Lead Plaintiffs' claims.

37.    During the course of this litigation, Lead Plaintiffs believe that they developed significant evidence in support of their allegations. At the same time, however, they came to realize that equally significant hurdles existed such that prevailing at trial would be very difficult. Some of the major issues confronting plaintiffs were:

(a)    ***Restatement Issue*** – Defendants have continually maintained that the restatement of their financial results was the product of just 16 specific transactions that fell outside their published policies for revenue recognition and to revisions of their accounting policies to more accurately reflect the realities of AspenTech's on-going business relationships with customers and resellers.  Although Lead Plaintiffs continue to believe that even under Defendants' version of events, Defendants would be liable for securities fraud, there remains a material risk that the trier of fact would decide otherwise.

(b)    ***Scienter*** – Defendants have continually argued that Lead Plaintiffs will be unable to prove that Defendants knew that the Company's financial statements at issue were false when made.  Given the procedural posture of this case, Lead Plaintiffs must face this issue on any motion to dismiss filed by Defendants, then again on summary judgment and again at trial. Substantial risk exists that the trier of fact would find against Lead Plaintiffs on this issue. To prevail at trial Lead Plaintiffs would necessarily have to convince the jury that Defendants knew of the falsity of their statements or that they made them with a reckless disregard for the truth of the matter asserted.  Short of obtaining an admission of liability from Defendants themselves, this proof would necessarily be in the form of circumstantial evidence which is primarily within the control of the Defendants.

(c)    ***Loss causation and damages –*** Even if Lead Plaintiffs were to overcome the significant risks of proving liability, Lead Plaintiffs would still face the risks of proving damage for the entire Class Period.  Defendants have continually maintained that no purchaser of AspenTech common stock after August 15, 2002 – or two and one-half years prior to the end of the Class Period – could have sustained damage because AspenTech's restated results show that the Company's originally reported financial statements ***understated*** the Company's earnings and therefore could not

have resulted in artificially inflated prices for AspenTech securities. The determination of damages is complicated and requires expert testimony. At trial, the damage assessments of Lead Plaintiffs' and Defendants' experts are sure to vary substantially, and in the end, this crucial element at trial would be reduced to a "battle of experts." The reaction of a jury to such expert testimony is highly unpredictable and in such a battle, Lead Plaintiffs' counsel recognize the possibility that a jury could be swayed by convincing experts for the Defendants, and find that there were no damages or only a fraction of the amount of damages Lead Plaintiffs contended.

38.    Although Lead Plaintiffs' counsel believe that they would be able to provide admissible and convincing expert testimony as to damages, we also realize that in the "battle of experts," a jury might disagree with Lead Plaintiffs' experts. Thus, the risk of proving damages could not be eliminated until after a successful trial and the exhaustion of all appeals. Thus, even if Lead Plaintiffs prevailed in establishing liability, additional risks would remain in establishing both loss causation and the existence or amount of damages.

**C.    The Judgment of the Parties that the Settlement Is Fair and Reasonable Provides Additional Support for Approval of the Settlement**

39.    Another factor in considering whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable. As outlined above, the Settlement was the product of arm's-length negotiations between adversaries with significant experience in securities class action litigation.

40.    Lead Plaintiffs' counsel strongly believe that the settlement represents a very good resolution for the Class under the circumstances. As outlined above, the Settlement is fair, reasonable and adequate in all respects and should be approved by the Court.

## VII.    THE PLAN OF ALLOCATION

41.    Pursuant to the Notice Order and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a proper Proof of Claim form. As provided in the Stipulation, after deducting all appropriate taxes, administrative costs, attorneys' fees and reimbursement of expenses, the Settlement Fund (the "Net Settlement Fund") shall be distributed according to the Plan of Allocation.

42.    If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit valid Proof of Claim forms.

43.    The proposed Plan of Allocation provides:

(a)    The Net Settlement Fund will be distributed to Class Members who submit valid, timely Proof of Claim forms ("Authorized Claimants") under the Plan of Allocation described below. The Plan of Allocation provides that you will be eligible to participate in the distribution of the Net Settlement Fund only if you have a net loss on all transactions in AspenTech common stock during the Class Period.

(b)    For purposes of determining the amount an Authorized Claimant may recover under the Plan of Allocation, Lead Plaintiffs' counsel have consulted with their damage consultants and the Plan of Allocation reflects an assessment of the damages that they believe could have been recovered had Lead Plaintiffs prevailed at trial.

(c)    To the extent there are sufficient funds in the Net Settlement Fund, each Authorized Claimant will receive an amount equal to the Authorized Claimant's claim, as defined below. If, however, the amount in the Net Settlement Fund is not sufficient to permit payment of the total claim of each Authorized Claimant, then each Authorized Claimant shall be paid the percentage of the Net Settlement Fund that each Authorized Claimant's claim bears to the total of the claims of

all Authorized Claimants. Payment in this manner shall be deemed conclusive against all Authorized Claimants.

44.    A claim will be calculated as follows:

(a)    For shares of Aspen Technology common stock purchased from October 29, 1999 through October 28, 2004, and

(i)    sold prior to October 29, 2004, the claim per share is $0.

(ii)    sold between October 29, 2004 and November 18, 2004, the claim per share is the lesser of (1) the purchase price less $5.196 (90-day average closing price), or (2) $0.670 per share (10/29/04 price decline).

(iii)    sold between November 19, 2004 through March 15, 2005, the claim per share is the lesser of (1) the purchase price less $5.196 (90-day average closing price), or (2) $1.120 per share (10/29/04 & 11/19/04 price declines).

(iv)    retained at the end of March 15, 2005, the claim per share is the lesser of (1) the purchase price less $5.196 (90-day average closing price), or (2) $1.530 per share (10/29/04, 11/19/04 & 3/16/05 price declines).

(b)    For shares of Aspen Technology common stock purchased from October 29, 2004 through November 18, 2004, and

(i)    sold prior to November 19, 2004 the claim per share is $0.

(ii)    sold between November 19, 2004 through March 15, 2005, the claim per share is the lesser of (1) the purchase price less $5.196 (90-day average closing price), or (2) $0.450 per share (11/19/04 price decline).

- 15 -

(iii)    retained at the end of March 15, 2005, the claim per share is the lesser of (1) the purchase price less $5.196 (90-day average closing price), or (2) $0.860 per share (11/19/04 & 3/16/05 price declines).

(c)    For shares of Aspen Technology common stock purchased from November 19, 2004 through March 15, 2005, and

(i)    sold prior to March 16, 2005 the claim per share is $0.

(ii)    retained at the end of March 15, 2005, the claim per share is the lesser of (1) the purchase price less $5.196 (90-day average closing price), or (2) $0.410 per share (3/16/05 price decline).

45.    The date of purchase or sale is the "contract" or "trade" date as distinguished from the "settlement" date. The determination of the price paid per share and the price received per share, shall be exclusive of all commissions, taxes, fees and charges.

46.    For Class Members who held shares at the beginning of the Class Period or made multiple purchases or sales during the Class Period, the first-in, first-out ("FIFO") method will be applied to such holdings, purchases and sales for purposes of calculating a claim. Under the FIFO method, sales of shares during the Class Period will be matched, in chronological order, first against shares held at the beginning of the Class Period. The remaining sales of shares during the Class Period will then be matched, in chronological order, against shares purchased during the Class Period.

47.    This proposed Plan of Allocation was formulated after consultation with Lead Plaintiffs' damage expert in order to calculate a fair method to divide the Net Settlement Fund for distribution among Class Members. The proposed Plan of Allocation attempts to eliminate the effects of market forces unrelated to the alleged misrepresentations and omissions as well as simplify

- 16 -

claims administration with attendant reduced cost to the Class. Thus, the proposed Plan of Allocation is designed to fairly and rationally allocate the proceeds of this Settlement among Class Members in accordance with the relative damages suffered by purchasers during different time periods.

## VIII.  FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

48.    The Notice provides that Lead Plaintiffs' counsel may apply for an award of attorneys' fees of up to 25% of the Settlement Fund, plus expenses of approximately $150,000.00. Lead Plaintiffs' counsel has already spent 595.45 hours litigating this case, which is valued at $225,419.75, based on the firms' current rates, and incurred $163,640.65 in out-of-pocket expenses.

49.    Lead Plaintiffs' counsel achieved this very favorable result for the Class at great risk and substantial expense to themselves.  They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Litigation to a successful conclusion.  As explained above, this litigation involved highly technical allegations of financial statement fraud.  In order to fully understand the extent of Defendants' Class Period conduct and statements, Lead Plaintiffs' counsel was required to gain a full and complete understanding of the technical aspects of AspenTech's business and its revenue recognition procedures.  Had Lead Plaintiffs' counsel not committed the appropriate resources to this action, there would likely have been no recovery at all for Lead Plaintiffs and the Class.  Accordingly, the requested fee is reasonable based on the quality of Lead Plaintiffs' counsel's work and the substantial benefit obtained for Class Members.

50.    Lead Plaintiffs' counsel's compensation for the services rendered is wholly contingent.  Lead Plaintiffs' counsel, in seeking reimbursement of expenses, has averred that the expenses are reflected in the books and records maintained by the firms and are an accurate recording of the expenses incurred.  In total, Lead Plaintiffs' counsel has incurred reimbursable

expenses in the amount of $163,640.65.  Included in this amount are the fees paid to Lead Plaintiffs' consultants, investigators and experts who provided us with extensive assistance during this litigation.  I respectfully submit that all of these expenses are reasonable and were necessarily incurred in connection with the prosecution of this litigation.

### A.    Extent of Litigation

51.    As described above, this case was settled only after Lead Plaintiffs' counsel had conducted an extensive investigation into the Class's claims, interviewed numerous witnesses, thoroughly researched the facts and law applicable to the Class's claims and Defendants' defenses, prepared and filed a fact-specific detailed Consolidated Amended Complaint specifying Defendants' alleged violations of the federal securities laws,  considered the risks of continued litigation in light of extensive investigation and engaged in extensive settlement negotiations with Defendants' counsel, resulting in a beneficial Settlement for the Class.

### B.    The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases

52.    This litigation was undertaken by Lead Plaintiffs' counsel on a wholly-contingent basis.  From the outset, we understood that we were embarking on a complex, expensive and lengthy litigation with no guarantee of ever being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, we were obligated to assure that sufficient attorney resources were dedicated to the prosecution of this litigation and that funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails.

53.    Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.  With an average lag time of three to four years

for these cases to conclude, the financial burden on contingent counsel is far greater than on a firm that is paid on an ongoing basis.

54.    In addition to advancing litigation expenses and paying overhead, counsel faced the possibility of no recovery.  It is wrong to assume that a law firm handling complex contingent litigation always wins.  Tens of thousands of hours have been expended in losing efforts.  The factor labeled by the courts as "the risks of litigation" is not an empty phrase.

55.    There are numerous cases where plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation.  It is only because defendants and their counsel know that the leading members of the plaintiffs' securities bar are actually prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary, that meaningful settlements in actions such as this can occur.

56.    I am aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the plaintiffs' bar produced no fee for counsel.  Indeed, federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases.  *See, e.g.*, *Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *Ziemba v. Cascade Int'l., Inc.*, 256 F.3d 1194 (11th Cir. 2001); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v. GE*, 101 F.3d 263 (2d Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996);

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos*., 75 F.3d 801 (2d Cir. 1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204 (4th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271 (D.C. Cir. 1994); *Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994); *Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993); *Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993).

57.     The many recent appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery.  *See Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (en banc) (reversing plaintiffs' verdict for securities fraud and ordering entry of judgment for defendants); *In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Levitin v. PaineWebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997).  Moreover, even plaintiffs who succeed at trial may find their judgment overturned on appeal.  *See*, *e.g.*, *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (same).

58.    Losses such as those cited above are exceedingly expensive.  The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state and local authorities.  Moreover, changes in the law through legislation or judicial decree can be catastrophic; frequently affecting all of contingent counsel's pending cases.

59.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies.  Vigorous private enforcement of the federal securities laws and state corporation laws can only occur if private plaintiffs can obtain parity in representation with that available to large corporate interests.  If this important public policy is to be carried out, the courts must award fees which will adequately compensate private plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

60.    Lead Plaintiffs' counsel undertook to act for the Class in this matter, aware that they would only be compensated by obtaining a successful result.  The benefits conferred on Lead Plaintiffs and the Class by this Settlement are particularly noteworthy in that a Settlement Fund worth $5.6 million was obtained for the Class.

**C.    Standing and Expertise of Plaintiffs' Counsel**

61.    The expertise and experience of plaintiffs' counsel are described in their resumes attached to their declarations in support of a fee and expense award submitted herewith.  Plaintiffs' counsel, including Lead Plaintiffs' Lead Counsel, are among the most experienced and skilled practitioners in the securities litigation field.

**D.    Standing and Caliber of Opposition Counsel**

62.    The Defendants are represented by Skadden, Arps, Slate, Meagher & Flom LLP , which is among the largest and most respected defense firms in the country, and possess substantial

experience and expertise in the defense of complex securities litigation. In the face of this formidable opposition, Lead Plaintiffs' counsel developed their case so as to persuade the Defendants to settle the case on a basis favorable to the Class.

## IX.    CONCLUSION

63.    For the reasons set forth above, I respectfully submit that (a) the Settlement and Plan of Allocation are fair, reasonable and adequate and should be approved; and (b) the application for attorneys' fees and reimbursement of expenses should be granted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. If called as a witness, I could and would competently testify thereto.

Executed this 27 day of February, 2006 at Melville, New York.

SAMUEL H. RUDMAN

S:\Settlement\Aspen.set\LONG DECL 00028424.doc

- 23 -

CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2006, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which will send notification of such filing to the e-mail

addresses denoted on the attached Electronic Mail Notice List, and I hereby certify the foregoing

document or paper has been mailed via the United States Postal Service to the non-CM/ECF

participants indicated on the attached Manual Notice List.

s/ THOMAS G. SHAPIRO
THOMAS G. SHAPIRO

SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
Telephone: 617/439-3939
617/439-0134 (fax)
E-mail: tshapiro@shulaw.com

# Mailing Information for a Case 1:04-cv-12375-JLT

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kevin B. Currid**
  kcurrid@foleyhoag.com

- **Thomas J. Dougherty**
  dougherty@skadden.com tholden@skadden.com

- **John A.D. Gilmore**
  john.gilmore@dlapiper.com

- **Theodore M. Hess-Mahan**
  ted@shulaw.com

- **David Pastor**
  dpastor@gilmanpastor.com rdambrosio@gilmanpastor.com

- **Thomas G. Shapiro**
  tshapiro@shulaw.com sgeresy@shulaw.com

- **Nicholas C. Theodorou**
  ntheodor@foleyhoag.com

- **Brandon F. White**
  bfwhite@foleyhoag.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Mario Alba, Jr
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
200 Broadhollow Road
Suite 406
Melville, NY 11747

Ellen Gusikoff Stewart
Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP
655 West Broadway
Suite 1900
San Diego, CA 92101

Richard Maniskas
Schiffrin & Barroway
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004

David A. Rosenfeld
Cauley, Geller, Bowman, Coates & Rudman, LLP
```

200 Broadhollow Rd.
Suite 406
Melville, NY 11747

**Samuel H. Rudman**
Cauley, Geller, Bowman, Coates & Rudman, LLP
200 Broadhollow Rd.
Suite 406
Melville, NY 11747

**Marc A. Topaz**
Schiffrin & Barroway, LLP
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004

John J. Falvey, Jr.
Testa, Hurwitz & Thibeault, LLP
High Street Tower, 125 High Street
Boston, MA 02110